IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

        v.                                                                                          Case No. 22-cr-767 KWR

MARC CANDELARIA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Objection to the Government's Expert Notice (Doc. 66). Having considered the briefing and the relevant law, the Court finds that Defendant's objection is not well-taken, and therefore, is **OVERRULED**.

## BACKGROUND

Defendant Marc Candelaria was indicted on a two count Indictment for bank robbery in violation of 18 U.S.C. §2113(a) and bank fraud in violation of 18 U.S.C. §1344(2).

On October 10, 2023, the Government filed a Notice of Intent to Offer Expert Witness Testimony. Doc. 63. On October 16, 2023, Defendant filed a Motion to Exclude Government Expert Witness Testimony specifically as to proposed witness, Peter J. Belcastro. Doc. 66. Defendant asks this Court to hold a *Daubert* hearing to determine if Mr. Belcastro's expert testimony is admissible pursuant to Rule 104(a). *Id*. at 1.

**LEGAL STANDARD**

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods, and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[1]

Fed. R. Evid. 702.  The touchstone of admissibility under Rule 702 is helpfulness to the trier of fact.  *See Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991).  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant.  509 U.S. 579, 597 (1993); *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline).

The gate-keeping function involves a two-step analysis.  First, the Court must determine whether the witness may be qualified as an expert.  To qualify as an expert, the witness must possess such "knowledge, skill, experience, training, or education" in the particular field so that it appears that his or her opinion rests on a substantial foundation and tends to aid the trier of fact in its search for the truth.  *See* Fed. R. Evid. 702; *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004).  "Rule

---

[1] Federal Rule of Evidence 702 has been revised effective December 1, 2023.  Since this trial will occur after the effective date, this Court analyzes Defendant's objection under the revised FRE 702.  However, the Court's decision on Defendant's objection reaches the same outcome under either formulation of FRE 702.

702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991).

Second, if the witness is so qualified, the Court must determine whether the expert's opinions are reliable under the principles set forth in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  In *Daubert*, the Supreme Court identified five factors that may or may not be pertinent in assessing reliability: (1) the theory or technique in question can be and has been tested; (2) it has been subjected to peer review and publication; (3) it has a known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community.  509 U.S. at 593–94.

Under *Kumho Tire*, a reliability finding is a prerequisite for all expert testimony in areas beyond the knowledge and experience of lay jurors, not just technical or scientific evidence.  When assessing the reliability of a proposed expert's testimony, the Court may consider the *Daubert* factors to the extent relevant, which will depend on the nature of the issue, the expert's particular expertise, and the subject of his testimony.  *Kumho Tire*, 526 U.S. at 150–51.  "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Kumho*, 526 U.S. at 139.

Where an expert witness's testimony is based on experience, the expert witness must explain how his experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  *See United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

Rule 702 further requires that expert testimony is relevant. One aspect of relevance is that the opinions have a sufficient factual basis and a reliable application of the methodology to the facts. *Daubert*, 509 U.S. at 591.

Although the Court is required to conduct a *Daubert* examination of all experts before it, it need only expressly address the specific objections raised by the parties. *United States v. Avitia-Guillen*, 680 F.3d 1253, 1259 (10th Cir. 2012) ("When a party fails to object to an expert's methodology, the district court need not make explicit findings."). The proponent of the expert bears the burden by a preponderance of the evidence to establish that the requirements for admissibility have been met. *See Nacchio*, 555 F.3d at 1251.

"Faced with a proffer of expert scientific testimony…the trial judge must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) citing, *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. "It is within the discretion of the trial court to determine *how* to perform its gatekeeping function under *Daubert*." *Goebel* 215 F.3d at 1087. "The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated." *Id*. citing, *Hynes v. Energy West, Inc.*, 211 F.3d 1193, 1203-04 (10th Cir. 2000); *United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999); *United States v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997).

