1             IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW MEXICO

3    _____
                                )
4    UNITED STATES OF AMERICA,   )      No. 1:22-cr-00767-KWR
                                )
5             Plaintiff,         )
                                )
6        vs.                    )      Pecos Courtroom
                                )      Albuquerque, New Mexico
7    MARC CANDELARIA,            )
                                )      December 18, 2023
8             Defendant.         )      9:04 a.m.
     _____)

9

10                  TRANSCRIPT OF PROCEEDINGS
                        MOTION TO SUPPRESS
11            BEFORE THE HONORABLE KEA W. RIGGS
                  UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14   For the Plaintiff:   SAMUEL A. HURTADO, ESQ.
                         NATASHA MOGHADAM, ESQ.
15                        Assistant United States Attorneys
                         201 Third Street NW, Suite 900
16                        Albuquerque, New Mexico  87102

17
     For the Defendant:   BUCK T. GLANZ, ESQ.
18                        EMILY P. CAREY, ESQ.
                         Federal Public Defender
19                        111 Lomas Boulevard NW, Suite 501
                         Albuquerque, New Mexico  87102
20

21   REPORTED BY:         ANDREA M. LYNCH, RPR, NM CCR #127
                         United States Court Reporter
22                        333 Lomas Boulevard Northwest
                         Albuquerque, New Mexico  87102
23                        Phone:  (505) 348-2093
                         Email:  Andrea_Lynch@nmd.uscourts.gov
24
         Proceedings recorded by mechanical stenography; transcript
25   produced by Computer-Aided Transcription.

I N D E X

                                                              Page

SAMUEL HARTMAN for the Government
    Direct Examination by Mr. Hurtado                         9:4
    Cross-Examination by Mr. Glanz                           24:13

MEAGHAN HENNELLY for the Government
    Direct Examination by Mr. Hurtado                        31:6
    Cross-Examination by Mr. Glanz                           49:14

Defense Argument                                             56:13

Government's Response                                        59:21

Court Reporter's Certificate                                 62:1

```
 1                        GOVERNMENT'S EXHIBITS

 2

 3    1    Photograph                                  8:25

 4    2    License Plate                               8:25

 5    3    FBI Consent to Search Form                  8:25

 6    4    Progressive Policy Details                  8:25

 7    5    Screenshot SFPD E-mail                      8:25

 8    6    SFPD Letter                                 8:25

 9    7    Copy of Check                               8:25

10    8    Bank Receipt & Cashier's Check              8:25

11    9    Release of Lien                             8:25

12   10    Bill of Sale                                8:25

13   11    Demand Note                                 8:25

14   12    Demand Note                                 8:25

15

16

17

18

19

20

21

22

23

24

25
```

1          <u>December 18, 2023</u>

2      (In open court at 9:04 a.m.)

3          THE COURT:  Good morning.  We are here for a hearing

4  on a motion to suppress in United States v. Marc Candelaria,

5  22-cr-767.

6          Would counsel for the United States identify

7  yourselves for the record.

8          MR. HURTADO:  Yes, ma'am, Your Honor.  Good morning.

9  Samuel Hurtado and Natasha Moghadam for the United States.

10          THE COURT:  Good morning.

11          Counsel for the defense?

12          MR. GLANZ:  Good morning, Your Honor.  Buck Glanz and

13  Emily Carey on behalf of Mr. Candelaria, who's not present but

14  is appearing by audio through Zoom.

15          THE COURT:  Mr. Glanz, I have a problem of not being

16  able to see your client's face.  Is there a reason he is not

17  appearing by video?

18          MR. GLANZ:  Your Honor, he did join but said he was

19  disconnected.  I don't know if he's having an issue with

20  service because of storms on the East Coast at the moment.

21  He's in New York state.  We can ask him to try to connect again

22  by video.

23          THE COURT:  Yes, if you would.

24          Mr. Candelaria, if you would try to connect again by

25  video, please.

1          THE COURTROOM DEPUTY:  Sorry, Judge, it was muted.  If
2   you want to try it again.
3          THE COURT:  Mr. Candelaria, if you would try to -- I
4   need to see your face, sir.  This is Judge Riggs.  If you would
5   try to connect again by video, please.
6          THE DEFENDANT:  Judge Riggs, can you hear me?
7          THE COURT:  I can.
8          THE DEFENDANT:  I'm trying to connect with video and
9   it's not working.  I don't know if it's the internet connection
10  or what.  I can mute it.
11         THE COURT:  Counsel, I'm a little uncomfortable
12  proceeding without being able to see the defendant's face.
13         Mr. Hurtado, on behalf of the United States, your
14  thoughts?
15         MR. HURTADO:  I would agree, Your Honor.  And the
16  reason the United States shares the Court's concern is that the
17  Government's willing to produce witnesses to testify this
18  morning at the hearing.  Part of their testimony includes being
19  able to identify the defendant in this case.  As such, if his
20  video feature is turned off, the United States will be in a
21  position to not be able to identify Mr. Candelaria.
22         THE COURT:  Mr. Glanz, on behalf of the defense?
23         MR. GLANZ:  And, Your Honor, as always, I prefer to
24  have to my client present or at the very least by video, but if
25  he's unable to connect, I'm at a loss of how we can address it

1    at this time.  I would not oppose a reset if the Court is

2    inclined to agree to that.

3            MR. HURTADO:  Your Honor, if I may address counsel's

4    proposed resolution?  Your Honor, I would respectfully ask the

5    Court to please proceed.  I do have one of the Government's

6    witnesses who flew in from St. Louis, Missouri, specifically to

7    be here today.  So it would be -- I would submit to the Court

8    that's a compelling basis to proceed with this hearing and try

9    to get Mr. Candelaria to get his video feature to work on his

10   computer.

11           THE COURT:  Absolutely.

12           Mr. Candelaria, can you hear the Court?

13           THE DEFENDANT:  Yeah.

14           THE COURT:  Yes, ma'am.

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  All right.  Thank you.

17           Mr. Candelaria, we are not going to be able to proceed

18   without seeing your face, so I need for you to get to a

19   computer immediately where we can see your face.  I have a

20   witness who has flown in from St. Louis just to be here for

21   this hearing.  The only reason that the Court agreed to this

22   was because we would be able to see your face, and it is

23   imperative to be able to proceed here, sir.

24           I am very disinclined to continue this hearing.  So

25   I'm going to give you about 15 minutes to take care of the

1  issue and if that doesn't help, then we'll have to take other

2  measures.

3          We'll be in recess.

4          THE DEFENDANT:  Thank you, Your Honor.

5      (Recess taken from 9:08 a.m. to 9:21 a.m.)

6          THE COURT:  All right.  We are back on the record in

7  United States v. Marc Candelaria, 22-cr-767.  I see

8  Mr. Candelaria appearing by video.

9          Thank you for doing that, Mr. Candelaria.  If you

10  would keep yourself on mute, unless you are asked to respond,

11  the Court would appreciate that.

12          That being said, I understand that the United States

13  has two witnesses; is that correct?

14          MR. HURTADO:  Yes, ma'am, Your Honor, that's correct.

15          THE COURT:  And who will be your first witness?

16          MR. HURTADO:  It will be FBI Agent Sam Hartman.

17          THE COURT:  All right.  Thank you.

18          And the defense has no witnesses?

19          MR. GLANZ:  That's correct, Your Honor; however, we

20  would ask the Court to invoke the rule of exclusion.

21          THE COURT:  All right.  The rule has been invoked.

22          Mr. Hurtado, are you ready to proceed?

23          MR. HURTADO:  Your Honor, there is one preliminary

24  matter before I get started.  I had the opportunity to confer

25  with defense counsel regarding the admissibility of the certain

1    exhibits.  I wanted to provide a copy of those exhibits to the

2    Court at this time.  It's my understanding that defense has no

3    objection to their admissibility.

4            THE COURT:  Thank you.  If you would, you may

5    approach.

6            MR. HURTADO:  And with that said, Your Honor, the

7    United States at this time would call Agent Hartman.

8            THE COURT:  Thank you.

9            Agent, if you would come forward, please, up the right

10   side of the courtroom in front of the jury box.  There is a

11   step up to this witness stand.  Please watch your step.

12           Could I get you to raise your right hand.

13      (The witness was duly sworn.)

14           THE COURT:  You may be seated.

15           Mr. Hurtado, before you begin, are you moving

16   admission of these exhibits?

17           MR. HURTADO:  Yes, ma'am, I am.  At this time the

18   United States would move to admit Government Exhibits 1

19   through 12.  I apologize for neglecting to do that earlier.

20           THE COURT:  No problem.

21           Any objection?

22           MR. GLANZ:  No, Your Honor.

23           THE COURT:  All right.  The Court will admit

24   Exhibits 1 through 12, and you may proceed.

25      (Government's Exhibits 1-12 admitted into evidence.)