"Nothing requires the Court to hold a formal *Daubert* hearing in advance of qualifying an expert." *United States v. Hunt*, 464 F. Supp. 3d 1252, (W.D. Okla. 2020), aff'd, 63 F.4th 1229 (10th Cir. 2023) citing, *Goebel*, 215 F.3d at 1087; *Kumho*, 526 U.S. at 152. "[W]hen faced with a party's objection, [the court] must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Avitia-Guillen*, 680 F.3d at 1256 citing, *Goebel*, 215 F.3d at 1088.

4

"[A]n appellate court must have before it a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law…Daubert is extensive, requiring the district court to "carefully and meticulously" review the proffered scientific evidence." *Call*, 129 F.3d at 1406 citing, *Robinson v. Missouri Pacific*, 16 F.3d 1083, 1089 (10th Cir. 1994); *United States v. Hunt*, 63 F.4th 1229, 1242-43 (10th Cir. 2023); *Adamscheck v. Am. Fam. Mut. Ins. Co.*, 818 F.3d 576, 586 (10th Cir. 2016). As long as a district court analyzes the *Daubert* factors and addresses a defendant's arguments, the gatekeeping role of a court is satisfied. *Hunt*, 63 F.4th at 1244. Therefore, in considering parties' briefings, in addition to conducting a *Daubert* and Rule 702 analysis, such a proceeding may be unnecessary. *Id*., at 1252 citing, *United States v. Ashburn*, 88 F. Supp. 3d 239, 244 (E.D.N.Y. 2015).

## DISCUSSION

**As explained below, the Government has shown by a preponderance of the evidence that the expert's testimony is admissible under Fed. R. Evid. 702, and the Court overrules Defendant's objections.**

A. **Admissibility of Mr. Peter Belcastro's Testimony**

Defendant argues that FBI Forensic Analyst Peter Belcastro should not be allowed to testify as to the results of the forensic document examination and analysis of a handwritten demand note found in Defendant's vehicle. Doc. 66 at 1. The handwritten demand note is potentially implicated in the October 30, 2021, Santa Fe bank robbery Defendant has been charged with. *Id*. The Government contends Mr. Belcastro's examination and testimony comply with administrative and technical verifications as required by standard operating procedures. Doc. 73 at 2. Mr. Belcastro is a trained and qualified expert, and his findings are both highly probative and relevant as to whether Defendant committed the charged crime. *Id*.

1. **Qualifications**

Defendant contests Mr. Belcastro's qualifications. Specifically, Defendant asserts that Mr. Belcastro is insufficiently qualified as an expert in his field because he is not certified by the American Board of Forensic Document Examiners. Doc. 66 at 6. The Government contends Mr. Belcastro has the necessary educational and training credentials, in addition to career experience with the FBI to qualify as an expert. Doc. 73 at 13. Mr. Belcastro undergoes bi-annual forensic proficiency tests in addition to having conducted thousands of document examinations, rendered over thirty opinions, and previously submitted without challenge forensic examinations and opinions to several courts. *Id*. Not only is handwriting analysis generally accepted under *Daubert*, but Mr. Belcastro's experience, forensic training, and credentials qualify his testimony as reliable and admissible under FRE 702.

Mr. Belcastro received a Bachelor of Science from the University of Maryland and a Master's of Forensic Sciences degree from The George Washington University. Doc. 73, Ex. 9. Mr. Belcastro has been a Forensic Document Examiner at the FBI Laboratory in Quantico, Virginia since August 1995. *Id*. Mr. Belcastro has received annual forensics trainings and attended numerous professional meetings and lectures since 1995. *Id*. Over the course of his career, Mr. Belcastro has been a member of the Mid-Atlantic Association of Forensic Scientists ("MAAFS") and the Midwestern Association of Forensic Scientists ("MAFS"). *Id*. Since 1997, Mr. Belcastro has conducted dozens of forensics lectures and training lectures with the FBI, law enforcement agencies, and the MAAFS and MAFS. *Id*. In 2022, Mr. Belcastro published as co-author, two peer-reviewed works discussing handwriting forensics. *Id*. Within the last five years, Mr. Belcastro has provided expert testimony to courts on at least four occasions, including to the United States District Court for the Eastern District of Oklahoma. *Id*. Neither the Government nor Defendant dispute Mr. Belcastro's experience.