1    MR. HURTADO:  Yes, Your Honor.

2                     SAMUEL HARTMAN

3         (being duly sworn, testified as follows:)

4                   DIRECT EXAMINATION

5    BY MR. HURTADO:

6    Q.  Agent, could you please identify yourself by name.

7    A.  Special Agent Samuel Hartman, FBI.

8    Q.  As a special agent, briefly describe your duties.

9    A.  Currently, I'm assigned to the Joint Terrorism Task Force

10   in the Memphis Division of the FBI.  Prior to that I served

11   nine years in the Santa Fe office of the FBI -- Santa Fe,

12   New Mexico.  At that time I investigated numerous violations of

13   Title 18 to include bank robbery.

14   Q.  How long total have you been an FBI agent?

15   A.  Over 14 years.

16   Q.  Now, are you familiar with a criminal investigation

17   involving a suspect named Marc Candelaria?

18   A.  I am.

19   Q.  Okay.  Could you please identify Mr. Candelaria for the

20   record?

21   A.  Yes.  He's on the screen here.

22   Q.  Okay.  Can you just briefly describe, perhaps, what he's

23   wearing?

24   A.  He's wearing a dark-colored shirt with a collar, looks like

25   a -- maybe a button-up.

1    MR. HURTADO:  Your Honor, at this time the United

2    States would move to have the defendant identified by way of

3    Special Agent Hartman's testimony.

4    THE COURT:  The record will so reflect that the agent

5    has identified the defendant.

6    Q.   (BY MR. HURTADO) Now, sir, what was your role in the

7    investigation involving Mr. Candelaria?

8    A.   I was the first case agent.

9    Q.   Okay.  Now, can you please describe to the Court the

10   investigation involving Mr. Candelaria and how you came to be

11   involved?

12   A.   Yes.  So on October 30th, 2021, Bank of America up in

13   Santa Fe, I believe on Paseo De Peralta, was robbed on a

14   Saturday morning around noon.  At the time, our duty agent --

15   you know, over the weekends we have an agent that will respond

16   to crimes if needed.  So a duty agent responded, took the

17   initial witness statements and notified me as a bank robber

18   investigative agent.  So when Monday came around, my supervisor

19   assigned me as the case agent, and I opened the investigation

20   looking into this matter.

21   Q.   How did Mr. Candelaria come to be a suspect in that bank

22   robbery?

23   A.   Mr. Candelaria became a suspect on or about November 29th,

24   2021.

25   Q.   How so?

1   A.  At the same time -- or I think about a month prior, the

2   Santa Fe Police Department had an investigation into a home

3   invasion and a check fraud case.  So the Santa Fe Police

4   Department had executed a search warrant on Mr. Candelaria's

5   home and vehicle, and during that search warrant they had found

6   a bank robbery demand note in the vehicle, and they -- they

7   recognized the similarities between the demand note that was

8   used in the bank robbery I was investigating and so they

9   contacted me.

10  Q.  What were some of those similarities?

11  A.  Some of the similarities were -- as described by the

12  witnesses -- the victim tellers of the bank and in the letter

13  some of them were:  No alarms, no dye packs, and that the

14  cartel was making the withdrawal.

15  Q.  So as I understand your testimony, there were similarities

16  in the language that was used?

17  A.  Yes.

18  Q.  Okay.  Now, you indicated that the Santa Fe Police

19  Department was conducting a parallel home invasion

20  investigation; is that correct?

21  A.  Yes.

22  Q.  Can you briefly summarize the facts of that home invasion?

23  A.  As I understand, because I'm not with the Santa Fe Police

24  Department, but as was briefed to me, that they had identified

25  Mr. Candelaria as a subject of their case where he entered the

1    home of a Mr. Hennelly and attacked him, causing some

2    life-threatening injuries, and during that home invasion had

3    obtained a blank check with Mr. Hennelly's signature on it.

4    After that home invasion, the blank check was written out to

5    and signed by Mr. Candelaria for, I believe, $23,000.

6    Q.   Did this home invasion investigation -- or the home

7    invasion crime occur on or about September 14th, 2021?

8    A.   Yes.

9    Q.   So just several weeks before the bank robbery on

10   October 30th, 2021; is that correct?

11   A.   That is correct.

12   Q.   I just want to make sure I have the timeline correct.

13       Now, fast-forwarding to the bank investigation, the bank

14   robbery investigation that you were conducting, did you -- how

15   did you go about conducting that investigation?

16   A.   You know, it started off with, you know, witness

17   statements, the victim teller statements from the bank, started

18   off by canvassing the neighborhood, looking for individuals

19   that lived in and around the bank that was robbed, asking them

20   if they saw anybody that day, if they had any video, maybe, on

21   some outside cameras around their property.  That's how we

22   started.

23   Q.   Now, did you ever make contact with an individual named

24   Meaghan Hennelly?

25   A.   I did.

Q.   When did you make contact with Ms. Hennelly?

A.   November 30th.

Q.   Of 2021?

A.   Yes.  Yes.

Q.   And, again, please describe to the Court how you came to have contact with Ms. Hennelly on November 30th, 2021.

A.   So the day prior, on November 29th, I was contacted by the Santa Fe Police Department, where they notified me of this bank robbery demand note that they had found in the vehicle they searched, I think either that day or the day prior.  During those conversations, they advised me that they were going to have Ms. Hennelly come to the office on November 30th, and they were going to interview her for their investigation, and they also suggested and advised me that if I wanted an opportunity to interview Ms. Hennelly about the bank robbery, that I could attempt to do so.

Q.   Did you decide to take the Santa Fe Police up on their offer?

A.   I did.

Q.   And so what happened on November 30th, 2021?

A.   Ms. Hennelly came into the Santa Fe Police Department. Prior to my interview, she had an interview with detectives with the Santa Fe Police Department about their investigation. I wasn't in the room at that time.  I was on the outside. After they concluded their interview, they invited me in to

1  begin my interview with Ms. Hennelly regarding the bank

2  robbery.

3  Q.  Now, I need to you explain to the Court, why did you want

4  to speak with Ms. Hennelly as opposed to somebody else?

5  A.  Because Ms. Hennelly was the registrant of the vehicle that

6  the Santa Fe Police Department had searched a day or two prior

7  and was currently located in their impound lot at that time.

8  Q.  Now, I just want to clarify one statement or one word that

9  you used.  You indicated that Ms. Hennelly was the

10  "registrant."  Does that mean the registered owner of the

11  vehicle?

12  A.  Yes.

13  Q.  And what was the vehicle that you were investigating?

14  A.  It was a 2017 Volkswagen, four-door.

15  Q.  Now, Agent, I'd like to publish at this time what has been

16  marked for identification and already admitted as Government

17  Exhibit 1.

18      Do you recognize Government Exhibit 1?

19  A.  I do.

20  Q.  And how could you recognize it?

21  A.  That is the vehicle that we searched.

22  Q.  Now, going back to your interview of Ms. Hennelly, could

23  you tell the Court, more or less, how old Ms. Hennelly was?

24  And you don't have to give me a precise date, but was she at

25  least of adult age?

1   A.   Yes.

2   Q.   Okay.  And when you approached Ms. Hennelly, describe the

3   context, the circumstances.  For example, was it in a room?

4   Was it outside?  Was --

5   A.   It was in a -- it was in kind of like a small conference

6   room, so similar to the rectangle table there.  I believe it

7   was, like, oval shaped with chairs on both sides of the table.

8   Ms. Hennelly was on one side.  I was on the other, and, you

9   know, I remember the Santa Fe Police detectives were in the

10  room as well.

11  Q.   How many other detectives were in there?

12  A.   I believe two remained in the room.

13  Q.   Now, how were those detectives dressed?

14  A.   I believe they had identifying information that would have

15  said -- sometimes they wear, like, long-sleeve shirts or polos,

16  but they'll say "Santa Fe Police Department" on them.

17  Q.   Do you remember whether their firearms were displayed?

18  A.   Yes.

19  Q.   And how about you; how were you dressed that day?

20  A.   I was probably -- I was not wearing a suit.  You know,

21  probably some regular pants, tennis shoes, and I was -- usually

22  concealed my firearm.

23  Q.   Street attire?

24  A.   Street attire.

25  Q.   Okay.  Did you identify yourself to Ms. Hennelly?

1    A.   Yes.

2    Q.   Do you remember more or less what time you made contact

3    with Ms. Hennelly?

4    A.   I don't remember.  I want to say it was earlier in the day.

5    Q.   So morning time as opposed to daytime?

6    A.   Yes.

7    Q.   When you spoke with Ms. Hennelly, what observations did you

8    make about her demeanor and tone of voice towards you?

9    A.   It was, you know, just a regular conversation with her as

10   noncombative.  Yeah, friendly.