Defendant argues that Mr. Belcastro's lack of certification from the American Board of Forensic Document Examiners disqualifies him as an expert. Defendant has neither explained nor provided case law demonstrating that this certification is necessary to be deemed a qualified forensics expert. Nor does Defendant dispute Mr. Belcastro's education or experience. *See* Doc. 66, Ex. A. In considering Mr. Belcastro's knowledge, skill, education, and experience from the record, forensics falls "within the reasonable confines" of his expertise. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969-70 (10th Cir. 2001); *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1519–20 (10th Cir.1996). Mr. Belcasto's qualifications and opinion rest on a substantial foundation that tend to aid the trier of fact in its search of truth. *See* Fed. R. Evid. 702; *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir.2004). Without Mr. Belcastro's expertise from his skill, knowledge, education, and experience in forensics, it is unlikely that the trier of fact would be able to understand the evidence at issue. *McDonald*, 933 F.2d at 1522. Given Mr. Belcastro's extensive knowledge, skill, education, and experience in his decades with the FBI, the Court finds that he is qualified as an expert in the field of forensics. *See Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013); *LifeWise Master Funding,* 374 F.3d at 928; *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir.1990).

2. **Reliability**

Defendant argues that forensic handwriting analysis, the methodology employed by Mr. Belcastro, is not scientifically reliable under FRE 702 and *Daubert*. Doc. 66 at 3-4. Defendant contends that Mr. Belcastro and others in published works, have doubted whether forensic document examination can be tested and is a reliable theory. *Id*. at 4-5. Defendant asserts that because forensic document examination is dominated by law enforcement and with few academics, acceptance by the law enforcement community is of minimal value in determining reliability under *Daubert*. *Id*. Overall, forensic document examination is highly subjective and arbitrary because examiners ultimately

7

determine forensic matches and therefore, unreliable. *Id*. at 5-6. The Court finds that forensic document examination, including Mr. Belcastro's methodology and protocols, satisfy the *Daubert* reliability standard.

The reliability inquiry "is a 'flexible one.'" *United States v. Baines*, 573 F.3d 979, 989 (10th Cir. 2009) (quoting *Daubert*, 509 U.S. at 594). The *Daubert* factors are neither exclusive nor definitive; expert testimony need not meet all of them to be deemed sufficiently reliable. *Id.*; *United States v. Medina-Copete*, 757 F.3d 1092, 1103 (10th Cir. 2014). A court need not discuss all factors; "[a] district court's gate-keeping function is more flexible than that, requiring the court to focus its attention on the specific factors implicated by the circumstances at hand." *Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1190 (10th Cir. 2014). The "reliability criteria enunciated in *Daubert* are not to be applied woodenly in all circumstances." *Medina-Copete*, 757 F.3d at 1103 (quoting *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009)).

In fulfilling a district court's gatekeeping role, a court cannot rest its decision solely on the admission of similar forensic evidence by other courts, but rather should carefully assess the reliability of a methodology under *Daubert*. *Hunt*, 63 F.4th at 1243; . However, it is well-established both within this Circuit and others, that handwriting forensics analysis, while subject to criticism by both courts and academic literature as not a traditional science[2], is admissible as a reliable methodology under *Daubert* and FRE 702. *See United States v. Foust,* 989 F.3d 842 (10th Cir.), cert. denied, 142 S. Ct. 294, 211 L. Ed. 2d 137 (2021); *United States v. Yass*, No. 08-40008-JAR, 2008 WL 5377827 (D. Kan. Dec. 19, 2008); *United States v. Hernandez*, 42 F. App'x 173 (10th Cir. 2002); *United States v. Mornan*, 413 F.3d 372, 380 (3d Cir.2005); *United States v. Crisp*, 324 F.3d 261, 269–70 (4th Cir.2003); *United States v.*