11   Q.   Was there anything to indicate that Ms. Hennelly may have

12   been under the influence of drugs or alcohol or been laboring

13   under some sort of mental impairment or difficulty?

14   A.   No.

15   Q.   Did she respond adequately to your questions?

16   A.   Yes.

17   Q.   Appropriately?

18   A.   Yes.

19   Q.   Okay.  Did you advise Ms. Hennelly of her Miranda rights?

20   A.   I did not.

21   Q.   And why was that?

22   A.   Ms. Hennelly wasn't the subject of the investigation.  You

23   know, we don't Mirandize everybody we talk to.  So at that time

24   she was just a witness.

25   Q.   Did she appear cooperative with you?

1    A.   Yes.

2    Q.   What sort of things did you ask Ms. Hennelly?

3    A.   I asked her, you know, her whereabouts on October 30th, the

4    day of the bank robbery, asked her if she knew the whereabouts

5    of Mr. Candelaria and just, you know, generally asked about

6    that day.

7    Q.   Did you also ask her for consent to search the vehicle?

8    A.   I did.

9    Q.   And what was her response?

10   A.   Yes.

11   Q.   That you could search the vehicle?

12   A.   Yes.

13   Q.   Now, Agent, let me publish for you what has been marked for

14   identification and already admitted as Government Exhibit 2.

15   Can you see Government Exhibit 2 on the screen there?

16   A.   I can.

17   Q.   Can you describe what that is?

18   A.   This is at license plate that was on the vehicle we

19   searched.

20   Q.   Now, when you obtained Ms. Hennelly's consent to search the

21   vehicle, did you present her with any sort of forms?

22   A.   Yes, our FBI consent to search form.

23   Q.   Now, Agent, I've just published what has been marked for

24   identification and admitted as Government Exhibit 3.  Do you

25   recognize that item?

1   A.   I do.

2   Q.   What is that?

3   A.   That's a FBI Consent to Search Form.

4   Q.   Can you just generally describe the language that's

5   contained in Government Exhibit 3?

6   A.   Yes.   Up top it states that the FBI, specifically special

7   agents, are asking for permission to complete a search, and

8   then it has you describe the persons, places or things you're

9   wanting to search.   Specifically on this form it's the 2017

10  Volkswagen Jetta, and then, of course, the VIN number is there

11  as well.   And down below it states that the individual giving

12  consent can refuse at any time and that they're giving this

13  permission voluntarily.   And then, finally, it finishes with

14  the signature of the individual giving consent.

15  Q.   So --

16  A.   Plus a witness.   Sorry.

17  Q.   Now, can you -- by the way, you're able to use the screen

18  to circle or make notes.   Can you circle where Ms. Meaghan

19  signed the form?

20  A.   Yes.

21  Q.   Okay.   And can you circle where she dated the form.   Okay.

22       Now, did you witness her sign this form?

23  A.   Yes.

24  Q.   And whose signature appears at the bottom towards the

25  signature block that reads, quote, "Witness," unquote?

1    A.    That is Detective Hilderbrandt's.

2    Q.    Was she -- she was there with you during the interview?

3    A.    Yes.

4    Q.    And now I'm going over to the second page, same exhibit,

5    that being Government Exhibit 3.   What's on this second page?

6    A.    The second page is the certification where we notify the

7    individual that gave us permission to search, gave us consent,

8    that the search was complete.

9    Q.    And when did you present this to Ms. Hennelly?

10   A.    According to the document, it was at 4:04 p.m.

11   Q.    And did Ms. Hennelly also sign this page?

12   A.    Yes.

13   Q.    And where is her signature noted?

14   A.    Her signature is here.

15   Q.    And whose signature appears below that in the signature

16   block that reads "Special Agent Federal Bureau of Investigation

17   U.S. Department of Justice"?

18   A.    That's my signature.

19   Q.    And how about the other signature block that reads "Special

20   Agent Federal Bureau of Investigation"?

21   A.    That's Special Agent Jose Cortez's signature.

22   Q.    Okay.   How long did you speak with Ms. Hennelly during the

23   interview?

24   A.    Maybe an hour.

25   Q.    And, again, this was in Santa Fe, New Mexico, correct?

1    A.   Correct.

2    Q.   County of Santa Fe?

3    A.   Yes.

4    Q.   Did Ms. Hennelly ever inform you that Mr. Candelaria, the

5    defendant, also used that vehicle?

6    A.   Yes.

7    Q.   Okay.  What did she say about -- or how did she describe

8    Mr. Candelaria's use of the vehicle?

9    A.   She described it as they had purchased the second

10   vehicle -- or meaning she, she had purchased it for him to

11   drive back and forth to work.

12   Q.   Did she ever indicate to you whether she used the vehicle

13   at all?

14   A.   I don't remember her indicating yes or no.

15   Q.   Do you know whether she had access to that vehicle?

16   A.   Yes, she did.

17   Q.   How so?

18   A.   Well, she was the one that purchased it, and she was the

19   registered owner of it.  The lien on the vehicle was in her

20   name.

21   Q.   Okay.  Did you have any reason to believe that Ms. Hennelly

22   did not have authority to give you consent to search the

23   vehicle?

24   A.   I didn't.

25   Q.   You did?

1  A.  I did not.

2  Q.  You did not.  Okay.

3      When were you made aware that Mr. Candelaria also used the

4  vehicle that you intended to search?  Was it during the

5  interview with Ms. Hennelly?

6  A.  Well, I knew, just based on conversations with the police

7  department, the day before.

8  Q.  With that said, why did you not reach out to Mr. Candelaria

9  to obtain his consent to search the Volkswagen Jetta?

10 A.  Primarily she was listed as the sole owner of the vehicle,

11 and in discussions with the Santa Fe Police Department -- at

12 the time I was notified, the vehicle was in their impound lot.

13 So I had discussions with the police department, where I asked

14 them if Mr. Candelaria had access to the vehicle or who was

15 allowed to come pick it up.  They had notified me that only

16 Ms. Hennelly could because she was the sole owner of the

17 vehicle.  So knowing that information, that it was going back

18 to her and that she didn't have to give the vehicle back to

19 Mr. Candelaria, is the reason why.

20 Q.  Now, I want you to contemplate a hypothetical here.  Let's

21 say you had spoken to Ms. Hennelly and requested her consent to

22 search the vehicle, and she responded by telling you, "No.  I

23 don't want to give you consent"?

24     In other words, let's say Ms. Hennelly denied consent to

25 search the vehicle.  What would have been your next step in the

1   investigation at that point in time?

2   A.  I would have sought a search warrant.

3   Q.  Okay.  Based on your training and experience do you believe

4   you would have obtained a search warrant?

5   A.  Yes.

6   Q.  And what would have been the basis for your probable cause

7   for that hypothetical search warrant?

8   A.  The basis would have been the bank robbery demand note.

9   Q.  And, again, you indicated, I believe, that the Santa Fe

10  Police Department had already obtained a search warrant for

11  Mr. Candelaria's vehicle, correct?

12  A.  Yes.

13  Q.  Okay.  Now, Agent, when did you search the vehicle?

14  A.  November 30th.

15  Q.  So the same day that you interviewed Ms. Hennelly?

16  A.  Yes.

17  Q.  Now, what did you find?

18  A.  We found the bank robbery demand note in the passenger

19  side -- front passenger seat visor.

20  Q.  Now, Agent, let met publish what has been marked and

21  identified and admitted as Government Exhibit 11.  Do you

22  recognize that document?

23  A.  Yeah.  Can I clear the --

24  Q.  Yes.

25  A.  Oh, okay.  Yes.

Q.   What's depicted in Government Exhibit 11?

A.   That is the bank robbery demand note.

Q.   And the bank robbery demand note, is that how it appeared to you at the time that you and perhaps other agents found it at the time?

A.   Yes.

Q.   Okay.  Now, let me show you what has been marked, identified and admitted as Government Exhibit 12.  Do you recognize that item?

A.   I do.

Q.   What is that?

A.   That is the demand note from the vehicle.

        MR. HURTADO:  Your Honor, may I have a brief moment to confer with my co-counsel?

        THE COURT:  You may.

        MR. HURTADO:  Thank you.

        Your Honor, the United States has no further questions at this time.  United States passes the witness.

        THE COURT:  Thank you.

        Cross-examination.

        MR. GLANZ:  Thank you, Your Honor.

        Your Honor, I don't wish to delay the hearing unnecessarily at this time.  We've already had enough delay this morning, but I would move for the disclosure of any materials covered by Rule 26.2, as the agent has testified;

1   however, I am prepared to proceed with cross-examination.

2          THE COURT:  All right.

3          MR. HURTADO:  Your Honor, upon information and belief

4   the United States has disclosed all exculpatory materials

5   pursuant to *Brady v. Maryland* and its progeny.  I don't have

6   any basis to believe that the United States has not complied

7   with any reports that the agent has prepared in connection with

8   this case.  As such, the United States submits that it has

9   complied with Rule 26.2 at this time.