---

[2] *See e.g., Almeciga v. Ctr. for Investigative Reporting, Inc*., 185 F. Supp. 3d 401 (S.D.N.Y. 2016); Jennifer L. Mnookin, Scripting Expertise: The History of Handwriting Identification Evidence and the Judicial Construction of Reliability, 87 Va. L. Rev. 1723 (2001).

*Mooney*, 315 F.3d 54, 63 (1st Cir.2002); *United States v. Paul*, 175 F.3d 906, 909–11 (11th Cir.1999); *United States v. Jones*, 107 F.3d 1147, 1160–61 (6th Cir.1997).

Despite this record of admissibility, this Court will carefully and meticulously review the proffered scientific evidence and arguments of both parties to assess this methodology's reliability under *Daubert*. The first *Daubert* factor asks if an expert's theory has been and can be tested. *Daubert*, 509 U.S. at 592-94, 113 S.Ct. 2786. Defendant contends – without citation – that forensic document examination cannot be quantitatively tested, and that Mr. Belcastro has admitted as much in a co-authored published work. Doc. 66 at 4-5. Specifically, Defendant states that Mr. Belcastro's study concluded, "[t]here is, currently, no generally accepted quantitative model that can be used as the basis for source conclusion decisions by the FDEs." *Id*. "[T]here are no precise criteria or thresholds that clearly delineate what constitutes sufficient information to make a specific conclusion for a given comparison." *Id*.

The Government argues that handwriting, while unique, can be consistently distinguished through forensics document examinations based on objective characteristics from individual to individual. Doc. 73 at 16. The Government cites numerous empirical studies in which the individuality of handwriting has been tested and correctly attributed to a specific author with a high interval of confidence through comparison analysis and the matching of handwriting features. *See* Doc. 73, Exs. 3, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18.[3]

---

[3] Exhibit 3, "Individuality of Handwriting" by Sagur N. Srihari *et al*., concludes that through individual discriminability via a machine-learning approach to handwriting analysis, we "were able to establish with a 98% confidence that the writer can be identified," with this being inferable over the entire U.S. population with a 95% degree of confidence. *See* Ex. 3 at 16. Exhibits 7 and 8 conclude that the handwriting of twin siblings can exhibit similarities in appearance and characteristics compared to non-twin siblings, distinguishing handwriting from other writers. *See* Exs. 7 and 8. Exhibit 10 concludes that the verification error rate between twin and non-twin handwriting can be reduced to less than 4% and 0.5%, respectively, concluding that the "difference of error rates shows that handwriting of identical twins is more similar than that of fraternal twins." Ex. 10 at 445-46. Exhibit 12 concludes that through document retrieval of a document set of 975 writers, using a computer-based system, "using only macro features, the identification rate is around 60%; using macro features plus micro features extracted only from 10 characters, the identification rate is 89.1%; using macro features and micro features extracted from all 62 classes, the identification rate is 97.94%." Ex. 12 at 6. Exhibit 15 concluded, "the quantification of handwriting