10          THE COURT:  All right.  Thank you.

11          You may proceed, Mr. Glanz.

12          MR. GLANZ:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. GLANZ:

15  Q.  Good morning, Agent Hartman.

16  A.  Good morning.

17  Q.  Thank you for being here today.

18          So you testified that you were first contacted by the

19  Santa Fe Police Department on or around the 29th or 28th of

20  November?

21  A.  As I recall, yes.

22  Q.  And you said it was Detective Hilderbrandt who contacted

23  you?

24  A.  I'm sorry?

25  Q.  You said it was Detective Hilderbrandt who contacted you?

1   A.  I don't think I said that she was the one that contacted
2   me.  I believe it was Sergeant Champlin that contacted me.
3   Q.  Okay.  And they notified you that they had performed a
4   traffic stop on the vehicle, the Volkswagen Jetta, you had
5   mentioned?
6   A.  Whether there was a traffic stop or not, the genesis that
7   started their search warrant, I'm not sure.  I just know they
8   conducted a search warrant.
9   Q.  Okay.  But they seized the vehicle and taken it to the
10  impound lot --
11  A.  Yes.
12  Q.  -- to perform that search warrant?
13  A.  Again, I wasn't present on where the search warrant was
14  conducted, whether it was conducted in -- off-site.  I just
15  know it was impounded, and that's where I conducted my search
16  was at the impound lot.
17  Q.  And they told you it was driven at that time by
18  Mr. Candelaria?
19  A.  I believe so, yes.
20  Q.  And I think you testified that at that time you were the
21  case agent on the bank robbery?
22  A.  Yes.
23  Q.  And you had testified that as part of your investigation
24  you had viewed surveillance footage?
25  A.  Yes.

1    Q.   And so in your opinion at that time you already did believe

2    that the bank robber was a male; is that correct?

3    A.   Yes.

4    Q.   So you proceeded to the impound lot based on this call from

5    Santa Fe PD, and you said you spoke to Ms. Hennelly there,

6    right?

7    A.   I didn't speak to her at the impound lot.  I spoke to her

8    at the police department on the 30th.

9    Q.   Okay.  So you did interview her that day at the impound --

10   or, I'm sorry, at the police station, the Santa Fe Police

11   station?

12   A.   Yes.

13   Q.   Now, on direct examination the Government asked you if

14   Ms. Hennelly had told you whether or not she used the vehicle,

15   and you said you didn't recall; is that correct?

16   A.   Yes.

17   Q.   Now, in preparation for this hearing today, do you review

18   the Government's response to the motion to suppress?

19   A.   I reviewed it -- I don't know.  When was that? -- a month

20   ago.

21   Q.   So you have read the document?

22   A.   Yes.

23   Q.   Now, would it surprise you to learn that, I believe, on

24   Page 5 of the Government's response, it says Ms. Hennelly told

25   you on the 30th that she did not use the vehicle -- used it

1  only rarely?  I'm sorry.

2  A.  Okay.

3  Q.  So do you have any reason to believe that's not true?

4  A.  I don't have any reason to believe.

5  Q.  So then, even though you don't remember it, you agree it's

6  likely she told you on November 30th that she rarely used the

7  vehicle?

8  A.  If those were the facts, yes.

9  Q.  That she had bought it for Mr. Candelaria's use?

10  A.  Yes.

11  Q.  Okay.  And that although she financed it, Mr. Candelaria

12  reimbursed her for those payments?

13  A.  I'm not sure.

14  Q.  Okay.  Now, also, when you talked to Ms. Hennelly, she had

15  arrived at the Santa Fe Police station voluntarily, correct?

16  A.  Yes.

17  Q.  And she didn't drive the Volvo there -- I'm sorry, the

18  Volkswagen there obviously because it had been impounded,

19  right?

20  A.  Right.

21  Q.  And I know this seems like an obvious question, but when a

22  vehicle is impounded, it's in the police custody, right?  They

23  have exclusive control over it?

24  A.  Right.

25  Q.  Meaning an individual generally cannot just walk in there

1  and drive the vehicle away?

2  A.  Right.

3  Q.  They would have to have the law enforcement agency consent

4  to them taking the vehicle?

5  A.  Correct.

6  Q.  And so even though Ms. Hennelly was the registered owner of

7  the vehicle, she herself could not just take the vehicle

8  without Santa Fe Police's permission?

9  A.  She couldn't.  She would have to pay the towing fee, and

10 they already notified me that when the vehicle was ready for

11 release, it could only be released to her.

12 Q.  And you said you performed your search of the vehicle on

13 November 30th as well, right?

14 A.  Yes.

15 Q.  And when you searched the vehicle, did you see any

16 possessions that belonged to Ms. Hennelly?

17 A.  I don't recall.

18 Q.  Did you find any possessions that belonged to

19 Mr. Candelaria?

20 A.  I'd have to review the photos of the search.  I'm not

21 entirely sure what we found in the glove box.

22 Q.  Okay.  And you did author a report that -- or not that day,

23 but about your interview with Ms. Hennelly that day?

24 A.  I'm sorry?

25 Q.  You did author a report about your interview with

1  Ms. Hennelly that day?

2  A.  Either that day or the next probably.

3  Q.  Okay.  So you were aware that Ms. Hennelly and

4  Mr. Candelaria were married at that time?

5  A.  Yes.

6  Q.  Okay.  And you said you had been an FBI agent in New Mexico

7  for nine years.  Was that correct?

8  A.  Yes.

9  Q.  So you were aware then, likely, that New Mexico is

10 community property state?

11        MR. HURTADO:  Objection, Your Honor.  This is, first,

12 beyond the scope and also irrelevant.

13        THE COURT:  Relevance, Counsel?

14        MR. GLANZ:  Your Honor, the relationship between

15 ownership of the vehicle and the ability of the person to

16 consent is absolutely relevant to the issue here.

17        THE COURT:  Overruled.

18 Q.  (BY MR. GLANZ) Would you like me to repeat the question?

19 A.  Yes, please.

20 Q.  Were you aware in your nine years of being an FBI agent in

21 New Mexico that New Mexico is a community property state?

22 A.  No.

23 Q.  You had no idea about that?

24 A.  No.

25        MR. GLANZ:  Your Honor, might I have a moment?

```
 1              THE COURT:  You may.
 2              MR. GLANZ:  Thank you.
 3              No further questions.
 4              Thank you, Special Agent Hartman.
 5              THE COURT:  Any redirect?
 6              MR. HURTADO:  Nothing on redirect.  Thank you,
 7    Your Honor.
 8              THE COURT:  May this witness be excused?
 9              MR. HURTADO:  Yes, ma'am.
10              THE COURT:  Any objection?
11              MR. GLANZ:  No, Your Honor.  Thank you.
12              THE COURT:  You are excused.  You're free to leave.
13    Thank you for your time this morning.  Please watch your step
14    when you step down.
15              MR. HURTADO:  Your Honor, at this time the United
16    States calls Ms. Meaghan Hennelly.
17              THE COURT:  Thank you.
18              Please watch your step, ma'am, as you step up.  And
19    before you're seated, can I get you to raise your right hand.
20         (The witness was duly sworn.)
21              THE COURT:  Thank you.  You may be seated.  And,
22    Ms. Hennelly, that microphone is adjustable, ma'am.
23              THE WITNESS:  Thank you.
24              THE COURT:  And there's water in the pitcher if you
25    need it.
```

```
 1            THE WITNESS:  Thank you.
 2            THE COURT:  You may proceed.
 3            MR. HURTADO:  Yes, ma'am, Your Honor.
 4                      MEAGHAN HENNELLY
 5            (being duly sworn, testified as follows:)
 6                      DIRECT EXAMINATION
 7   BY MR. HURTADO:
 8   Q.  Ms. Hennelly, please tell us your name.
 9   A.  Meaghan Hennelly.
10   Q.  I'd like you to just share some details about your personal
11   life with the Court.  Where are you from?
12   A.  I'm originally from St. Louis, Missouri.  I moved to
13   Santa Fe after I graduated from college and resided there until
14   about 2014, '15, when I moved to New York City.
15   Q.  How long were you in New York City?
16   A.  I was in New York until 2019, and then I returned to
17   Santa Fe.
18   Q.  Now, you indicated you attended college.  Where did you go
19   to college?
20   A.  I went to the University of Michigan.
21   Q.  Did you obtain a degree from the University of Michigan?
22   A.  Yes.  I received a Bachelor of Art and Design.
23   Q.  When did you graduate?
24   A.  In 2000.
25   Q.  What do you do for a living?
```

1   A.   I design and manufacture jewelry.

2   Q.   Do you own your own business?

3   A.   Yes.

4   Q.   Now, where do you live currently?

5   A.   I'm -- right now I'm staying with family in St. Louis.

6   Q.   Now, Ms. Hennelly, do you know a man named Marc Candelaria?

7   A.   Yes.

8   Q.   How do you know Mr. Candelaria?

9   A.   He's my ex-husband.

10  Q.   When were you married to Mr. Candelaria, what dates?

11  A.   We were married in June of 2017, and divorced late April or

12  early May of 2022.