While Defendant offers a study co-authored by Mr. Belcastro to dispute the testability of forensic document examinations, the Court finds this argument unconvincing. Nor does Defendant offer any further empirical evidence to rebut the Government's argument and evidence as to the testability of forensic document examination. Although handwriting analysis is an experience-based expertise, it has been held to still be subject to other forms of testing such as criminal investigations, court proceedings, certifications, proficiency exams, training, etc. *Foust*, 989 F.3d at 846 citing, *United States v. Baines*, 573 F.3d 979, 990 (10th Cir. 2009). The numerous empirical studies and conclusions in the Government's exhibits discussed in footnote three demonstrate that forensics document examinations, including the exam conducted by Mr. Belcastro, are a well-established methodology that can be tested and relied on with a high degree of confidence. The methodology employed by the FBI and Mr. Belcastro in the forensic examination at issue uses the same form and features of forensic analysis as those in the empirical studies cited by the Government. *See* Exs. 2, 21. While Defendant is correct in his assertion that there is a degree of subjectivity in forensic document examination, which lacks a purely non-subjective quantitative model, such subjectivity does not invalidate this methodology. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. The subjective elements of forensic document examinations inevitably rely on objective criteria and characteristics employed by examiners. *See* Exs. 2, 21. Furthermore, the forensic document examinations conducted by the FBI and specifically Mr. Belcastro, as accredited labs, are subject to peer review including by secondary examiners. Doc. 72 at 20. Nor do Mr. Belcastro's statements and conclusions in his co-authored works, when taken in full context, refute or contradict the numerous empirical studies cited by the Government confirming the testability of forensic document examination. Given the record of admissibility within this Circuit and

---

by the assignment of a graph to each character provides a very powerful basis for biometric identification…for use in determining the identity of an unknown author of a writing sample." Ex. 15 at 13. These exhibits, in addition to others provided by the Government, reach similar conclusions and attest to the consistent testing and broader accuracy and reliability of handwriting forensic document examination.

others, in addition to the evidence offered by the parties, the Court finds forensic document examination, the methodology applied here, has been and can be tested.  Therefore, the first *Daubert* factor favors admissibility.

The second *Daubert* factor asks whether this methodology has been subject to peer review and publication.  *Daubert*, 590 U.S. at 593-94, 113 S.Ct. 2786.  Defendant does not contest that forensic document examination is subject to peer review and publication.  The Government cites numerous peer reviewed publications of handwriting forensic document examination.  *See* Doc. 73 at 19-20; footnote three.  Furthermore, the Government argues, and the Court finds that peer review occurs as standard operating procedures within Mr. Belcastro's lab as part of its forensic document examination process.  *Id*.  Therefore, this factor favors admissibility.

The third *Daubert* factor asks whether this methodology has a potential or known error rate.  *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786.  Defendant implicitly argues forensic document examination has a high error rate.  In questioning its reliability, Defendant cites Mr. Belcastro's co-authored piece stating, "participants only repeated 68% of their own conclusions."  Doc. 66 at 5.  Additionally, Defendant argues handwriting analysis is highly subjective and therefore, unreliable.  *Id*.  The Government argues that numerous empirical studies establish that forensic document examinations consistently outperform laypersons in handwriting identification examinations.  *See* Doc. 73, Exs. 4, 5, 6, 25, 26, 27, 28; footnote three.

Handwriting analysis inherently relies on subjective judgment, which cuts against admissibility.  *Foust*, 989 F.3d at 846 citing, *Baines*, 573 F.3d at 991.  Given this reliance on subjectivity does not generally support admission, it has been held that such a factor "has less relevance in the specific context of handwriting comparison."  *Id*. citing, *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167.  Furthermore, Defendant has not provided evidence refuting the numerous studies the Government has

offered establishing reliable and consistent performance of forensic document examinations, including error rates. Defendant cites a singular figure from a published work co-authored by Mr. Belcastro as to the exact repeatability of the study participants. Doc. 66 at 5. In weighing Mr. Belcastro's co-authored work in its full context in addition to the numerous empirical studies offered by the Government, the Court finds forensic document analysis has potential error rates and is used with a high degree of confidence. Defendant's assertion does not refute the empirical data cited by the Government as to the error rates of forensic document analysis. Furthermore, Defendant's argument that subjectivity renders this methodology unreliable has been held to be of less relevance in this forensic area. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. Accordingly, the Court agrees with the Government that forensic document examinations and the methodology employed by Mr. Belcastro have potential or known error rates but are used with a high degree of confidence. Defendant has not proffered sufficient evidence establishing otherwise. Therefore, the known or potential error rates factor satisfies *Daubert*.