13  Q.   So approximately five years?

14  A.   Yes, sir.

15  Q.   Now, is Mr. Candelaria -- well, he's not physically

16  present, but could you identify Mr. Candelaria for the record?

17  A.   He appears on the screen in front of me, wearing a dark

18  button-down, collared shirt.

19          MR. HURTADO:  Your Honor, may the record reflect that

20  Ms. Hennelly has identify the defendant, Mr. Candelaria?

21          THE COURT:  The record will so reflect.

22  Q.    (BY MR. HURTADO) Now, Ms. Hennelly, did you and

23  Mr. Candelaria ever live in Santa Fe, New Mexico?

24  A.   Yes.  We moved there in 2019.

25  Q.   And where in Santa Fe did you and Mr. Candelaria live?

1    A.  We lived in my parents' guest house.

2    Q.  And who are your parents?

3    A.  John Hennelly and my stepmother, Victoria Hennelly.

4    Q.  Why were you living in the guest house with your parents?

5    A.  It was meant to be a temporary place to land until we

6    figured out where we wanted to live.

7    Q.  Did anybody else live in the guest house with yourself and

8    Mr. Candelaria?

9    A.  Our daughter.

10   Q.  What is her name?

11   A.  Shay Candelaria.

12   Q.  Did you and Mr. Candelaria own any vehicles?

13   A.  At the time that we first moved to Santa Fe, we owned one

14   vehicle that we shared.

15   Q.  What vehicle was that?

16   A.  It was a Volvo XC60, navy blue.

17   Q.  A blue Volvo?

18   A.  Yes.

19   Q.  And when you say that you shared it, what kinds of things

20   would you share the vehicle?

21   A.  Marc would use the vehicle primarily to drive to and from

22   Los Alamos, to and from work, but when he was home, I would use

23   the vehicle to run errands, get groceries.  I would use it on

24   the weekend.  We shared it.

25   Q.  At some point in time did you and Mr. Candelaria decide to

1  get another vehicle?

2  A.  Yes.  In September of 2020 we purchased an additional car.

3  Q.  What kind of car was that?

4  A.  It was a Volkswagen Jetta, white.

5  Q.  Four-door?

6  A.  Yes.

7  Q.  And from where was it purchased, what dealership?

8  A.  The Subaru dealership on Cerrillos Road in Santa Fe.

9  Q.  Who actually purchased that vehicle?

10 A.  I did.

11 Q.  How much did you purchase the vehicle for?

12 A.  If I recall correctly, it was about $16,000.

13 Q.  Why did you pay for that car as opposed to Mr. Candelaria?

14 A.  Because he had poor credit.

15 Q.  Who selected the Volkswagen Jetta for purchase?  For

16 example, who made the decision that this was the car you would

17 purchase as opposed to another kind of vehicle?

18 A.  I think that he found the vehicle online, and then we went

19 together to test-drive it and check it out, make sure it would

20 accommodate our needs for a second car.

21 Q.  And what did you decide?

22 A.  That it was a good deal, and we purchased it -- I purchased

23 it.

24 Q.  And who was declared the registered owner of the vehicle?

25 A.  I was.

1  Q.  Did you have documentation to verify that you where the

2  registered owner of that vehicle?

3  A.  I have a copy of the title.

4  Q.  Okay.  Was that vehicle financed when you purchased it?

5  A.  Yes.

6  Q.  Can you please describe to the Court the terms of the

7  finance?

8  A.  It was about a five- or six-year loan.  I don't remember

9  the percentage, but I paid just around $300 a month for the

10  car.  The loan was through Sandia Area Federal Credit Union.

11  Q.  Did you also obtain insurance for that vehicle?

12  A.  Yes.

13  Q.  Who was listed on the insurance?

14  A.  I was the primary policyholder, and I added the defendant.

15  Q.  With respect to the $300-a-month payments that you

16  referenced earlier, was that paid out of your account?

17  A.  Yes.  I would transfer money monthly to make the payments.

18  Q.  And your account was with who?

19  A.  Bank of America.

20  Q.  Did Mr. Candelaria ever help you with those $300-a-month

21  payments that you were making out of your account?

22  A.  He contributed to the household.  He would give me about

23  $2,000 or $2,500 cash every month, and then I would use that to

24  pay -- help pay for the vehicles, both vehicles, the insurance,

25  food.

1  Q.  So part of that 2,000 -- approximately $2,000 a month, you

2  did use that to make the payments for the Volkswagen Jetta?

3  A.  Yes.

4  Q.  Was there ever any arrangement between yourself and

5  Mr. Candelaria where -- wherein you wouldn't be allowed to

6  search or access the vehicle?

7  A.  No.

8  Q.  Did you feel free to search or use the vehicle as you

9  desired?

10 A.  Yes.

11 Q.  Did you ever drive the vehicle?

12 A.  On a few -- a times.

13 Q.  And when you say "a few times," what does that mean in your

14 mind?

15 A.  I think, maybe, I drove it two or three times to run

16 errands or when he -- when there was inclement weather in

17 Los Alamos, he would drive the Volvo to Los Alamos because it

18 had four-wheel drive, so on occasion he may have left the Jetta

19 at home and I would use it.

20 Q.  So other than those two or three times that you drove the

21 vehicle, to your knowledge Mr. Candelaria drove the vehicle all

22 other times; is that correct?

23 A.  Correct.

24 Q.  Okay.  Did you ever know of anybody, other than

25 Mr. Candelaria, to drive that vehicle?

1   A.   No.

2   Q.   Now, let me just publish what's been marked and admitted as

3   Government Exhibit 1.  Do you recognize Government Exhibit 1?

4   A.   Yes.  It's a photo of the white, four-door Volkswagen

5   Jetta.

6   Q.   And now let me publish what has been marked and admitted as

7   Government Exhibit 2.  Do you recognize that item?

8   A.   It's a photograph of the license plate from the Jetta.

9   Q.   Now, Ms. Hennelly, were you ever approached by the FBI to

10  consent to search to the Volkswagen Jetta?

11  A.   Yes.

12  Q.   When was that?

13  A.   It was on November 30th at the Santa Fe Police Department,

14  when I was there on another matter speaking with them.

15  Q.   Now, you say November 30th.  Would that have been

16  November 30th of 2021?

17  A.   Yes.

18  Q.   And you indicated you were speaking with the Santa Fe

19  Police Department?

20  A.   Yes.

21  Q.   What were you speaking to them about?

22  A.   I was speaking to them about a home invasion that occurred

23  at my parents' house.

24  Q.   When did that home invasion occur?

25  A.   September 14th.

1  Q.  Of 2021?

2  A.  Yes.

3  Q.  And just very briefly describe what sorts of things you and

4  the police were talking about on September -- excuse me, on

5  November 30th, 2021.

6  A.  The Santa Fe Police Department was asking me questions

7  pertaining to the crime that happened at my father's house, any

8  information that I had related to where my husband may have

9  been that night, what we had been doing the days prior, just

10  questions about -- pertaining to their investigation.

11  Q.  Now, when did the FBI show up?

12  A.  When the Santa Fe Police Department -- the investigators

13  from the Santa Fe Police Department were finished speaking with

14  me, they said they had another investigator there to talk to

15  me, and that's when Special Agent Hartman came in the

16  conference room.

17  Q.  He was the investigator the officers were referring to?

18  A.  Yes.

19  Q.  Do you remember what Agent Hartman was wearing that day?

20  A.  I don't.  I believe he was in civilian clothes.

21  Q.  Did he identify himself to you?

22  A.  That is the first thing he did.  He showed me his badge.

23  Q.  And did he say anything when he identified himself to you?

24  A.  Just introduced himself, "I'm Special Agent Sam Hartman."

25  Q.  When you spoke with Agent Hartman do you recall what his

1  voice and demeanor was like towards you?

2  A.  Yes.

3  Q.  What was that?

4  A.  He was not aggressive.  He was kind and very matter of

5  fact.

6  Q.  Professional?

7  A.  Yes.

8  Q.  Respectful?

9  A.  Yes.

10  Q.  And what was your tone and demeanor like towards

11  Agent Hartman?

12  A.  I hope I was kind and respectful back.  I'm pretty sure I

13  was.