      The fourth *Daubert* factor is the existence and maintenance of standards controlling the methodology and its operation. *Daubert*, 113 S.Ct. 594. Defendant has not challenged or offered evidence refuting the existence and maintenance of standards controlling the methodology employed by Mr. Belcastro or forensic document examinations more broadly. The Government asserts that published standards created by the Scientific Working Group for Forensic Document Examination (SWGDOC) are followed in forensic document examinations, including those conducted by Mr. Belcastro. *See* Doc. 73, Exs. 19, 20, 21. These standards include minimum training requirements, terminology, conclusion definitions, the processes for receiving, storing, and documenting evidence, and examination steps. *Id*. The FBI incorporates SWGDOC and ASB standards whenever possible, which were followed by Mr. Belcastro in this case. *Id*. The FBI laboratory where this forensics analysis occurred is an accredited lab meeting specific standards set forth by the American National Standards Institute (ANSI) National

Accreditation Board. Doc. 73 at 19, Ex. 22. While Defendant asserts that forensics document examinations, including those conducted by Mr. Belcastro, are subjective, Defendant does not challenge the existence and maintenance of controlling standards. Similar to potential or known error rates, subjectivity may cut against admissibility, however, this factor too has less relevance in the context of handwriting analysis. *Foust*, 989 F.3d at 846 citing, *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. Subjectivity itself does not preclude reliability. Through the various procedures and standards that guide forensic document examinations, including this examination, there are clearly standards that exist to maintain reliable and consistent forensics analyses. To the extent that forensic document examinations have some degree of subjectivity, the Government has established, and Defendant does not dispute that common forensics standards governed the methodology employed by Mr. Belcastro. Therefore, the Court finds this factor favors admissibility.

The fifth *Daubert* factor asks whether the methodology employed is widely accepted within a relevant community. *Daubert*, 590 U.S. at 594, 113 S.Ct. 2786. Defendant argues that forensic document examinations are widely accepted by law enforcement agents but not academics. Doc. 66 at 5. Therefore, widespread acceptance carries minimal value in determining admissibility. *Id*. The Government posits that numerous national, international, and regional associations as well as universities recognize forensic document examinations. *See* Doc. 73 at 20, Ex. 24. Apart from the FBI, the Bureau of Alcohol, Tobacco, Firearms and Explosives; United States Secret Service; Drug Enforcement Agency; Postal Inspection Service; and others all employ forensic document analysis. *Id*. Lastly, the Government contends that handwriting identification analysis has long been recognized as a reliable methodology by courts. Doc. 73 at 21.

Even if Defendant's argument as to law enforcement bias within document forensics were true, while acceptance by unbiased experts would carry even greater weight, general acceptance by other

experts in a field should be considered. *Baines*, 573 F.3d at 991. The Tenth Circuit previously rejected a similar argument offered by the defendant in *Baines* asserting law enforcement bias regarding fingerprint analysis as to *Daubert's* fifth factor. *Id.*; *see Kumho Tire*, 526 U.S. at 156, 119 S.Ct. 1167. As to handwriting analysis specifically, this Court finds widespread acceptance within the relevant community. Forensics document examinations are widely practiced and studied by numerous universities and law enforcement agencies as a reliable methodology. *Id*. Handwriting analysis has been tested, is subject to peer review and publication, its error rates are known, and there are standards controlling its operation. *See* footnote three, Ex. 21. While Defendant asserts forensics analysis is not accepted by an impartial scientific community, after *Kumho Tire*, such a distinction is irrelevant. *Id*. Given the longstanding and increasingly widespread acceptance of forensic handwriting comparison within the relevant community, this factor weighs in favor of admissibility. *Foust* 989 F.3d at 846 citing, *Crisp*, F.3d at 271.