14  Q.  Were you cooperative with Agent Hartman?

15  A.  Yes.

16  Q.  Did you want to help Agent Hartman?

17  A.  Yes.

18  Q.  Why did you want to help him?

19  A.  Because they -- the Santa Fe Police Department indicated to

20  me that there was a piece of evidence found in the Volkswagen

21  Jetta that pertained to an investigation that Special

22  Agent Hartman was conducting.

23  Q.  How long did you interview with Agent Hartman?

24  A.  I don't remember exactly, maybe 45 minutes or an hour.  I

25  don't --

1  Q.  And at what point did he ask you for consent to search the

2  vehicle?

3  A.  I think that was one of the first things that he said, that

4  he was there because the Santa Fe Police Department found a

5  piece of evidence in the Jetta pertaining to an investigation

6  he was conducting, and he asked if I would sign a consent to

7  search, and I said yes.

8  Q.  Now, Ms. Hennelly, let me show you what has been marked and

9  admitted as Government Exhibit 3.  Could you please tell the

10  Court what's contained on Government Exhibit 3?

11  A.  It's a Department of Justice Federal Bureau of

12  Investigation Consent to Search Form.

13  Q.  Is that the form that you filled out and signed?

14  A.  Yes.

15  Q.  Now, there's also a back page, a second page to that form.

16  Can you describe what's contained on the second page?

17  A.  It says that -- it describes the Volkswagen Jetta, lists

18  the number, and it says that nothing was removed from my

19  custody by special agents of the Federal Bureau of

20  Investigation.

21  Q.  Is that form signed by anybody?

22  A.  Signed by me, and there's two other signatures.  I can't

23  decipher, but two other special agents -- oh, a witness.

24  Agent Hartman and a witness.

25  Q.  Now, directing your attention to the interview on

1    November 30th, 2021, do you know where the Volkswagen Jetta was

2    at the time that you were submitting to your interview with

3    Agent Hartman?

4    A.   To my understanding, it was in the Santa Fe Police

5    Department impound lot.

6    Q.   Do you know whether agents searched it on November 30th,

7    2021?

8    A.   I assume that they may have, but I don't know for certain.

9    Q.   That's fine.

10       Were you able -- were you ever informed by the FBI as to

11   what was found in the Volkswagen Jetta?

12   A.   I was provided with a receipt but never told what it was

13   that they found.

14   Q.   Now, how long was the Volkswagen Jetta in the Santa Fe

15   Police Department impound lot?

16   A.   From November -- late November 20 something -- I don't

17   remember the exact date -- until February of 2022.

18   Q.   And I apologize.  I'm skipping around here.  I want to go

19   back for just a moment to the consent to search form.

20       At the time of your interview, Ms. Hennelly, if I may, how

21   old were you at the time that you gave this interview with the

22   FBI?

23   A.   43.

24   Q.   Did you have access to the Volkswagen Jetta?  For example,

25   did you have a spare key to the vehicle?

1  A.  Yes.  There was a drawer in our home that had spare keys to

2  both vehicles, keys to my father's house, just additional keys.

3  Q.  And I apologize.  I'm going back now again.

4      I believe you indicated that the Volkswagen Jetta was

5  contained in the Santa Fe Police Department impound lot from

6  late November of 2021 to February of 2022.  Did I understand

7  your testimony correct?

8  A.  Yes.

9  Q.  During the time that the Volkswagen Jetta was at the police

10 impound lot, I imagine you still had to make the payments for

11 $300 a month on the vehicle?

12 A.  Yes, I did.

13 Q.  Did Mr. Candelaria reimburse you for those payments?

14 A.  No, he did not.

15 Q.  Do you know why he did not?

16 A.  I do not.

17 Q.  Do you know whether Mr. Candelaria was aware that the

18 vehicle was in impound at the time?

19 A.  I'm fairly certain he knew the vehicle was in impound.

20 Q.  What leads you to that conclusion?

21 A.  Because I believe he contacted the police department to try

22 and get contents, some of his own personal effects, out of the

23 car.

24 Q.  And what was the police department's response, if you know?

25 A.  They told him that they would obtain the items from the

1  vehicle for him, once I picked the vehicle up.

2  Q.  Why was it necessary for you to come pick the vehicle up?

3  A.  Because I was the registered owner.

4  Q.  Now, your interview with the FBI was on November 30th of

5  2021.  Did you make any changes to the insurance policy for the

6  vehicle?

7  A.  I did.  Later.

8  Q.  When did you make those changes?

9  A.  Later that day, on November 30th, I had the defendant

10  removed from my insurance policy.

11  Q.  Now, let me publish for you what has been marked for

12  identification and admitted as Government Exhibit 4.  Do you

13  recognize Government Exhibit 4?

14  A.  Yes.

15  Q.  What is Government Exhibit 4?

16  A.  It's a policy history/details of my vehicle insurance.

17  Q.  Is in the same policy that you referenced earlier with

18  respect to your having removed Mr. Candelaria for the insurance

19  for the vehicle?

20  A.  Yes.

21  Q.  Why did you have Mr. Candelaria removed?

22  A.  Because I didn't want to be liable for any poor decisions

23  he might make.

24  Q.  What led you to believe he may make poor decisions?  What

25  do you mean?

1  A.  Well, the investigation with the Santa Fe Police

2  Department, as well as the evidence potentially linking him to

3  another crime, I was not comfortable paying for his car

4  insurance.

5  Q.  Now, you indicated that you made the change on

6  November 30th, 2021?

7  A.  That is correct.  At night, so it was after business hours,

8  November 30th.  It went into effect on December 1st.

9  Q.  And is the December 1st, 2021, date reflected on Government

10  Exhibit 4?

11  A.  Yes.

12  Q.  Now, Ms. Hennelly, I want that publish for you what has

13  been marked for identification and admitted as Government

14  Exhibit 5.  This may be a little bit difficult to see, given

15  the purple type on the exhibit, but can you describe what's

16  contained on Government Exhibit 5?

17  A.  It is an e-mail from Robert L. Romero to myself.  He is the

18  evidence supervisor at the Santa Fe Police Department, and he

19  indicates in the e-mail what it is that I need to do in order

20  to obtain my belongings from the police department.

21  Q.  What is the date of that e-mail?

22  A.  I think it says February 21st, 2022, but there's a little

23  glare.

24  Q.  Do you -- well, let me ask you this:  How did Mr. Romero

25  know to get ahold of you?

1    A.   I was the registered owner of the vehicle.

2    Q.   Do you know whether Mr. Romero ever made an attempt to get

3    ahold of Mr. Candelaria as opposed to get getting ahold of you

4    via this e-mail?

5    A.   I do not know.  I don't know.

6    Q.   Were you aware of any impound fees that were charged in

7    connection to the impound of the Volkswagen Jetta?

8    A.   Yes.  I had to write a check to the City of Santa Fe for, I

9    think it was, $227.72 in order to have the vehicle released.

10   Q.   And, again, did you have to pay that out of your own

11   account?

12   A.   Yes, I did.

13   Q.   Did Mr. Candelaria reimburse you for that?

14   A.   No, he did not.

15   Q.   Was he aware of the impound fees?

16   A.   I don't know.

17   Q.   Now, let me show you what's been marked as Government

18   Exhibit 6.  Government Exhibit 6 has already been admitted into

19   evidence.  Can you describe what Government Exhibit 6 is?

20   A.   It is a letter, a notarized letter authorizing -- signed by

21   myself, authorized -- authorizing my stepfather to collect my

22   belongings from the evidence department of the Santa Fe Police

23   Department.

24   Q.   Why did you prepare this letter?

25   A.   It was requested by Evidence Supervisor Romero.

Q.   And did Evidence Supervisor Romero receive this letter?

A.   Yes.

Q.   Ms. Hennelly, let me show you what's been marked as Government Exhibit 7.  It's already been admitted.  Can you describe Government Exhibit 7?

A.   It's a carbon copy of the check that I wrote to the City of Santa Fe for $227.72.

Q.   Why did you want to get the vehicle back?

A.   Because I was paying for the vehicle and it was sitting in a lot and costing me money.

Q.   Now, while this vehicle is sitting in the impound lot, I imagine that you're still living with Mr. Candelaria because you're both still married at this point, correct?

A.   No.  We were not living together.

Q.   Okay.  I apologize.

     Did Mr. Candelaria, during the time that the vehicle was impounded, ever try to reach out to you to retrieve the vehicle from the impound lot?

A.   No.

Q.   Did he ever make reference to the vehicle in the impound lot?

A.   I don't recall, but I don't think so.

Q.   Ms. Hennelly, let me show you what has been marked for identification as Government Exhibit 8.  Can you advise what that is?

1  A.  It is a copy of a cashier's check made out to Sandia Area

2  Federal Credit Union from my account for $12,647.32, and a

3  receipt from Sandia Area Federal Credit Union for my paying off

4  the loan of the Jetta.

5  Q.  Why did you want to pay off the loan?

6  A.  Because I was going to sell the vehicle.

7  Q.  Did you have an idea of -- excuse me.  Did you have an idea

8  to whom you were going to sell the vehicle?

9  A.  Yes.  A family member.

10  Q.  Did it ever occur to you to try to, instead, give the

11  vehicle to Mr. Candelaria?

12  A.  No.

13  Q.  Why is that?

14  A.  Because I had made all the payments on it.  I was

15  responsible for it.  I would -- there was no reason for me to

16  offer him the vehicle.

17  Q.  Ms. Hennelly, did you ever have any personal effects of

18  yours inside of Mr. Candelaria's vehicle?

19  A.  Not that I stored in there, no.

20  Q.  How about items that you and he shared, not necessarily

21  yours?

22  A.  There may have been a car seat.

23  Q.  A car seat.  Can you describe further?

24  A.  A car seat for our daughter, because sometimes he would

25  transport her places; sometimes I would drive her places.  I

1    think we had car seats in both vehicles.

2    Q.  Now, Ms. Hennelly, let me show you what has been marked and

3    admitted as Government Exhibit 9.  Do you recognize that item?

4    A.  Yes, I do.

5    Q.  What is it?

6    A.  It is a letter from Sandia Area Federal Credit Union

7    releasing the lien.

8    Q.  To the vehicle?

9    A.  Of the vehicle.

10   Q.  And, finally, let me show you what's been marked and

11   admitted as Government Exhibit 10.  Do you recognize that item?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's a bill of sale for the Volkswagen Jetta to my

15   stepfather.

16   Q.  How much did you sell it to your grandfather for -- excuse

17   me, stepfather for?

18   A.  I think it was for -- close to the amount that I paid off,

19   around $12,000.

20   Q.  And when was that sale finalized?

21   A.  In March of this year.

22   Q.  To this date, where is this vehicle?

23   A.  The vehicle is now in Colorado.

24   Q.  To the best of your knowledge and belief, did

25   Mr. Candelaria ever object to your proceeding to sell the

1   vehicle to anybody?

2   A.  No, he did not.

3   Q.  Did Mr. Candelaria have any involvement whatsoever in the

4   sale of this vehicle?

5   A.  No, he did not.

6        MR. HURTADO:  Your Honor, may I please have a brief

7   moment to confer with co-counsel?

8        THE COURT:  Yes, you may.

9        MR. HURTADO:  Your Honor, I have no further questions

10  at this time.  Thank you, Your Honor.  United States passes the

11  witness.

12       THE COURT:  Cross-examination.

13       MR. GLANZ:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15  BY MR. GLANZ:

16  Q.  Good morning, Ms. Hennelly.

17  A.  Good morning.

18  Q.  Thank you for being here today.

19       So I believe you testified that on November 30th of 2021,

20  when you went to speak to the Santa Fe Police Department, you

21  and Mr. Candelaria were married at that time?

22  A.  We were.

23  Q.  And you had testified that initially you both shared a

24  Volvo for transportation?

25  A.  Yes.

Q.  And then you had purchased -- the two of you together had agreed to purchase this other vehicle for Mr. Candelaria to use?

A.  As a second family car, yes.

Q.  And he chose the vehicle?

A.  I had -- he found it online, but we went together.

Q.  Okay.  And then you had mentioned that you financed in your name because of his credit?

A.  Yes.

Q.  But he reimbursed you, I think you said, $2,500 a month for all household expenses, including the vehicle?

A.  His portion of household expenses, not all of the household expenses.

Q.  My apologies if I misspoke.  I meant that was his contribution towards the total household expenses?

A.  Correct.

Q.  Okay.  And you also mentioned that one of those was the car insurance?

A.  Correct.

Q.  Which was also in your name, but he was on the policy?

A.  Correct.

Q.  And then you testified that he pretty much exclusively drove the vehicle, aside from when he needed the Volvo because of weather conditions?

A.  Yes.

1    Q.   You said you maybe drove it two or three times?

2    A.   Correct.

3    Q.   And then you said that you did have a key to the vehicle?

4    A.   Yes.  There was a spare key in our home.

5    Q.   But the key was kept in what, I believe, you described as a

6    spare key drawer?

7    A.   Yes.

8    Q.   So it was not on your key chain?

9    A.   No.

10   Q.   Okay.

11   A.   It was in a drawer with all the spare keys to both cars,

12   for both cars in that drawer.

13   Q.   Okay.  So meaning he didn't have the key to your Volvo

14   either on his key chain?

15   A.   No, he did not.

16   Q.   And then I think you had testified -- and please correct me

17   if I'm wrong -- that you don't believe you had any property in

18   the car?

19   A.   I don't believe I did, except a car seat for the child.

20   Q.   Okay.  And you mentioned that you maybe had a car seat in

21   there, but you weren't sure.

22        So in terms of the overall maintenance of vehicle, is it

23   fair to say that Marc was responsible for cleaning it?

24   A.   Sure.  He cleaned both cars.

25   Q.   Okay.  And he would rotate the tires?

1  A.  I don't know.

2  Q.  Well, if there was maintenance that was required, would he

3  take care of that?

4  A.  If he chose to, yes.

5  Q.  So an oil change, things like that, he would be responsible

6  for?

7  A.  He took care of it for both vehicles.

8  Q.  Okay.  And if there was any kind of major mechanical

9  issues, he would be the one who would handle that for both

10  vehicles as well?

11  A.  Probably, yes.

12  Q.  And on a daily basis you used the other vehicle for going

13  to work?

14  A.  Once it was purchased -- once the second car was purchased,

15  I used primarily the Volvo.

16  Q.  Running errands, things like that?

17  A.  Yes.

18  Q.  Now, on direct examination the Government had elicited

19  testimony from you that you removed him from your insurance

20  policy, I believe, the same day on November 30th, 2021?

21  A.  That is correct.

22  Q.  And that he had made no attempt to contact you to resume

23  payments or anything like that related to the vehicle?

24  A.  That is correct.

25  Q.  Isn't it true that very shortly after that, within, I

1    believe, two or three days, you also filed for divorce?

2    A.   That is correct.

3    Q.   And isn't it also true that in the final settlement

4    agreement, one of the pieces of property, which you gained

5    exclusive control over, was the vehicle?

6    A.   I suppose, yes.

7    Q.   Okay.  That was one of the assets that you took in the

8    divorce?

9    A.   Yes.

10   Q.   And Marc didn't contest that.  He signed off on it, right?

11   A.   Yes.  In May of 2022 or April of 2022.

12   Q.   So in that entire period, between you filing from divorce

13   and when you eventually finalized it and took exclusive title

14   to the vehicle, it was your intention that entire time to take

15   the vehicle, right?  I mean, it was in your name?

16   A.   Correct.

17   Q.   Now, because Marc drove the vehicle on a daily basis, if

18   you had wanted to use the vehicle for something, you would have

19   had to coordinate with him, right?

20   A.   Probably, but I could have just taken it at any point if I

21   wanted.

22   Q.   Fair enough.  But say on Monday morning, normal commute, if

23   you were going to drive his vehicle, you probably would have

24   said, "Hey, I need to take the Jetta today"?

25   A.   Yes.

1  Q.  And that's just basic logistics of coordinating, you know,
2  married schedules?
3  A.  Yes.
4  Q.  And let's say that you wanted to loan the Jetta to a
5  friend, you probably would have had to tell Marc, "Hey, my
6  friend's going to borrow the Jetta"?
7  A.  Yes.
8  Q.  So that also would have required some level of coordination
9  with him?
10 A.  Yes.
11 Q.  And obviously the same would be true for you -- the Volvo
12 that you primarily drove.  Is that true?
13 A.  Mostly, but he would get up early to go to work and
14 sometimes take the car without coordinating with me just
15 because the weather was bad.
16 Q.  Okay.  So I guess that implied in your answer there that he
17 normally left for work before you did?
18 A.  I worked from home.
19 Q.  Oh, okay.
20 A.  So, yes.
21 Q.  So with that in mind, it seems likely that if you wanted to
22 use the vehicle, you probably would even have to tell him the
23 day before, just to make sure that he didn't just leave in it?
24 A.  Yes.
25 Q.  Okay.  And in 2023 -- this almost seems like a silly

1    question, but did you ever connect your phone to the Bluetooth

2    in the vehicle?

3    A.    In the Jetta?

4    Q.    Yeah.

5    A.    I don't remember.

6    Q.    So it's fair to say you probably didn't have any saved

7    radio stations in there, anything like that?

8    A.    I don't know.  I don't think so.

9    Q.    Okay.

10          MR. GLANZ:  Your Honor, might I have a moment?

11          THE COURT:  You may.

12          MR. GLANZ:  Thank you.

13          No further questions, Your Honor.  Thank you.

14          THE COURT:  Thank you, Ms. Hennelly.

15          Any redirect?

16          MR. HURTADO:  No, ma'am, Your Honor.  Thank you.

17          THE COURT:  May this witness be excused?

18          MR. HURTADO:  Yes, she may.

19          THE COURT:  Any objection?

20          MR. GLANZ:  No, Your Honor.  Thank you.

21          THE COURT:  You are excused.  You may step down.

22    Please watch your step, and you're free to go.  Thank you.

23          And that's your last witness, Mr. Hurtado?

24          MR. HURTADO:  Yes, ma'am, it is.  The United States

25    closes its presentation of evidence.  Thank you.

1    THE COURT:  Just to double-check, no witnesses from
2  the defense?
3    MR. GLANZ:  No witnesses, Your Honor.  Thank you.
4    THE COURT:  Would Counsel like to make brief argument?
5    MR. HURTADO:  The United States would rest on the
6  pleadings as well as the testimony of the witnesses in this
7  case; however, I'm happy to answer any questions -- follow-up
8  questions that the Court may have.
9    THE COURT:  Thank you.  I do not have any questions
10  for you at this time, Mr. Hurtado.
11    Mr. Glanz, would you like to make brief argument?
12    MR. GLANZ:  I would, Your Honor.  Thank you.
13    Your Honor, I won't just rehash all the pleadings
14  we've already filed, but I do think it's just important to
15  emphasize that this space, a car, is so different from the case
16  law that we cite to about shared space inside of a residence.
17  And I say that because from *Matlock* is that idea that a person
18  assumes the risk of joint occupancy and that a joint occupant
19  may allow access to that shared space, and I think from the
20  testimony here today, we see that's clearly not the case here.
21    The car was almost exclusively Mr. Candelaria's and
22  any access of it by Ms. Hennelly would have required
23  coordination with him by her testimony.  It's not the same as
24  the cases we cite to where, just by the fact that one has, for
25  example, a roommate, you assume the risk that your roommate may

1    bring someone else into your shared space, your kitchen, your,

2    you know, living room, potentially even a common bathroom and

3    allow that person access to it, and that could happen at any

4    given time.

5            Additionally, within that idea I would hope --

6    assuming one has a good roommate, is the idea that you would

7    share maintenance of that space; that you would hopefully clean

8    it, that you would maintain it.  All of those things from the

9    testimony today are absent from this situation.

10           So we would submit to the Court that it's very clearly

11   here that there was no actual authority to consent to the

12   search, and I think that's mainly clear because the

13   Government's argument relies primarily on her ownership of the

14   vehicle as the registered owner.  And *Matlock* is very clear

15   that this question is not determined by the law of property.

16   This question is determined by -- I believe they use language

17   along the lines of "How common sense dictates people use the

18   space together."  And that's what we have here, is looking at

19   common sense, looking at the testimony.  We don't have shared

20   space in the same way we do in a residence.  So for that

21   reason, we would say there was no actual authority, Your Honor.

22           And then briefly, moving to the Government's second

23   argument of apparent authority, I think it's pretty clear from

24   the testimony that the agent was aware that Mr. Candelaria was

25   the target of the investigation, that the bank robber was a

male, that he -- he testified Ms. Hennelly was not a target and that's why he didn't Mirandize her.  So their intent was to investigate Mr. Candelaria, and he was aware that the vehicle had been taken by Santa Fe PD and searched related to another investigation.  So he knew, presumably, that Mr. Candelaria was the one operating it at that time and had no reason to doubt that.

And in the Government's response, they cite to a Tenth Circuit case, which I don't know if I'm pronouncing the name correctly, but it's *United States v. Kimoana*, and that's 338 F.3d 1215 from 2004.  And at 1222 in that opinion there's a quotation to a couple of other cases, but I'll just read it without the internal citations.  And it says, "Where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent."

And then it goes on to say -- they're citing another out-of-circuit opinion favorably that talks about, "The burden of proving effectiveness of consent cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making any further inquiry.  Warrantless entry is unlawful without further inquiry if circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent."

And as the Government notes right in its response,

1    Ms. Hennelly told the agent -- and he did concede that he had

2    no reason to doubt that -- on November 30th that Mr. Candelaria

3    primarily used the vehicle, that she had maybe driven it a few

4    times.  So he was aware that it was Mr. Candelaria's vehicle.

5    And for that reason, Your Honor, we would say he was faced with

6    an ambiguity of consent and ownership to where he should have

7    looked into it further, potentially gotten a warrant.  There

8    was no reason not to.  There was no exigency.  From the

9    testimony we have, the vehicle remained at the Santa Fe impound

10   lot all the way up until -- I believe it was February of 2022.

11   So there was simply no reason not to get a warrant, not to

12   investigate further, not to lawfully search that vehicle,

13   rather than to rely on consent from an individual who did not

14   have authority to grant it.  So for all those reasons,

15   Your Honor, we would ask the Court to grant the motion to

16   suppress and deny the Government the use of the note at trial.

17   Thank you.

18            THE COURT:  Thank you, Mr. Glanz.

19            Mr. Hurtado, any response?

20            MR. HURTADO:  Yes, Your Honor, briefly.

21            As the Court is aware, the United States is making

22   a -- actually, an argument on many different fronts.  The

23   first, of course, is that Ms. Hennelly did have apparent and

24   actual authority.  Based on the testimony as well as the

25   exhibits that have been provided, it is evident that

1  Ms. Hennelly, quite frankly, did everything with respect to the

2  vehicle.  She was the registered owner.  She was responsible

3  for paying the insurance.  She was responsible for making the

4  $300-a-month payments.  She also had access to a spare vehicle

5  [*sic*] for the Volkswagen Jetta.  She was also responsible for

6  making the payments once that vehicle was impounded.

7          I would submit to the Court that Agent Hartman's

8  assessment of Ms. Hennelly's authority to give consent was

9  founded on a good faith basis to believe that she was the

10 registered owner.  Ms. Hennelly was an adult.  She was

11 cooperative.  She had access to the vehicle.  She was married

12 to the defendant at the time.  I would submit to the Court that

13 if the Court were to take Mr. Glanz's argument to its logical

14 extension, then Agent Hartman would basically have to conduct

15 an entire side investigation to determine who, in fact, is the

16 owner of that vehicle, and that would require steps beyond that

17 which are necessary under the law when determining who, in

18 fact, has authority to consent to a search of a vehicle.

19         Even if this Court were to find that Ms. Hennelly did

20 not have actual or apparent authority, the United States does

21 rest on its final argument, which is that that handwritten

22 demand note would have been subject to inevitable discovery.

23 According to Agent Hartman's testimony, had Ms. Hennelly stated

24 to him that she was going to deny consent, Agent Hartman would

25 have simply gotten a search warrant for that vehicle.  The

1   Santa Fe Police Department was able to obtain a search warrant
2   for that vehicle.  It therefore stands to reason that if the
3   Santa Fe Police Department was able to obtain a search warrant,
4   so could Agent Hartman for purposes of his investigation into
5   the bank robbery.
6           Subject to any questions, Your Honor, that's all I
7   have.  Thank you.
8           THE COURT:  Thank you.  I have no questions.
9           I do have the exhibits here.  Counsel, I will take
10  this under advisement and issue a ruling quickly.
11          Anything further from the United States?
12          MR. HURTADO:  No, ma'am.  Thank you.
13          THE COURT:  Anything further from the defense?
14          MR. GLANZ:  Only that our response to the Government's
15  amended notice, we file tomorrow.
16          THE COURT:  Oh, I did have -- all right.  Thank you.
17  That was my question.
18          Thank you very much.  We look forward to your
19  response, and we'll be in recess.
20      (Proceedings adjourned at 10:28 a.m.)
21
22                          *  *  *  *  *
23
24
25

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF NEW MEXICO

 3  _____
                                  )
 4  UNITED STATES OF AMERICA,     )      No. 1:22-CR-00767-KWR
                                  )
 5           Plaintiff,           )
                                  )
 6      vs.                       )
                                  )
 7  MARC CANDELARIA,              )
                                  )
 8           Defendant.           )
    _____)
 9

10            CERTIFICATE OF OFFICIAL COURT REPORTER

11      I, Andrea M. Lynch, RPR, New Mexico CCR #127, Federal

12  Official Court Reporter, in and for the United States District

13  Court for the District of New Mexico, do hereby certify that

14  pursuant to Section 753, Title 28, United States Code, that the

15  foregoing is a true and correct transcript of the

16  stenographically reported proceedings held in the

17  above-entitled matter on December 18, 2023, and that the

18  transcript page format is in conformance with the regulations

19  of the Judicial Conference of the United States.

20  Dated this 6th day of September, 2024.

21

22  _____
    ANDREA M. LYNCH, RPR, NM CCR #127
23  FEDERAL OFFICIAL COURT REPORTER
    333 Lomas Boulevard Northwest
24  Albuquerque, New Mexico  87102
    Phone:  (505) 348-2093
25  Email:  Andrea_Lynch@nmd.uscourts.gov
```