      Handwriting comparison specifically, since it is not a traditional science, does not correspond perfectly with the *Daubert* factors. *Id*. at 846-47. The *Daubert* factors are "meant to be helpful, not definitive." *Id*. citing, *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. The Government has demonstrated that it is more likely than not that Mr. Belcastro's testimony will assist the trier of fact through his expert knowledge to understand the evidence and determine facts in issue. His testimony is rooted in sufficient facts and data that are the product of reliable principles and methods. Mr. Belcastro's opinion reflects a reliable application of the principles and methods of forensic document examination to this case. Therefore, in weighing the *Daubert* factors and FRE 702, longstanding acceptance of this methodology by courts, and Mr. Belcastro's examination, this Court finds the Government's expert testimony is sufficiently reliable and therefore, admissible.

### 3. Relevance

The Court finds Mr. Belcastro's testimony will assist the trier of fact and is therefore, relevant. *United States v. Wofford*, 766 F. App'x 576, 581 (10th Cir. 2019) citing, *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006).  Mr. Belcastro will testify as to whether the handwritten demand note found in Defendant's vehicle is likely Defendant's handwriting based on forensics document examination.  Mr. Belcastro's testimony and specialized knowledge will help the jury "understand evidence [and] determine a fact in issue." Fed. R. Evid. 702(a).  Furthermore, Mr. Belcastro's opinion has a sufficient factual basis and reflects a reliable application of the methodology to the facts. *See Daubert*, 590 U.S. at 591.  Handwriting forensics are not within a juror's common knowledge and experience nor will Mr. Belcastro's testimony usurp a jury's role in evaluating his credibility.  Given this, the record does not support a finding that Mr. Belcastro's testimony would be cumulative and unnecessary as Defendant asserts.  The Court concludes that Mr. Belcastro is qualified to give the proposed testimony, that his testimony is both relevant and reliable, and that such testimony will assist the jury.  Therefore, Mr. Belcastro's testimony is admissible.

### B. Defendant's *Daubert* Hearing Request is Denied

Trial judges have considerable leeway in deciding how to go about determining if an expert is reliable and "to decide whether or when special briefing or other proceedings are needed to investigate reliability." *Kumho*, 526 U.S. at 152.  "It is within the discretion of the trial court to determine *how* to perform its gatekeeping function under *Daubert*." *Goebel,* 215 F.3d at 1087.  While the most common method of fulfilling this function is through a *Daubert* hearing, such a process is not mandated.  *Id*. citing, *Hynes*, 211 F.3d at 1203-04; *Charley*, 189 F.3d at 1266; *Call*, 129 F.3d at 1405.  Courts need not engage in "unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted" nor is Rule 702 "intended to provide an excuse for an automatic

challenge to the testimony of every expert." *Kumho*, 526 U.S. at 152; Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments. The Federal Rules of Evidence "seek to avoid 'unjustifiable expense and delay' as part of their search for 'truth' and the 'just determine[ation] of proceedings." *Kumho*, 526 U.S. at 152 citing, Fed. R. Evid. 102.

This Court has made specific findings, carefully and meticulously reviewed the proffered scientific evidence and arguments of both parties, and applied the relevant law. *Avitia-Guillen*, 680 F.3d at 1256 citing, *Goebel*, 215 F.3d at 1088; *Dodge*, 328 F.3d at 1223. "As long as a district court analyzes the *Daubert* factors and addresses a defendant's arguments, the gatekeeping role of a court is satisfied." *Hunt*, 63 F.4th at 1244. Therefore, having done so, in considering the parties' briefings and conducting a *Daubert* and Rule 702 analysis, this Court finds a *Daubert* hearing unnecessary. *See Hunt*, 464 F. Supp. 3d at 1252 citing, *Ashburn*, 88 F. Supp. 3d at 244.

**IT IS THEREFORE ORDERED** that Defendant's Objection to the Government's Expert Notice (Doc. 66) is **OVERRULED**.

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE