```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF NEW MEXICO

 3    _____
                                   )
 4    UNITED STATES OF AMERICA,    )     No. 1:22-cr-00767-KWR
                                   )
 5            Plaintiff,           )
                                   )
 6       vs.                       )     Bonito Courtroom
                                   )     Albuquerque, New Mexico
 7    MARC CANDELARIA,             )
                                   )     March 26, 2024
 8            Defendant.           )     8:52 a.m.
      _____)

 9

10                   TRANSCRIPT OF PROCEEDINGS
                        JURY TRIAL - VOL. 1
11              BEFORE THE HONORABLE KEA W. RIGGS
                  UNITED STATES DISTRICT JUDGE
12

13    APPEARANCES:

14    For the Plaintiff:   SAMUEL A. HURTADO, ESQ.
                           NATASHA MOGHADAM, ESQ.
15                         Assistant United States Attorneys
                           P.O. Box 607
16                         Albuquerque, New Mexico  87103

17

      For the Defendant:   BUCK GLANZ, ESQ.
18                         EMILY P. CAREY
                           Assistant Federal Public Defenders
19                         111 Lomas NW, Suite 501
                           Albuquerque, New Mexico  87102
20

21    REPORTED BY:         ANDREA M. LYNCH, RPR, NM CCR #127
                           United States Court Reporter
22                         333 Lomas Boulevard Northwest
                           Albuquerque, New Mexico  87102
23                         Phone:  (505) 348-2093
                           Email:  Andrea_Lynch@nmd.uscourts.gov
24

          Proceedings recorded by mechanical stenography; transcript
25    produced by Computer-Aided Transcription.
```

```
 1                          I N D E X

 2

 3                                                 Page

 4

 5    Government's Opening Statement                4:22

 6    Defense's Opening Statement                  14:11

 7    VICTORIA HENNELLY for the Government
         Direct Examination by Ms. Moghadam        21:5
 8       Cross-Examination by Ms. Carey            58:3
         Redirect Examination by Ms. Moghadam      67:15
 9
      JOHN HENNELLY for the Government
10       Direct Examination by Ms. Moghadam        71:3
         Cross-Examination by Ms. Carey            94:18
11       Redirect Examination by Ms. Moghadam      104:5

12    MEAGHAN HENNELLY for the Government
         Direct Examination by Mr. Hurtado         106:21
13       Cross-Examination by Mr. Glanz            127:15
         Redirect Examination by Mr. Hurtado       137:13
14
      LORRAINE CABESUELA for the Government
15       Direct Examination by Ms. Moghadam        139:22
         Cross-Examination by Mr. Glanz            148:3
16       Redirect Examination by Ms. Moghadam      150:12

17    REBECCA HILDERBRANDT for the Government
         Direct Examination by Mr. Hurtado         153:22
18       Cross-Examination by Mr. Glanz            173:22
         Redirect Examination by Mr. Hurtado       181:22
19
      VANESSA VASQUEZ GARCIA for the Government
20       Direct Examination by Mr. Hurtado         183:13
         Cross-Examination by Ms. Carey            192:11
21       Redirect Examination by Mr. Hurtado       193:20

22    TERRANCE BAILEY for the Government
         Direct Examination by Mr. Moghadam        195:4
23       Cross-Examination by Mr. Glanz            218:11
         Redirect Examination by Mr. Moghadam      225:12
24
      Court Reporter's Certificate                 229:1
25
```

GOVERNMENT'S EXHIBITS

| | | |
|---|---|---|
| 1 | Check | 44:20 |
| 2 | Check | 48:18 |
| 4 | ATM Deposit Receipt | 163:2 |
| 5 | Marc Candelaria WF Account | 158:11 |
| 6 | Hennelly Family Trust WF Account | 158:11 |
| 7 | Letter of Interrogatory | 186:6 |
| 9 | Gaming Records | 206:18 |
| 9A | Gaming Records | 206:18 |
| 9B | Gaming Records | 206:18 |
| 10A-F | Photographs | 41:3 |
| 11 | Time Sheet | 139:13 |

```
 1        (In open court at 8:52 a.m.)
 2             THE COURT:  Anything we need to take up before we
 3   bring in the jury this morning?
 4             MS. CAREY:  No, Your Honor.
 5             THE COURT:  I think they're lined up and ready to go.
 6        (Jury enters at 8:52 a.m.)
 7             THE COURT:  Good morning, ladies and gentlemen.
 8   Welcome back.  Thank you for being back so promptly this
 9   morning so that we can go ahead and get started.  I hope no one
10   had a difficult time getting home yesterday in that weird
11   weather coming out of the courthouse when we left.
12             That being said, I think we're ready to begin.
13             Would the United States like to make closing argument
14   at this time?
15             MS. MOGHADAM:  Opening, Your Honor?  Yes.
16             THE COURT:  That would probably be better.  I
17   apologize.
18             Would you like to make opening argument at this time?
19             MS. MOGHADAM:  Yes, Your Honor.  May it please the
20   Court?
21             THE COURT:  You may proceed.
22             MS. MOGHADAM:  In the early hours of September 14th,
23   2021, the defendant's father-in-law, John Hennelly, a
24   77-year-old man at the time, lays in a pool of his own blood on
25   the floor of his bedroom closet.  He is unconscious, alone,
```

1    with no one to call 9-1-1.  On that day Mr. Hennelly suffered

2    severe injuries at the hands of an armed, masked intruder.

3    During this trial you may never know who hurt Mr. Hennelly, but

4    you will know why.  And the reason why is simple:  Money.  What

5    happened on that day sets the stage for why the defendant,

6    Marc Candelaria, is sitting in that chair accused of bank

7    fraud.

8              So who is the defendant?  Who is Marc Candelaria?

9    Well, the defendant used to be married to John Hennelly's

10   daughter Meaghan Hennelly.  The defendant and Meaghan have a

11   daughter.  The defendant is a man with a poor, reckless and

12   irresponsible relationship with money.  He has many debts.  One

13   thing the defendant loves more than most things is gambling.

14   He hit the casino every chance he got.  He lost at the casino

15   every chance he got.  In a little over a year and a half the

16   defendant played with close to $250,000 at the Buffalo Thunder

17   Casino.  The defendant continuously chased a jackpot he rarely,

18   if ever, hit.

19             Mr. Hennelly, on the other hand, had a different

20   relationship with money.  Mr. Hennelly is a hardworking and

21   successful man, who made smart and careful investments to

22   prepare himself and his family for his retirement.

23   Mr. Hennelly loves his family, and he has the finances to help

24   and support his family any way he can.

25             At one point Mr. Hennelly tried to take the defendant

1  under his wing and involve him in an investment.  That didn't

2  go too well for Mr. Hennelly.  And after a failed attempt at a

3  joint investment where the defendant mishandled thousands of

4  dollars out of an options trading account, Mr. Hennelly was not

5  interested in ever making the mistake of investing with the

6  defendant again.  Despite Mr. Hennelly's reluctance to invest

7  with the defendant, it didn't mean that the defendant wasn't

8  family.  After all, the defendant was married to his daughter.

9  That was his son-in-law.  He had a grandchild by him.

10        So when Meaghan and the defendant wanted to move from

11  New York City to New Mexico, it was a no-brainer that they

12  would stay with Mr. Hennelly and his wife, Victoria Hennelly,

13  at their Santa Fe home until they got on their feet.  So in

14  2019, Meaghan, the defendant and their two-year-old daughter

15  packed up their bags and they moved into the Hennellys'

16  guesthouse located behind the Hennellys' main house.

17        Now, even though Meaghan and the defendant stayed in

18  the guesthouse, it did not mean that they were not welcome into

19  that main house.  They were always welcome.  The defendant had

20  access to the spare keys of the main house.  The defendant did

21  maintenance jobs around the main house.  The defendant came

22  over for family dinners on a weekly basis at that main house.

23  He was welcome into that home.  After all, he was family.  If

24  anyone were to be welcomed into the Hennellys' main house, it

25  would be family.

1              In 2021 Meaghan and the defendant moved into a home of

2    their own, thanks to Mr. and Mrs. Hennelly's generosity with a

3    down payment.  They were in that slow moving-out process where

4    every once in while they would go to the guesthouse, pick up

5    belongings as needed, little by little.  September 14th, 2021,

6    was one of those days for Meaghan, where she planned to go pick

7    up some belongings.

8              Meaghan briefly wakes up at 4:00 a.m. and she notices

9    something odd.  She notices that the defendant is nowhere in

10   sight.  Now, even though this strikes Meaghan as odd, she

11   doesn't think too much of it.  The defendant is a carpenter at

12   Los Alamos National Labs and, to Meaghan's knowledge, sometimes

13   the defendant gets called in to work early and needs to wake up

14   in time to make the drive to work.  Keep in mind that the

15   evidence will show that at no point on September 14th, 2021,

16   did the defendant ever go to work.

17             Now, at around 9:30, 10:00 a.m., Meaghan makes her way

18   to the Hennelly house to pick up some of her belongings, and

19   she notices something else that was odd.  She notices that the

20   newspaper is still out in the driveway.  Mr. Hennelly, her dad,

21   always picks up the newspaper first thing in the morning.  But

22   even though this struck Meaghan as odd, she doesn't think too

23   much of it.  Reason being is Mrs. Hennelly is out of the state

24   in Florida.  The entire family knows that Mrs. Hennelly is out

25   of town.

1    So Meaghan assumed that her dad's late start to the
2   morning had something to do with him being alone for the first
3   time in a long time.  So Meaghan picks up the newspaper, she
4   puts it closer to the front door so her dad has easy access to
5   it when he gets to it.  She sends him a text message, and she
6   carries on with her day.  Throughout the morning and early
7   afternoon, Meaghan does not hear from her dad.  Meaghan becomes
8   concerned.  Meaghan calls Mrs. Hennelly in Florida, and when
9   Mrs. Hennelly couldn't get in touch with her husband,
10  Mrs. Hennelly became concerned.
11    So at around 2:00, 2:30 p.m., Meaghan makes her way
12  back to the Hennelly house to check on her dad.  Meaghan enters
13  the home through the garage, and she calls out to her dad; no
14  response.  Meaghan makes her way to her dad's bedroom and what
15  she finds was horrifying:  Mr. Hennelly laying on the floor of
16  his closet, covered in blood.  Meaghan calls 9-1-1.
17  Mr. Hennelly is rushed to the hospital, and Mrs. Hennelly is on
18  the first flight out of Florida to be by her husband's side,
19  and she arrives the next day on September 15th, 2021.
20    Mr. Hennelly will tell you what happened to him that
21  night when the armed, masked intruder came into his home.  He
22  survives his injuries, and he will tell you that that night
23  started off as a normal night alone.  He got ready for bed.  He
24  fell asleep.  And at some point in the night he wakes up to a
25  flashlight shining in his eyes and a gun pointed to his head.

1          During the course of that night, this intruder makes

2   many demands.  The first demand out of the intruder's mouth,

3   "Open the safe."  The safe which is located -- hidden -- in

4   Mr. Hennelly's closet.  When Mr. Hennelly struggled to open the

5   safe, the intruder goes to Plan B.  The intruder demands that

6   Mr. Hennelly lay on the floor of that closet.  The intruder

7   leaves the bedroom and grabs a checkbook, which is located in

8   an office space nearby.  The intruder returns and demands that

9   Mr. Hennelly sign a $23,000 check and to leave all other

10  portions of the check blank.  The intruder then beat

11  Mr. Hennelly until he fell unconscious, and that is where

12  Meaghan found him.

13          Now, there's something interesting about this

14  break-in.  There wasn't a broken doorknob.  There wasn't a

15  broken door.  There wasn't a broken window.  There was no sign

16  whatsoever of a forced entry.  The evidence will show that the

17  intruder either knew the layout of the home or was instructed

18  on the layout of the home.  This intruder knew the home so

19  well, he entered discreetly; he entered without force.  This

20  intruder knew the home so well that he was able to locate a

21  checkbook outside of Mr. Hennelly's bedroom without once

22  asking, "Where do you keep your checks?"

23          Another interesting thing about this break-in, nothing

24  of value was taken:  Not a TV, no technology, not a laptop, no

25  expensive artwork on the walls.  Nothing was taken except that

1   $23,000 check and that checkbook.  That checkbook was never
2   found.
3        Not only was this attack on Mr. Hennelly shocking for
4   the entire Hennelly family, you will hear something else that
5   was shocking.  You will hear how shocked the Hennelly family
6   was when they found out that just hours after Mr. Hennelly was
7   attacked, while Mr. Hennelly is laying on the floor of his
8   closet with no one to call 9-1-1, the defendant deposits a
9   $23,000 check into his Wells Fargo Bank account on
10  September 14th, 2021, at 8:58 a.m.  That check had
11  Mr. Hennelly's signature on it.  That check was written out for
12  $23,000.  That check was written to the defendant,
13  Marc Candelaria.  It was backdated September 10th, and on the
14  memo line were the letters "BTC," and you'll learn that BTC
15  stands for Bitcoin, the cryptocurrency.
16       Mr. Hennelly would never write a check for Bitcoin.
17  He would never invest in Bitcoin.  He doesn't like it.  He
18  thinks it's too speculative, and he would never make a risky
19  investment with the defendant, someone he learned long ago not
20  to invest with.  And Mr. Hennelly will tell you that at no
21  point did the defendant ever have a conversation with him about
22  investing in Bitcoin.
23       So what does the defendant do on September 14th, 2021,
24  as soon as he deposits that $23,000 check at 8:58 a.m.?  He
25  hits the casino.  By 10:00 a.m., he's gambling.  So what does

1    the defendant do on September 15th, 2021, the day that
2    Mrs. Hennelly flies back to be by her husband's side?  Well, he
3    does a couple of things.  The first thing he does is he starts
4    withdrawing and transferring that $23,000 out of that
5    Wells Fargo account.  And the second thing he does is he hits
6    the casino.  The defendant is moving faster than
7    Mr. and Mrs. Hennellys' bank.

8         Soon after the transfer, the bank becomes suspicious
9    of this check, and they notify Mrs. Hennelly that if she does
10   not confirm the validity of the check by September 15th, that
11   same day that she came into town, by 11:00 p.m., the $23,000
12   will be credited back to the Hennellys' joint bank account.
13   Now, it's too late for that $23,000.  Within a day of
14   depositing, the defendant transferred and withdrew that money
15   out of that account, but when the Hennellys' account got
16   credited back the $23,000, this put the defendant's account in
17   the negative for thousands upon thousands of dollars.

18        Now, eventually Mrs. Hennelly gets around to
19   addressing this issue, this notification from her bank, and she
20   notices, "Huh.  This check was written out to the defendant."
21   But keep in mind that at this point Mr. Hennelly has not once
22   mentioned writing a check for the armed, masked intruder.  He
23   is laying in a hospital bed.  His memory is foggy.  He is under
24   medication, and he suffered severe trauma to the head.  So
25   Ms. Hennelly is not on notice that Mr. Hennelly ever wrote a

1    $23,000 check for his attacker.

2           But when Mrs. Hennelly sees that this check was

3    written out to the defendant, she gives him a call, and the

4    defendant doesn't hesitate to come up with a story.  First, he

5    admits that he deposited that $23,000 check into his

6    Wells Fargo account.  He tells Mrs. Hennelly that he -- their

7    son-in-law -- and Mr. Hennelly had plans to invest in Bitcoin.

8    And he tells Ms. Hennelly that because the funds were credited

9    back to the Hennellys' account, this put his account in the

10   negative.

11          So Mrs. Hennelly, who is riddled with stress, riddled

12   with anxiety, worried and trying to make sure that her husband

13   is okay, she writes the defendant another check for $23,000.

14   But that $23,000 check, the second one that Ms. Hennelly

15   writes, it does not go into the defendant's Wells Fargo account

16   to fix the negative funds.  You won't hear where that check

17   went, but you will hear that it got deposited somewhere.

18          So as Mr. Hennelly's getting a little better, this

19   conversation about a check comes up.  Mr. Hennelly's confused.

20   He didn't write a check to the defendant for $23,000.  He

21   certainly would never write one for Bitcoin.  But in that

22   moment, during that conversation, Mr. Hennelly remembers

23   something.  He remembers that on the night he was attacked, he

24   was forced at gunpoint to write a $23,000 check.  Mr. Hennelly

25   will tell you that he would never write a check for Bitcoin.

1          Eventually, law enforcement turned their attention to

2     the defendant, and they execute a search warrant on the

3     defendant's car, and they find a deposit slip for the

4     $23,000 -- just like the defendant said that he deposited --

5     from the night that Mr. Hennelly was attacked.  Mr. Hennelly --

6     and that check was backdated, like I said, to September 10th.

7     So not only did Mr. Hennelly not write a $23,000 check to the

8     defendant for Bitcoin, he certainly didn't write one on

9     September 10th.

10          Mr. and Mrs. Hennelly will tell you what they were

11    doing leading up to Mrs. Hennelly leaving town and none of

12    their activities involved writing the check -- writing a check

13    to the defendant for Bitcoin.  Mr. Hennelly will also tell you

14    that that's simply not how he writes checks.  He fills out

15    every portion of that check.  And when he looks at that check,

16    he'll recognize his signature.  He'll recognize the 23,000 that

17    he wrote out, but he won't recognize himself as the person that

18    filled out any other portion of that check.  Mrs. Hennelly and

19    Mr. Hennelly will tell you that their bookkeeping is

20    immaculate.  They keep track of every investment they make,

21    every loan they give out, and there is no record anywhere that

22    Mr. Hennelly planned on investing with the defendant and handed

23    him a $23,000 check.

24          At the conclusion of this trial, you may never know

25    who hurt Mr. Hennelly, but you will know why, and the reason

1   why is so the defendant can obtain money to gamble, money to

2   blow.  At the conclusion of this trial, the United States will

3   ask you to return the only verdict consistent with the law and

4   the evidence, and that is a verdict of guilty as to one count

5   of bank fraud when the defendant deposited the $23,000 check

6   that came from the attack on Mr. Hennelly.

7                THE COURT:  Thank you, Counsel.

8                Would the defense like to make an opening statement at

9   this time?

10               MS. CAREY:  Yes, Your Honor.  Thank you.

11               Members of the jury, Marc Candelaria is not the

12  nefarious, calculating man that the government would have you

13  believe him to be.  He is just a man who, until recently, faced

14  ordinary life challenges, but who now finds himself in this

15  nightmare being prosecuted by the federal government for a

16  crime that he did not commit.

17               Like many of us, Marc Candelaria has had his fair

18  share of financial fumbles.  He's had credit card debt.  He's

19  been behind on taxes.  And, yes, he likes to gamble.  But he's

20  also a man who understands the significance of hard work, who's

21  respected for his work ethic.  He's a union carpenter, who has

22  spent the majority of his career using his hands to construct,

23  to repair and to build.

24               He's a dad.  He's a dad who has virtual spa dates with

25  his now six-and-a-half-year-old daughter, who watches Disney

1    movies with her over FaceTime from afar.  And, until somewhat
2    recently, he was also a husband, a husband who moved across the
3    country from New York City to Santa Fe, New Mexico, to be
4    closer to his wife's family so that his wife could be near her
5    family and so that he could build a better future for his own.
6            And in a time where most people are now meeting their
7    partners through online dating platforms, the chance encounter
8    between Meaghan Hennelly and Marc Candelaria was something
9    special.  They met at a holiday market amidst the hum and
10   history of Grand Central Station in Manhattan, New York.  Marc
11   was -- as a carpenter, was building exhibit booths for the
12   fair, and Meaghan is an artist, a jeweler, who was showing her
13   work at the holiday fair, and the two immediately hit it off.
14   And although Meaghan returned to New Mexico shortly after the
15   fair, she eventually moved to New York and a couple of years
16   later she and Marc were married in 2017.  And just a few short
17   months after their wedding, they gave birth to their daughter.
18           Now, babies, for any of you who have had them, are
19   expensive and for anybody who's familiar with New York City, it
20   is also extremely expensive to visit, to live there.  Marc was
21   working full-time.  Meaghan was caring for the baby and trying
22   to build her jewelry business, but they were having a lot of
23   financial struggles.  It was hard.  The city suddenly felt loud
24   and overcrowded, and so Marc and Meaghan made the decision to
25   move to Santa Fe, New Mexico, where Meaghan's father,

1   John Hennelly, and his [*sic*] stepmother, Victoria Hennelly,
2   were living at the time.
3           Now, the Hennellys have been extremely generous with
4   family, exactly as the government described.  And so when
5   Meaghan asked her stepmom if it would be okay for her family to
6   the live in the Hennelly guesthouse just until they could find
7   their own place, there was no hesitation on the part of
8   Vicki Hennelly.  The Hennellys said yes.  So in 2019, Meaghan,
9   Marc and their two-year-old daughter moved from New York to
10  Santa Fe, New Mexico, and into the Hennelly guesthouse.
11          Marc almost immediately secured work as a union
12  carpenter at the Los Alamos National Laboratory.  Meaghan was
13  still making jewelry, working to expand her business.  And
14  although the stay at the Hennelly guesthouse was only ever
15  supposed to be temporary, if you heard, they moved in September
16  of 2019.  And whatever you might feel about it, a few months
17  later, the world completely turned upside down because of
18  COVID-19.  The housing prices soared.  The housing market still
19  hasn't quite sorted itself out, and so Meaghan and Marc
20  remained in that guesthouse for close to two years.  And during
21  those two years, Meaghan, Marc and their daughter saw Vicki and
22  John all the time.  They had barbecues on Sundays in the
23  summer.  They visited outside on the back patio.  Marc would
24  help his in-laws with projects inside of their house.  Shay was
25  able to spend time with her grandparents.

1      You will learn that the Hennellys are quite wealthy, that

2  the Hennellys had the means and the ability to help Marc and

3  Meaghan financially and that they did so on a number of

4  occasions.  For example, you'll learn that Marc at one point

5  was trying to get a Q clearance in order to expand his ability

6  to work in different areas of the labs.  He had some debt, and

7  the Hennellys helped him pay off that debt.  They loaned him

8  money to pay back that debt so he could get his clearance.  And

9  it was only because of the financial assistance of the

10  Hennellys that Marc and Meaghan were able to buy their own

11  home, and that home needed a lot of work.  And it's because of

12  the financial assistance of the Hennellys that they were able

13  to get some money to fix up that home.  And Marc spent many

14  weekends at that house.  He redid the floors.  He built the

15  cabinets.  He tore out the ceilings, all so that he could make

16  a home for his wife and child.  And in August of 2021 Meaghan

17  and Marc and their daughter finally left the Hennelly

18  guesthouse and moved into their own home.

19      The government is going to try to convince you that on

20  September 14th of 2021, Marc Candelaria threw all of that away.

21  That this man, a husband, a father, that this man orchestrated

22  a brutal home invasion that nearly killed his father-in-law and

23  shattered his family all for a $23,000 check.

24      John Hennelly is going to share with you the terrifying

25  things that happened to him in the late hours of

1    September 13th or the early morning hours of September 14th,

2    2021.  The government undoubtedly is going to show you

3    photographs of the extensive injuries that Mr. Hennelly

4    incurred as a result of the attack on him:  Facial fractures,

5    skull fracture, a serious head injury.  You'll learn that

6    Mr. Hennelly could have died.

7         There's no question that what happened to Mr. Hennelly was

8    horrific.  But Mr. Hennelly is also going to tell you that he's

9    positive his assailant was not Marc, that they only ever saw

10   one person, that he only ever heard one person, and that he

11   is -- it definitely was not Marc Candelaria.  So who is the

12   assailant?  We still don't know because the police focused on

13   Marc and stopped looking.

14        You're going to hear from Vicki, Marc's then-mother-in-law,

15   who's going to talk to you about the check that's at the center

16   of this case.  She'll tell you that on September 15th, 2021,

17   she received notification from her bank, Wells Fargo, that they

18   flagged a check.  When she forgot to respond to the

19   notification on time, that check was reversed.  And when the

20   check was reversed, Vicki looked into it.  She saw an image of

21   the check, and she saw that it was written out to her

22   son-in-law, to Marc Candelaria, and so she called him.  She

23   called him.  They had a discussion.  And after speaking with

24   him and learning more, she offered to -- and did -- write a

25   replacement check to replace the check that her bank had

1    reversed.

2         There's nothing sinister about this.  There's nothing

3    criminal, but the government is going to try to paint

4    Marc Candelaria as a man with poor investment decisions, who

5    has a history of credit card debt and gambling habit so severe

6    that he would choreograph an invasion into his own

7    father-in-law's home, that he was sacrifice everything he'd

8    worked for, everyone he loved, for a $23,000 check.

9         Let me be clear.  This did not happen.  Marc did not commit

10    this crime, but it's not his job to prove that to you.  As you

11    learned during jury selection, it is the government that must

12    put on the evidence in this case, and it's your job to think

13    about and look at that evidence critically, decide how much

14    weight you want to give it, how much of it you want to accept

15    and how much of it you want to reject.

16         The one thing that we'll ask of you as you consider the

17    evidence, what you see and what you hear over the next couple

18    of days, is also what you don't see, what you don't hear.  What

19    information is missing?  What questions are left unanswered for

20    you?  The Judge is going to tell you that you must find

21    Mr. Candelaria not guilty if the government has not proven its

22    case beyond a reasonable doubt.  And the evidence in this case

23    will show there are a lot of uncertainties.  A lot of missing

24    information.  A lot of unanswered questions.  A lot of

25    conjecture, substantial doubt.

1    Yes, Marc Candelaria likes to gamble.  He has a history of

2  credit card debt.  He's been behind on taxes.  He's borrowed

3  money from his in-laws, but the chasm between those lawful acts

4  and the heinous act that the government accuses Marc of is

5  incredibly deep.  Marc Candelaria did not do this thing.  He

6  did not orchestrate a home invasion at the expense of his

7  family, all for a check.  He did not commit bank fraud.

8    And we know that at the end of this case, you'll agree with

9  us, that the government has not met its burden.  You will be

10  left with reasonable doubt about whether Mr. Candelaria

11  committed the crime that the government accuses him of, and we

12  know that at the end of your deliberations, you will come back

13  and you will find Mr. Candelaria is not guilty.

14         THE COURT:  Thank you, Ms. Carey.

15         Would the United States like to call their first

16  witness?

17         MS. MOGHADAM:  Yes, Your Honor.  The United States

18  calls Victoria Hennelly.

19         THE COURT:  Good morning, Ms. Hennelly.  Before you're

20  seated, can I get you to raise your right hand.

21    (The witness was duly sworn.)

22         THE COURT:  Thank you.  You may be seated.  That

23  microphone in front of you is adjustable, ma'am, and I believe

24  there are some water bottles there for you.

25         THE WITNESS:  Oh, thank you.

```
 1            THE COURT:  Thank you.
 2            You may proceed.
 3                     VICTORIA HENNELLY
 4         (being duly sworn, testified as follows:)
 5                    DIRECT EXAMINATION
 6   BY MS. MOGHADAM:
 7   Q.  Good morning.
 8   A.  Good morning.
 9   Q.  Please introduce yourself to the jury by your first and
10   last name.
11   A.  I'm Victoria Hennelly, Vicki.
12   Q.  Mrs. Hennelly, where do you currently live?
13   A.  In Santa Fe, New Mexico.
14   Q.  How long have you been living in Santa Fe?
15   A.  We've been living there full-time for about ten years, but
16   we've been coming since the 1990s when we bought our house.
17   Q.  Where were you living before Santa Fe?
18   A.  In the Los Angeles area.
19   Q.  Mrs. Hennelly, what do you do for a living?
20   A.  Well, I'm retired now, but I started off as an attorney in
21   Los Angeles, which is how I met my husband, and I practiced law
22   for a few years, and then we had a few detours.  My -- our son
23   was diagnosed with autism, so I stayed home.  I stopped working
24   for about -- oh, for several years, and then my husband and
25   another attorney started a firm, and I went there and I did a
```

1    lot of admin for the firm.  It was a small firm, and I did that

2    for many years part-time and then retired.  He sold the

3    practice, so --

4    Q.  Who is your husband?

5    A.  John Hennelly.

6    Q.  How long have you been married?

7    A.  It will be 39 years this year.

8    Q.  Do you share any children with Mr. Hennelly?  You mentioned

9    one, I think.

10   A.  I have one son, Mark, and I have three stepchildren from

11   John's first marriage.

12   Q.  Who are your stepchildren?

13   A.  John, Cara and Meaghan.  John's 53 and the youngest one is

14   37, my son.

15   Q.  Who was your stepdaughter Meaghan married to in 2021?

16   A.  To Marc Candelaria.

17   Q.  Are they still married?

18   A.  No.

19   Q.  Mrs. Hennelly, do you see Marc Candelaria in the courtroom

20   today?

21   A.  Yes.

22   Q.  May you please identify him by an article of clothing

23   and --

24   A.  He's wearing a dark gray suit, sitting over by the other

25   attorneys, yes, in the middle with a tie.

1      MS. MOGHADAM:  Your Honor, would the record reflect

2  that the witness has identified the defendant?

3      THE COURT:  The record will so reflect.

4  Q.  (BY MS. MOGHADAM) Do you know if Meaghan and the defendant

5  have any children?

6  A.  They have one daughter, Shay.

7  Q.  How old is Shay now?

8  A.  Shay is six and a half.

9  Q.  Mrs. Hennelly, you mentioned that your husband used to be

10  an attorney?

11  A.  John?  Yes.

12  Q.  Is he currently an attorney?

13  A.  No.  He retired full-time about ten years ago when we moved

14  here.

15  Q.  Would you say that Mr. Hennelly was or is the breadwinner

16  of your family?

17  A.  Yes, he was at the time.  Because as I said, I stopped

18  working for years.  I would go back and forth because of our

19  son.

20  Q.  Aside from the income as an attorney, did Mr. Hennelly have

21  any other sources of income?

22  A.  We would get dividends from investments and -- pretty much

23  it was his salary and the dividends and the little bits I

24  brought.

25  Q.  What sort of investments did Mr. Hennelly participate in?

1  A.  We usually invested in stocks; conservative.  A lot of that

2  was driven by our son being autistic.  He can't live on his

3  own, so we needed to provide for him.  So we were very

4  conservative, but -- so stocks and generally not bonds.

5  Q.  Were you involved or had knowledge of the investments that

6  your husband would --

7  A.  Yes.

8  Q.  -- make?

9  A.  Yes.  We'd talk about it.

10  Q.  Okay.  How about your bank accounts; are they all joint?

11  Are they separate?

12  A.  No, they're all joint.

13  Q.  Are you aware of the defendant and your husband ever

14  investing together?

15  A.  Yes.

16  Q.  What happened -- what was that investment?

17  A.  So Meaghan, Marc and Shay moved to Santa Fe from New York

18  in 2019, and at that time marc had a real interest in investing

19  on options, and he and John would talk a lot about it, and so

20  they decided -- John said, "I think we should set up an account

21  together, you, me and Marc, and we'll put 10,000 in it and kind

22  of let him -- see what he could do."

23      And so they did, and he let Marc do the investing for the

24  account.

25  Q.  How did that investment go?

1    A.   Actually, in the beginning it went really well.  He made

2    several -- I think 20- or $30,000 pretty quickly, and then it

3    went back to the original 10-.

4    Q.   When it went back to the original 10-, what was the

5    decision about what to do with that account?

6    A.   Well, John said, "We should put a stop on it.  Let's just

7    figure out what we're going to do," so that we don't have this,

8    I guess, bouncing ball effect.  So he said, "Let's just leave

9    the money in the account, and we'll decide what to do," and --

10   Q.   What happened with that money?

11   A.   The money was gone.  And it looks like it was -- it didn't

12   do well, so the money was lost somehow.  And we were not happy

13   about that because we had said, "Let's" -- "We're going to stop

14   and talk about what we're going to do next," and suddenly the

15   account's empty.

16   Q.   Okay.  So aside from the account being empty, you don't

17   know what happened to that money?

18   A.   No, not really.  John was upset and we talked, and as a

19   result, we asked Marc to leave.  They were living in our

20   guesthouse when they moved from New York.

21   Q.   Okay.  And we'll talk about them moving over to Santa Fe,

22   but really quickly, did you -- after that investment, did you

23   or Mr. Hennelly have any intention of investing with your

24   son-in-law, the defendant, again?

25   A.   No.  No investments because John was not happy.  I mean, we

1    were trying to help him out, and we felt that, you know, he

2    hadn't done what we asked and we lost $10,000.

3    Q.   So you mentioned that Meaghan and the defendant moved to

4    Santa Fe.  Let's talk about that.  When did Meaghan and the

5    defendant get married?

6    A.   They got married in June of 2007 in New York.

7    Q.   2007?

8    A.   I'm sorry.  2017.  Yeah, Shay was born that same year,

9    2017.

10   Q.   And where in New York?

11   A.   They were married at the foot of the Brooklyn Bridge.  I

12   forget.  There's a -- they were married in New York.

13   Q.   Okay.  And you mentioned that they moved to New Mexico.

14   When did they move?

15   A.   They moved just right around Shay's second birthday in

16   2019, September 2019.

17   Q.   Okay.  And where did they move when they came to

18   New Mexico?

19   A.   Well, Meaghan had asked if they could live in the

20   guesthouse -- we have a small casita behind our house -- and if

21   they could live there while they were getting on their feet and

22   figuring what they were going to do and move.  And we said, "Of

23   course," and we were excited.

24   Q.   Were you aware of why they -- why Meaghan wanted to move

25   back to --

1    A.  Well, Meaghan had talked to me, and she just -- it was --
2    New York was very expensive, and she was tired of the commuting
3    with the subway.  She's a jewelry designer, so she could do
4    things at home, but she also had to go in the city, so she
5    just -- and I think she wanted to be around family.  She had a
6    two-year-old.
7    Q.  Could they afford to live New York City?
8    A.  Well, they -- they had an apartment there, so I assume.
9    Yeah, it was in Brooklyn.
10   Q.  So when they moved to the guesthouse -- let's talk a little
11   bit about that layout.  Where is the guesthouse in relation to
12   your main house?
13   A.  If you walk out the back door of the house, there's a patio
14   and the guesthouse is right there.  So it's -- I don't know.
15   It's very close.
16   Q.  Can you see the guesthouse from your home?
17   A.  Oh, yes.  Oh, yeah.  I mean, it's, like, maybe 15 steps
18   from the back door to the front door.
19   Q.  Did Meaghan and the defendant have access to the main
20   house?
21   A.  Yes.
22   Q.  How so?
23   A.  Well, they had a set of keys, and, you know, there was a
24   lot of back and forth.  I would babysit Shay.  I would go
25   there.  She would bring her over to play.  We would have

1  dinners usually in the main house.  Marc did some work for us,

2  help with repairs.  So there was -- it was the pandemic, so

3  there was a lot of flow between the two houses.

4  Q.  How often would you say Meaghan and the defendant came over

5  to the main house while they were living in the guesthouse?

6  A.  Oh, I think we tried to do dinners once a week, maybe every

7  couple weeks.  A lot of times outside, but in the house gather

8  around, so probably once a week or so.

9  Q.  Did the defendant ever watch your home while you were out

10 of town?

11 A.  Well, I think that Meaghan and Marc both kind of kept an

12 eye on the house.  They would go in to water the plants.  You

13 know, I usually stopped the mail, but if short trips, they get

14 the mail, bring it inside, any packages, do a walk-through.

15 They had a set of keys out in the guesthouse, and we had a set

16 of keys in the main house for the guesthouse.

17 Q.  Did you have plants in your bedroom --

18 A.  Yes.

19 Q.  -- that would need watering?

20 A.  Yes.

21 Q.  And was there any part of the house that the defendant was

22 prohibited from going?

23 A.  I mean, no.  I mean, we had our personal areas, but there

24 was -- we never said, "Don't" -- you know, if they were helping

25 us out, of course they would go whenever the work was needed or

1  to water the plants.

2  Q.  And you mentioned that you would have family dinners at the

3  main house.  Who was usually present for these family dinners?

4  A.  Well, John and me, and then Marc, Meaghan and Shay.

5  Occasionally some other family members might come by, but

6  usually the core group.

7  Q.  What sort of conversations would you have at family

8  dinners?

9  A.  Generally what everybody was doing, a lot about Shay, you

10 know, plans that we were going to -- you know, if they were

11 going to go somewhere, if we were going to go somewhere.  Marc

12 would talk a little bit about work.  We would talk about what

13 we were doing.  And Meaghan, of course, would be talking about

14 her jewelry business.  She was working a lot at home, so there

15 was a lot of talk about that.

16 Q.  So were there conversations about money or investments?

17 A.  We had conversations about money, but after that first

18 thing, we never talked about investments, but we did have some

19 discussions about money.

20 Q.  Okay.  So during these family discussions, did you ever

21 hear the defendant bring up wanting to invest in Bitcoin?

22 A.  No.

23 Q.  While the defendant was living in your guesthouse, was he

24 employed?

25 A.  Yes.  He worked as a carpenter up at Los Alamos.

1   Q.   Did you do anything to help him secure this employment?

2   A.   Yes.  Well, no, not the employment.  He got that -- he went

3   up to the Carpenter's Union, I believe, after they moved and

4   got the job right away.

5   Q.   And how did you help him keep that job?

6   A.   Well, there was -- I guess up at the lab if you have a

7   Q clearance, you can work on more top secret or confidential

8   projects, so they let you -- you have more access to the lab,

9   but you have to be cleared.  I don't really know what the

10  procedure is, but he talked to us in -- oh, let's see, it was

11  in -- I think it was in September of 2019 that he had a lot of

12  credit card debt and that was going to impact his Q clearance,

13  getting his Q clearance, and he wondered if we could loan him

14  the money to cover the credit card debt, and he -- we asked him

15  what he had.  So he wrote up a list of all of his credit cards

16  and when he owed.  It was about $25,000.  So we said, "Okay.

17  It's important to get your Q clearance.  It will help you and

18  the family."  And we said, "But we'll loan it to you at

19  6 percent."

20       And so we set up a schedule.  We wrote the check.  He had

21  his list of his cards he was going to pay off, and then we kept

22  a notation.  And every month he would either pay -- he said he

23  could pay 500 a month, so he paid either by a Wells Fargo check

24  or 500 in cash, and he paid every month.  And then we would

25  keep a note of what was interest and principal as we worked it

1   down.

2   Q.  Was that 500 a month something that you asked him to pay or

3   something that he indicated he was able to pay?

4   A.  He said he could pay 500 a month, and we said that's fine.

5   Q.  And did he make those payments?

6   A.  Yes.

7   Q.  Did those payments ever stop?

8   A.  They stopped in, like, November of -- or October, maybe,

9   2021.  I think our last payment was in September or October of

10  '21.  I'm not sure of the exact one, but then they stopped

11  completely, and we haven't had any contact.

12  Q.  Okay.  Did you -- did you give him any more money to pay

13  anything else off?

14  A.  Yes.  So about, maybe, six months later, we were sitting

15  outside having a family barbecue and he brought up the fact

16  that he owed about $16,000 in taxes, back taxes.  He hadn't

17  filed -- I guess he was getting his taxes filed and, again,

18  talking about the Q clearance and how important it was to get

19  that.  And so that was part of the discussion at dinner, and so

20  John and I talked, and we said, "You know, we've already lent

21  them money, but if he can get his Q clearance, he's going to

22  make more money, have better jobs."  So we said, "Okay.  We're

23  going to add this" -- we wrote the check to Meaghan, although

24  for Marc's taxes, we put a memo.  And we gave it to her, and we

25  immediately added it to -- we said, "We're going to add it to

1    what you're already paying."

2        And so it jumped up his monthly -- we didn't ask for more

3    money, because we knew he was giving us -- but continued to pay

4    the 500.  So that was just added to the around 25,000 we had

5    already given, and that was for 16,000.

6    Q.  Okay.  So when he would pay the $500 a month, was that --

7    how was the form of payment?

8    A.  In the beginning it was generally a Wells Fargo check, but

9    then he just started giving us five $100 bills every month,

10   which was fine.

11   Q.  Did it strike you as odd that he was paying you in $1

12   bills?

13   A.  You mean $100 bills?

14   Q.  Oh, 100.  Sorry.  I thought you said $1.

15   A.  Not really.  I figured he was just going to the bank and

16   pulling it out and probably said, "I need 500," and they

17   gave -- they said, "Do you have a problem with hundreds?"

18       No, it didn't strike me as odd.

19   Q.  You mentioned that you would write the checks for the loans

20   to Meaghan?

21   A.  Well, just for the taxes, because I had said, "You take

22   this and pay Marc's taxes."

23   Q.  Why didn't you just give it to Marc?

24   A.  I don't know.  I just -- I wrote "Marc's taxes" on it, but

25   I just -- I said, "Meaghan, you just make sure it gets done."

1    Q.   Now, was there ever a point in this loan process where you
2    came to the conclusion that you were no longer going to lend
3    Marc Candelaria money?
4    A.   Yes.  I mean, we -- we actually talked about the taxes
5    because we felt like there was already quite a bit of debt out
6    there, but, you know, we -- but this was it.  I mean, that was
7    two within a year, pretty much, and he was supposed make a good
8    living -- and Meaghan -- you know, they could help.  So, yeah,
9    we were done.  I thought we had done enough for them.  And,
10   really, it was to get that Q clearance and that was the big
11   sort of prize.
12   Q.   Do you know if -- do you have confirmation or records that
13   the defendant actually paid off his debts or his loans?
14   A.   I have no idea.
15   Q.   Okay.  Prior to September 14th, 2021, if the defendant
16   needed another loan, were you inclined to give it to him?
17   A.   No.
18   Q.   Mrs. Hennelly, were you aware that the defendant had a
19   gambling issue?
20   A.   No.
21   Q.   At any point did the defendant and Meaghan purchase their
22   own home?
23   A.   Well, Meaghan purchased the home -- it's in her name -- in,
24   like, I would say, November, December of 2020.
25   Q.   And did you and Mr. Hennelly help finance that home in any

1   way?

2   A.   We gave them a little bit for the down payment, which we

3   had done with the other kids too.

4   Q.   Do you know why Meaghan and the defendant did not purchase

5   the home jointly?

6   A.   You know, Meaghan wanted to buy the house.  I don't think

7   we got into it a lot.  So I think she just thought with her

8   credit record she would get what -- the money -- she would be

9   able to afford the house that they wanted.

10  Q.   Okay.  And when did they -- did they ever fully move out of

11  the house?  How was that moving-out process?

12  A.   So they bought the house in November, December.  It was an

13  old adobe out in -- just outside of Santa Fe city, and it had

14  substantial work to be done.  So the two of them did, you know,

15  a lot of the work.  They did have somebody come in and help,

16  but they did a lot of work, and they really moved out in

17  August, I would say -- July or August of 2021, but there was

18  still stuff in the guesthouse, and they would come back for

19  things, and they had things in the garage.  So they moved out

20  to the house, but they didn't fully move out.  There were still

21  things in there.

22  Q.   Okay.  Mrs. Hennelly, I want to direct your attention to

23  September 14th of 2021.  Where were you on September 14th,

24  2021?

25  A.   That would be -- I was in Florida.  My mom had been out

1   visiting, and I flew back with her and -- to visit my sister,

2   and I was there at -- in Florida with my mom.

3   Q.   How long was your mom in Santa Fe?

4   A.   She'd been there for about a month.

5   Q.   And at this time period, while your mom is staying with

6   you, is Meaghan and the defendant -- are they visiting?

7   A.   Oh, yeah.

8   Q.   When did you leave for Florida?

9   A.   So my mother and I flew out of Santa Fe on Sunday morning

10  the 12th.  We had, like, a five o'clock or 5:30 flight out to

11  Florida.

12  Q.   Did you tell members of your family that you were leaving

13  Florida -- or leaving for Florida?

14  A.   Yeah, it would have come up.  I mean, my mom had been there

15  a month.  We'd a lot of family over for barbecues and dinners,

16  so it wasn't a secret.  And my mom didn't like flying

17  connections.  She was in her middle-to-late 80s and it made her

18  uncomfortable.  So I said, "I'll come back and I'll stay and

19  visit Liza," my sister.

20  Q.   And I don't know if you -- how long was your intended trip

21  supposed --

22  A.   One week.

23  Q.   One week.  So you left Sunday.  Your intended arrival would

24  have been the next Sunday?

25  A.   Sunday or Monday, yeah.

1    Q.   Mrs. Hennelly, did anything cut your trip short?

2    A.   Yes.

3    Q.   What?

4    A.   So on Tuesday -- let me see.  Let me get this right.  My

5    stepdaughter called -- Meaghan called Tuesday morning and said,

6    "I've been by the house with Shay to pick up some stuff and the

7    newspaper is still outside" -- it was about nine o'clock, and

8    she said, "I think that's kind of odd, because, you know,

9    dad" -- we're usually up early for paper and coffee in the

10   morning.

11        And I said, "Well, you know, maybe -- you know, there's

12   been a lot going on" -- we'd been very busy the weekend

13   before -- and I said, "So maybe he's just taking time off."

14        And I think I called -- I talked to him the night before,

15   but we weren't -- anything strange.  Anyway, a few hours later,

16   Meaghan goes back to the house with Shay and she finds the

17   paper still up on the porch where she had put it, and so called

18   me, and I said, "Oh, that doesn't sound right.  You should go

19   in."  I said -- we talked about, you know, maybe dad fell,

20   maybe dad had a stroke, you know, the things you worry about

21   when you're older.  So I said, "Call me back.  But go back."

22        So she and Shay went in the house and they found John.

23   Q.   Okay.  And let me backtrack just a little bit.  What time

24   do you and Mr. Hennelly usually wake up for coffee and pick up

25   the newspaper?

1    A.  Seven o'clock.  You know, we're -- six to seven o'clock,

2    we're having coffee and paper.

3    Q.  Okay.  And when you found out about your husband's -- what

4    did you find out about his state at the time?

5    A.  You mean when Meaghan --

6    Q.  When Meaghan --

7    A.  So I didn't hear from Meaghan and so that worried me, and I

8    called her, and she said, "Vicki, dad's in the closet.  It

9    looks like he fell, and Shay and I found him, and I've called

10   the paramedics and they're here, and I can't really talk."

11       And I'm, like, "Oh, God.  Okay."  And I just, you know,

12   hung up, and then I -- it was about 4:00 or 5:00 Florida time,

13   so I immediately made -- got on to the -- made reservations for

14   the next morning to go home.

15   Q.  Okay.  And when did you return home?

16   A.  I got home -- I got to the -- he was sent up to

17   New Mexico -- the UNM Hospital, and I landed -- and I think I

18   was there by 11:30 to 12:00 on Wednesday.

19   Q.  11:30 a.m --

20   A.  A.m., yes.

21   Q.  -- Wednesday the 15th?

22   A.  Yes.

23   Q.  And as soon as you land, what do you do?  Where do you go?

24   A.  Well, my brother-in-law who's a doctor -- John's brother

25   who lives in Albuquerque -- he had been able to stay with John.

1    So he came out and met me.  This is during COVID, so there
2    was -- they only wanted one visiter at a time.  So he met me
3    outside the hospital, told me John was in the trauma unit and
4    that I should go in and so I did.  I went -- somebody directed
5    me to the trauma unit, and that's where I found my husband.
6    Q.  Let me ask you this:  What were your emotions?  What were
7    you feeling?
8    A.  Well, the -- I was scared.  The night before the police had
9    been calling me, and they finally informed me that it wasn't a
10   fall, that it was an attack, and that's why they sent him up to
11   the trauma.  So I was completely -- so by the time I got there,
12   I was everywhere.  So I went right to the trauma unit and
13   talked to the doctors.
14   Q.  If you need a minute at any point.  Let me know.  Okay?
15   A.  I'm fine.  I'm fine.
16   Q.  So did you eventually, you know, lay eyes on your husband?
17   A.  Oh, yeah.  I was able to go right in and sit with him.
18   Q.  At that time when you arrived was Mr. Hennelly able to
19   speak?
20   A.  You know, he -- I sat there for a while and then he woke up
21   and he couldn't really talk.  He was -- his jaw was broken,
22   but, of course, he saw me and he reached over and grabbed my
23   hand and kissed it, so I'm like, "Oh, he's there.  He knows who
24   I am.  So I was" -- I'm sorry.
25   Q.  No worries.

1    A.  So that made me very happy, because they didn't know -- you

2    know, they really hadn't had a chance to -- he was still

3    swollen from all of his injuries, and he tried to talk.  He

4    would maybe say "yes" or "no" if they asked him about pain or

5    something, but we weren't able to converse.

6    Q.  Did you even attempt to have a conversation with him about

7    what happened at that time?

8    A.  No.  No, I was just -- because he was still in danger.

9    They didn't -- they didn't move him out of the trauma unit

10   until later, and it was several days before they could tell me

11   that things had healed up and they weren't worried about

12   infection or things like that.  I mean, he had rehab and stuff

13   to go through, but they weren't worried about him dying, which

14   we had -- for several days, that was a concern.

15   Q.  Okay.  And was Mr. Hennelly under medication at that time

16   for pain?

17   A.  Yes.  He had a lot of injuries and -- primarily to his head

18   and face -- so, yes -- and his hand, so he was on pain meds

19   and, I guess, antibiotics, whatever they needed.

20   Q.  How long was Mr. Hennelly in the hospital?

21   A.  Well, they moved him out of the trauma unit that afternoon

22   to the regular ward at UNM, and he was there, maybe, ten days

23   or so, and then he spent ten days in rehab up here in

24   Albuquerque.

25           MS. MOGHADAM:  May I approach the witness, Your Honor?

1        THE COURT:  You may.

2    Q.  (BY MS. MOGHADAM) Mrs. Hennelly, I'm handing you

3    Government's 10A, 10B, 10C, 10D, 10E and 10F.  Okay?

4    A.  Okay.

5    Q.  I want you to look through the photos.

6    A.  Oh, okay.

7    Q.  Look up at me when you're done, but don't show the jury.

8    A.  Yes, I've looked at them.

9    Q.  Mrs. Hennelly, do you recognize what those are?

10   A.  Yes.  Those are pictures of my husband and the injuries he

11   sustained.

12   Q.  And is that what he looked like on September 15th, 2021,

13   when you saw him?

14   A.  Pretty much, except he had -- his face was really swollen,

15   I think, from the -- so I saw him probably the next day from

16   when these were taken, and he was swollen up a bit from the

17   injuries.

18   Q.  But you recognized the individual in those photos as your

19   husband?

20   A.  Oh, yeah.  This is my husband.

21        MS. MOGHADAM:  Your Honor, the government moves into

22   evident what has marked as Government's A through -- I'm going

23   to have to look -- F.

24        THE COURT:  Any objection?

25        MS. CAREY:  We're not going to object, Your Honor.

1    THE COURT:  All right.  Government's Exhibit 10A

2    through F will be admitted without objection.

3        (Government's Exhibits 10A-10F admitted into evidence.)

4        MS. MOGHADAM:  May I publish, Your Honor?

5        THE COURT:  You may.

6        Ladies and gentlemen, are your monitors on?  Yes?

7    All right.  Thank you.

8        For the record, the prosecutor published Exhibits 10A

9    through F on the overhead.

10   Q.  (BY MS. MOGHADAM) Mrs. Hennelly, when you arrived to

11   New Mexico, did you ever get a notification from your bank?

12   A.  I did.  I was in the trauma unit and there was -- it was a

13   text or phone call -- I just don't remember which -- saying

14   that there was an alert, a fraud alert, on our account and we

15   should get in touch.  And I think at some point the nurses or

16   doctors were in the trauma unit, so I went outside and I called

17   them, and I -- they said -- I said, "What's this about?"  I

18   said, "I'm really not in a good place to talk," but they said

19   there was a large check that had been deposited in our account

20   and it raised the red flag for the fraud unit because there

21   were two different handwritings on it, and it was for a

22   substantial sum of money, 23,000 and it looked like the

23   signature was John Hennelly, one of the signatories on our

24   account, of course.

25       I said, "Look, I'm in the hospital and I don't have access

1   to a computer or anything to look at it."

2        And they said, "Look, our policy is if you don't get back

3   to us by 11:00, 11:30 tonight, we're simply going to credit the

4   money back to your account."

5        And I said, "Great.  I don't have to think about it until

6   later."

7        And then I went back in and, really, I never thought about

8   it again, until the next morning when I got a text from them

9   saying that the money had been put back in our account.  I

10  said, "Oh, I better go look and see what it is."  So I pulled

11  it up on my iPad and I looked at the check, and I saw that

12  it -- it was a check for $23,000 and the amount written and

13  numerical were my husband's handwriting as well as his

14  signature, but the date, the payee, and the memo was not.  And

15  so when I read it, the payee was "Marc Candelaria," and it had

16  been dated the 10th, before I ever left town, the Friday

17  before.  And there was a note -- I couldn't read it all, but it

18  said "BTC" at one point, and so I, like -- "Oh, what is this?"

19  Q.  Now, at this point when you got this notification from the

20  bank and checked to see what the check was about, did you ever

21  have a conversation with Mr. Hennelly about what happened on

22  the night he was attacked?

23  A.  No.  I mean, he -- no.  He was on drugs and pain meds.  The

24  police had come and interviewed him in the hospital.  You know,

25  we were so focused on him healing -- well, first, was he going

1    to live?  And then, you know, when could he get through rehab
2    and, you know, learn to walk and all.  You know, physically, he
3    had a lot of issues.
4    Q.  Were you present when the police officers were interviewing
5    him in the hospital?
6    A.  Yes.
7    Q.  Was he able to form complete sentences at that time?
8    A.  Pretty much, yeah.  And he remembered, you know, about
9    the -- somebody breaking in and the gun and the flashlight and
10   being told to go in the closet.  And we have a safe in our
11   closet, and they had tried to get him to open the safe.
12   Q.  And was Mr. Hennelly having difficulties with his speech at
13   that time?
14   A.  I thought he -- no.  I think he was trying to speak
15   clearly.  You know, he was trying to help them.
16          MS. MOGHADAM:  May I approach the witness?
17          THE COURT:  You may.
18   Q.  (BY MS. MOGHADAM) Mrs. Hennelly, I am handing you
19   Government's Exhibit 1.  Take a look at this.
20   A.  Yeah.
21   Q.  Do you recognize what I handed you?
22   A.  Yes.
23   Q.  How do you recognize that?
24   A.  Well, this is a check from our joint checking account, and
25   this is the check that Bank of -- I mean, Wells Fargo had

1  called me about, and it's the one I pulled up on my iPad when I
2  went to go check what the fraud was.
3  Q.  So you've seen that check before?
4  A.  Yes.
5  Q.  And when was the first time you laid eyes on that check?
6  A.  When I signed into my Wells Fargo account that morning
7  and -- to see what check they were talking about.
8  Q.  Was this the next day after you arrived in New Mexico?
9  A.  It was first thing in the morning.  When I got up, I
10  checked my e-mail to see if there's -- and I saw -- well, I
11  think it was a text or a call from the bank, again, saying,
12  "We've reversed the funds and it's back in your account."  And
13  that's when I went to go follow up and look and see the check.
14        MS. MOGHADAM:  Your Honor, the United States moves
15  into evidence Government's Exhibit 1.
16        THE COURT:  Any objection?
17        MS. CAREY:  No, Your Honor.
18        THE COURT:  Government's 1 will be admitted without
19  objection.
20     (Government's Exhibit 1 admitted into evidence.)
21        MS. MOGHADAM:  Permission to publish?
22        THE COURT:  You may.
23  Q.  (BY MS. MOGHADAM) Mrs. Hennelly, do you see that on your
24  screen?
25  A.  I do.

1    Q.   I want to start by talking about this upper right-hand

2    corner.  What is this number?

3    A.   5126.

4    Q.   And do you recognize where this -- which checkbook this

5    check came from?

6    A.   Probably my checkbook.  John had a -- you know, he would

7    pay some of his own bills and stuff, so he had a checkbook on

8    his desk, and I had a checkbook in my -- on my desk -- at my

9    desk.

10   Q.   And, Mrs. Hennelly, do you recognize your husband's

11   handwriting?

12   A.   I do.

13   Q.   How do you recognize his handwriting?  Did he ever write

14   you cards or anything like that?

15   A.   I mean, 39 years we've been -- yes, I've seen his -- we've

16   been signing in front of each other.  And, you know, he would

17   write checks.  This is the way he did it, with the X's and

18   the --

19   Q.   With these X's?

20   A.   Yes.  Yeah, that's John.

21   Q.   Okay.  What portions of this check do you recognize to be

22   your husband's handwriting?

23   A.   The dollar amount, the 23- -- yes.  And then the amount

24   written out, "Twenty-three thousand and XX dollars" and then

25   his signature.

1    Q.   And do you recognize the other handwriting?

2    A.   Well, it's Marc's, and the signature on the endorsement.

3    Q.   And when you saw this "BTC," that's listed in this memo

4    line, did you know what that meant at the time?

5    A.   No.  And I couldn't really read the first word.  No, I

6    didn't, so I followed up.

7    Q.   And what is the date written at --

8    A.   9/10/2021.

9    Q.   We'll go back and we'll talk about that date.  Okay?

10   A.   Okay.

11   Q.   Now, after you saw your son-in-law's name at the top,

12   "Marc Candelaria," what did you -- what did you do when you saw

13   that notification?

14   A.   Well, I called Meaghan.  I said, "Meaghan, I have a check

15   in front of me that the Wells Fargo bounced back, and it was

16   made out to Marc for $23,000."

17        And she said, "I don't know anything about it.  Let me get

18   Marc on the phone."

19   Q.   And when Marc got on the phone, did you ask him about this

20   check?

21   A.   I did.  I said, "Marc, what's this for?"

22        And he said, "John and I have talked about investing in

23   Bitcoin," and that's what the "BTC" was.

24   Q.   Okay.  And after he told you about this investment, what

25   did you think about that?

1    A.  Well, I thought it was odd because my husband doesn't
2    believe in Bitcoin.  It's very speculative, and we were not
3    speculative investors, and we had -- so I just thought it was
4    odd.  But a couple of things; I wanted to get back to the
5    hospital, and I didn't understand it and I didn't have any
6    paperwork, and he said -- I mean, this is my son-in-law, and he
7    said, "We had decided to do something."
8        And I thought -- and I remember the date was odd because
9    that was when I was still here.  In any event, he says, "I have
10   a $23,000 negative balance in my Wells Fargo account because
11   they took the funds back."
12       And I'm, like, "Oh, God."  So I just wrote him a check
13   for -- to say, "I will replace the funds and we'll figure it
14   out later, talk about it later."  I didn't -- you know, I
15   wanted to get to the hospital.
16   Q.  And I want to break that down a little bit really quickly.
17   At that point have you ever heard, aside from that
18   conversation, the defendant mention an investment in Bitcoin?
19   A.  No.
20   Q.  Okay.  Now, when you said you wrote -- you said you wrote a
21   second check?
22   A.  I did.  I wrote a check to Marc for $23,000, and I wrote
23   "BTC" at the memo, and I left -- I think it was at the house
24   and somebody picked it up.  I don't really know.  I just left
25   the check.

1    Q.  We'll get there.

2            MS. MOGHADAM:  Your Honor, I -- if I have permission

3    to approach, I am handing the witness Government's Exhibit 2.

4            THE COURT:  You may approach.

5    Q.  (BY MS. MOGHADAM) Mrs. Hennelly, take a look at that.

6    A.  Yeah.  Yeah, that's the check I wrote on the 16th.

7    Q.  Okay.  Is that a fair and accurate copy of check that --

8    the second check, the one you wrote --

9    A.  Yes, it is.

10   Q.  -- for Marc?

11   A.  Yes, it is.

12           MS. MOGHADAM:  United States moves into evidence what

13   has been marked as Government's 2.

14           THE COURT:  Any objection?

15           MS. CAREY:  No, Your Honor.

16           THE COURT:  Government's Exhibit 2 will be admitted

17   without objection.

18      (Government's Exhibit 2 admitted into evidence.)

19           MS. MOGHADAM:  Permission to publish?

20           THE COURT:  You may.

21   Q.  (BY MS. MOGHADAM) Mrs. Hennelly, when you -- you just

22   testified that when you wrote this check, you said, "We'll

23   figure it out later."

24       What did you mean by that?

25   A.  Well, there were several odd things.  I mean, the Bitcoin

1    thing to Marc -- I mean, for John to give Marc money without

2    talking to me about it first, especially this amount.  I didn't

3    know, really, whether it was a loan or an investment, and I

4    just remember thinking, that I'll talk to Marc later about, "Is

5    this -- where's the documentation about this that you have with

6    John or what investor account?"

7        But at the time, I mean, I didn't -- I was just, "Oh, my

8    God.  Let me figure it out later.  I don't know even know if my

9    husband's going to be alive in the next couple days."

10       And so my energy's really focused on John, and this is my

11   son-in-law.  I figure we'll just figure it out later.

12   Q.  Let me ask you this, a little bit about your recordkeeping:

13   If this was an investment, would you keep records of the

14   investments that your family makes?

15   A.  Oh, yes.  And John would have talked to me about this

16   amount.  This is a lot of money, on top of what we've already

17   helped him with.  And whether it was an investment or a loan --

18   and if it was a loan, he would have added it to our thing we

19   were keeping.

20   Q.  What's this thing you were keeping?

21   A.  A record, you know, like, the interest and principal.

22   Every month when he paid, I would write down, "Okay.  This much

23   is interest.  This much is principal," so he would know what he

24   owed us.  So we always kept records.

25   Q.  And did you also keep records of investments?

1    A.  Well, our own, but we had that one -- that one Schwab

2    account.  Of course, we had records of that.

3    Q.  And when you went back to check your records, did you ever

4    have a record of Mr. Hennelly handing over a $23,000 check to

5    the defendant for a Bitcoin investment?

6    A.  No.

7         MS. MOGHADAM:  I am publishing now, Your Honor, back

8    to what's been already admitted as Government's Exhibit 1.

9    Q.  (BY MS. MOGHADAM) Did you -- do you know -- you mentioned

10   this check came from your checkbook, correct?

11   A.  Yeah, I'm pretty -- yes.  I wrote most of the checks, and

12   John would have -- had his own, but this was from a checkbook

13   that was on my desk or in my drawer.

14   Q.  Did you ever locate the checkbook --

15   A.  No.

16   Q.  -- that this check came from?

17   A.  No.

18   Q.  Is it common for your family to lose checkbooks?

19   A.  No.  It would have been in a folder, and the police asked

20   me to check -- down the road when this started happening --

21   because I wasn't looking at bills, even.  So I had never had an

22   opportunity to go look for my checkbook for several weeks.

23   Q.  Let me ask you this:  You -- you've mentioned seeing your

24   husband, Mr. Hennelly, write checks before, right?

25   A.  Yes.

1    Q.   Okay.  Is it typical of him to not fill out every portion

2    of the check?

3    A.   I've never seen him not do that.

4    Q.   So he always fills out every portion?

5    A.   The date, amount, payee and memo, if he puts a memo in.

6    Q.   Okay.  At any point did you have -- at any point did you

7    talk to Mr. Hennelly about this check that you wrote?

8    A.   No.

9    Q.   No?

10   A.   No.

11   Q.   Okay.  At any point did Mr. Hennelly remember anything

12   about a $23,000 check?

13   A.   Yes.  So he had talked with the police about the attack,

14   and he remembered trying to get in the safe and not being

15   successful --

16            MS. CAREY:  Objection.

17   A.   -- and they asked him to --

18            THE COURT:  Just a moment, ma'am.  There's an

19   objection.

20            MS. CAREY:  Your Honor, hearsay.

21            THE COURT:  Response?

22            MS. MOGHADAM:  Your Honor, this is not going for its

23   truth.  It's going to go towards the state of mind of the

24   person listening to the statement.

25            THE COURT:  Would you like to reply?

1          MS. CAREY:  Yeah.  I mean, Your Honor, it does sound
2    like the truth of the matter asserted, that she's going to say
3    what Mr. Hennelly said about the attack on him.
4          MS. MOGHADAM:  I can respond.
5          THE COURT:  Yes.
6          MS. MOGHADAM:  It's Mrs. Hennelly's statement to the
7    witness, who, then, finally remembered something.  It's not
8    only an excited utterance at that moment when he had a
9    conversation about it, but it's also not being offered for
10   her -- the truth of the matter of the statement that she is
11   stating.
12         THE COURT:  Overruled.  I'll allow her to answer.
13   Q.  (BY MS. MOGHADAM) So what did you say to Mr. Hennelly about
14   a check?
15   A.  Okay.  I had not talked to John about really the attack or
16   the check or anything.  He was in rehab, and I was -- the
17   police were questioning -- asking questions.  I was not there
18   when the event occurred, so they kept asking me questions:
19   Would this be normal looking in the house?  Would this
20   drawer -- and I finally said, "Look, why don't I just come in
21   and look at your crime scene photos instead of trying to do it
22   over the phone."
23       And so we had set up an appointment for a Tuesday, and I
24   tried to have somebody with John for a little bit every day
25   during the hospital and rehab for notes or whatever, and I said

1    to him, "Okay.  I've got" -- it was a Thursday, and I said,

2    "I've got people set up."  I said, "By the way, I'm not going

3    to be here on Tuesday because I'm going to go into the police

4    station.  I'm going to go look at the crime scene photos."  And

5    I said, "They keep asking me questions about, you know, 'Was

6    this normal the way this room looks?  Was this drawer'" -- and

7    I said, "They're asking me questions about the -- like, the

8    office and, you know, the drawer we keep the checks and stuff

9    like that."

10       And he looked at me, and he said, "Oh, my God.  Vicki, I

11   wrote a check in the closet."

12       And I said, "What are you talking about?"

13       He said, "I wrote a check for, like, twenty-three,

14   twenty-three five in the closet before I was attacked."

15       And I said, "You know what?  No, honey, the only big check

16   that was written lately was the $23,000 check to Marc."

17       And he said, "What check to Marc?"  And we just kind of

18   looked at each other, and he said, "Oh, my God.  I remember

19   they came in with the checkbook, and they had me write a

20   check."  He said, "You need to call the police right now," and

21   so I did.

22       And he just -- I never mentioned the check specifically, I

23   just talked about that the police wanted me to go by and look

24   at things, and he just -- it just popped into his head, so --

25           MS. MOGHADAM:  Your Honor, I'm publishing what's been

1    already entered as Government's Exhibit 10 [*sic*].

2    Q.   (BY MS. MOGHADAM) Mrs. Hennelly, the date on this check is

3    September 10, 2021?

4    A.   Correct.

5    Q.   What were you doing on that day?

6    A.   Well, that was a Friday, and I -- it was when my mom was

7    getting ready to leave, and I was part of a committee putting

8    on a charitable tennis tournament on the 11th, and I was doing

9    a lot of paperwork.  So on the 10th, I remember we took my mom

10   out to lunch, for her last lunch, and then I -- we were back at

11   the house, and I was working on paperwork and the agenda for

12   next day and making sure everything was in place, and we were

13   sitting on the portal having, like, a glass of wine and talking

14   while I was working and -- so that was a busy day for us.  And

15   the next day was the tournament.

16   Q.   At any point on September 10th, 2021, did the defendant

17   come by to pick up a check from you?

18   A.   No.

19   Q.   All right.  Let's talk a little bit about September 11th,

20   2021.  What was this tournament you mentioned?

21   A.   It was a charity tennis tournament in Santa Fe, and I was

22   one of several committee members.  And that next morning John

23   and I got up -- he was helping with setup, so we went over to

24   the tennis courts, the club, early and we set up, and he was --

25   we were there all day.  He would help out where needed and --

1    we both were, and then it finished, I don't know, maybe 3:00 or

2    4:00 in the afternoon.  We went back to the house.  My mom was

3    there packing, and we had dinner and a glass of wine and went

4    to bed early, because we had a really early flight out of

5    Santa Fe.

6    Q.  At any point on September 11th, 2021, did you -- or did you

7    see Mr. Hennelly -- hand Marc Candelaria a check for $23,000?

8    A.  No.

9    Q.  And what time was your -- what time did you have to be at

10   the airport on September 12th?

11   A.  I think, like, 5:30 in the morning.  We were routing

12   through Dallas or someplace.

13   Q.  Aside from Government's Exhibit 2 from September 16th,

14   2021, did you ever hand Marc Candelaria a check for $23,000?

15   A.  No.

16   Q.  When you went back to your home after September 14th, 2021,

17   was anything taken from your home?

18   A.  No.  I did a walk-through and everything -- computers and

19   everything was there.  You know, and at that time I didn't know

20   the checkbook was gone.  I hadn't even looked for that.  I

21   think the police had me do a walk-through, but it was -- John's

22   laptop was still there.  My computer was there.  Nothing

23   else -- and -- yeah.

24   Q.  Where is your safe located?

25   A.  In the closet of our master bedroom.

1  Q.  If someone were to walk into the bedroom, could they see
2  the safe?
3  A.  No.  It's behind a cabinet on the ground.
4        MS. MOGHADAM:  A moment to confer, Your Honor?
5        THE COURT:  You may.
6  Q.  (BY MS. MOGHADAM) Mrs. Hennelly, at any point did your
7  family hire a private investigator?
8  A.  Yes.  While I was at the hospital, my stepkids, who had all
9  flown in town, hired a private investigator.
10 Q.  And why did you do that?
11 A.  Well, they were confused about what happened.  One of my
12 husband's cousins is an ex-DEA agent, so they called Billy, and
13 he said, "You should hire somebody," and so they did, and he
14 gave them a recommendation.
15 Q.  Were you still -- even though your family hired a private
16 investigator, were you still working closely with local police?
17 A.  Oh, yes.
18       MS. MOGHADAM:  No further questions, Your Honor, at
19 this time.
20       THE COURT:  Thank you.
21       Counsel, we've been going for quite some time, so I
22 think now is a good time to take a break.
23       Ladies and gentlemen, please rise for the jury.
24    (Jury exits at 10:18 a.m.)
25       THE COURT:  You may be seated.

1          Ms. Moghadam, I would remind you -- you've gotten in a
2     rhythm.  Be careful not to speak over Mrs. Hennelly and vice
3     versa so that our stenographer can -- or our court reporter can
4     get a clear record for us.
5          MS. MOGHADAM:  Yes, Your Honor.
6          THE COURT:  Mrs. Hennelly, you are free to step down
7     during the break.  Please watch your step as you step down, and
8     they can show you where the water fountain and restroom is, if
9     you need something like that.
10         Let's take about 15 minutes, counsel.  We'll be in
11    recess.
12       (Recess taken from 10:19 a.m. to 10:41 a.m.)
13         THE COURT:  Anything we need to address before we
14    bring the jury back in?
15         MR. HURTADO:  No, ma'am, Your Honor.
16         THE COURT:  And we need to get the witness back on the
17    stand.
18         You-all can be seated while we bring the witness back
19    in.
20         Please watch your step.
21         THE WITNESS:  I will.
22         THE COURT:  All right.  Let's rise for the jury.
23       (Jury enters at 10:41 a.m.)
24         THE COURT:  You may be seated.
25         Would the defense like to cross-examine?

```
 1              MS. CAREY:  Yes, Your Honor.  Thank you.

 2              THE COURT:  You may proceed.

 3                         CROSS-EXAMINATION

 4    BY MS. CAREY:

 5    Q.  Good morning, Mrs. Hennelly.

 6    A.  Good morning.

 7    Q.  My name is Emily Carey and I'm one of the attorneys for

 8    Mr. Candelaria.

 9        So I promise -- I know you've had a long morning already

10    and been up on the stand for a bit.  I don't have a ton of

11    questions.

12        So I want to talk a little bit, first, about your

13    relationship with Marc.

14    A.  Okay.

15    Q.  So your stepdaughter Meaghan is married to Marc -- was

16    married to Marc?

17    A.  Yes.

18    Q.  And they married in 2017?

19    A.  Correct.

20    Q.  And just a few months later they gave birth to their

21    daughter?

22    A.  Yes.

23    Q.  And that's your granddaughter?

24    A.  Yes.  Shay.

25    Q.  She's six and a half now?
```

1    A.    Yes.

2    Q.    And they were living in New York at the time she was born;

3    is that right?

4    A.    Yes.  Yes, Shay was born in New York.

5    Q.    And you visited them several times out there?

6    A.    Yes, we did.

7    Q.    But eventually Meaghan and her family decided to leave

8    New York?

9    A.    Yes.

10   Q.    And they moved to Santa Fe?

11   A.    Correct.

12   Q.    And you think that was in September of 2019?

13   A.    Yes.  Right in there, right around Shay's second birthday.

14   Q.    Okay.  And Marc's from Long Island, New York?

15   A.    Yes.

16   Q.    And, to your knowledge, he didn't have with family out here

17   of his own?

18   A.    In New Mexico?

19   Q.    Correct.

20   A.    No.

21   Q.    But Marc and Meaghan and Shay would have you in New Mexico?

22   A.    Yes.

23   Q.    And your husband?

24   A.    Yes.

25   Q.    And it sounds like there was some extended family living in

1    the area?

2    A.   Yes.  All my husband's siblings live in New Mexico.

3    Q.   Okay.

4    A.   Nieces, nephews, yeah.

5    Q.   And when they moved to New Mexico, you were gracious enough

6    to allow them to live in your guesthouse?

7    A.   Yes.

8    Q.   And that's on -- you described it.  It's on the same

9    property as your primary home?

10   A.   It's -- yeah, it's right in our backyard.

11   Q.   It sounds like there's just a patio that separates the two?

12   A.   Yes.

13   Q.   And I know that -- it sounds like that was supposed to be a

14   temporary stay; is that right?

15   A.   That's right.  It was for a few months while they figured

16   it out, but, you know, COVID came and changed timing.  But

17   nobody was living there, so it wasn't a problem.

18   Q.   Okay.  And so they stayed about two years in that

19   guesthouse?

20   A.   Yeah.  Yes.

21   Q.   And during that time it sounds like you and your husband

22   would see Meaghan and Marc and Shay quite a bit?

23   A.   Yes.  We'd have dinners.  We'd babysit, play in the

24   backyard, have cousins over, yeah.

25   Q.   And Marc's a carpenter?

1    A.   Yes, he is.

2    Q.   So he would sometimes help with projects in your house?

3    A.   Yes.

4    Q.   And he helped do things like hang doors?

5    A.   Pretty much if we needed -- besides carpentry, he was good

6    at, like, simple plumbing issues.  I mean, if we had a problem,

7    we would kind of ask him to look at it, if he could fix it; if

8    not, then we would have somebody else.  He might make a

9    suggestion, yeah.

10   Q.   Okay.  I don't have those skills so --

11   A.   Neither do I.

12   Q.   After the attack on your husband, Marc even changed the

13   locks in the house?

14   A.   Yes, he did.

15   Q.   Okay.  And he helped take out the carpet in the closet?

16   A.   Yes.

17   Q.   And you and your husband helped Meaghan and Marc out

18   financially?

19   A.   We did.

20   Q.   You would loan them money sometimes?

21   A.   Correct.

22   Q.   And it sounds like you really helped him out with his

23   Q clearance?

24   A.   Yes.  Yes.  The idea was to help him get his Q clearance so

25   he could move into the top secret areas.

1  Q.  And so you loaned him $25,000 to pay back credit card debt?

2  A.  Yes.  There was, like, 10 or 12 credit cards he listed.

3  Q.  And about other 16,000 to pay for taxes that he owed?

4  A.  Correct.  Back taxes.

5  Q.  And you mentioned on direct that when -- before making a

6  decision about paying for the taxes, you and your husband had a

7  little bit of a conversation about that?

8  A.  Oh, yes.  Yes, for any loan or anything, we talked.

9  Q.  And that you had decided that that was it, that that was

10  the big thing.  You weren't going to loan Marc any more money?

11  A.  Right.  We thought that was sufficient for him to get his

12  Q clearance.

13  Q.  Did you ever directly communicate that to Mr. Candelaria?

14  A.  Communicate that we were not going to give any more money?

15          MS. MOGHADAM:  Objection.  Hearsay.

16          THE COURT:  I'm sorry?

17          MS. MOGHADAM:  Objection.  Hearsay as to what she

18  communicated to Marc.

19          THE COURT:  Response?

20          MS. CAREY:  Your Honor, I'm -- it's for the effect on

21  the listener.  I mean, it's -- I'm asking what she --  I'll

22  rephrase, Your Honor.  I'll rephrase.

23          THE COURT:  All right.  Thank you.  I'll sustain the

24  objection and allow you to rephrase.

25  Q.  (BY MS. CAREY) You and your husband decided you weren't

1   going to loan Marc any more money?

2   A.  Correct.

3   Q.  Okay.  To your knowledge, did Marc know that?

4   A.  Did Marc know that?

5           MS. MOGHADAM:  Objection.  Speculation.  Hearsay.

6           MS. CAREY:  I'm asking whether she knows, Your Honor.

7           MS. MOGHADAM:  How can she know what someone else

8   knew?

9           THE COURT:  Overruled.  I'll allow her to answer if

10  she has an opinion.

11  A.  At the time we made the -- we wrote the check for the back

12  taxes, we made it clear that we were helping him for the

13  Q clearance and that that was it.  And it was clear to Meaghan

14  and Marc, it should have been because, you know, we -- we'd

15  already done so much.

16  Q.  (BY MS. CAREY) Thank you.

17      And it sounds like you helped them with a down payment to

18  purchase their home as well?

19  A.  I think -- yeah, I think we gave them a little bit of money

20  for that to get them to the 20 percent.

21  Q.  And it sounds like that home needed a lot of work?

22  A.  The home?  It did.  It was an old adobe, and it did need

23  work.

24  Q.  And Marc did some of the work himself?

25  A.  He and Meaghan did a lot of the work, and then they had a

1    contractor come in.  But what they could do, they did.

2    Q.  And you offered to help with some of the construction

3    costs; is that right?

4    A.  Yes.

5    Q.  And I -- and you even gave Meaghan a blank check at some

6    point for that purpose?

7    A.  So Meaghan -- yes.  So Meaghan bought the house, and she

8    had a -- she was working with a construction company, and

9    sometimes -- because her income will come and go -- jewelry.

10   So at one point, she did have a blank check in case -- she

11   said -- I forget what was going on, but she might need to write

12   some -- need to pay the person when they came.

13   Q.  Okay.  Thank you.

14   A.  But she never used it.

15   Q.  I want to turn our focus a little bit to the check that you

16   wrote to Marc Candelaria.

17   A.  Yes.  Okay.

18   Q.  So you were out of state when you learned about what had

19   happened to your husband?

20   A.  Correct.

21   Q.  And you arrived back in New Mexico on September 15th?

22   A.  On Wednesday, yes.

23   Q.  And on that same day, the Wells Fargo department -- or

24   fraud department alerted you to a suspicious check?

25   A.  Correct.

1  Q.  And they set a deadline for you to respond?

2  A.  Yes.

3  Q.  And would it be fair to say you had a lot going on that

4  day?

5  A.  Never thought of it again, really.

6  Q.  And so you forgot to respond?

7  A.  Correct.  Yes.  I just went back to my sister-in-law's and

8  went to bed.

9  Q.  And the following day, you learned that the bank had

10  actually reversed the check?

11  A.  Correct.

12  Q.  And you received an image of that Wells Fargo check?

13  A.  Well, when I went into my account and I clicked on the

14  disputed check, yes, then I saw the check.

15  Q.  And you observed that it was made out to your son-in-law,

16  Marc Candelaria?

17  A.  Correct.

18  Q.  In the amount of $23,000?

19  A.  Yes.

20  Q.  And it was dated September 10th?

21  A.  Yes.

22  Q.  And it was signed by your husband?

23  A.  Yes.

24  Q.  And so you called Marc to ask him about it?

25  A.  Yes -- well, I called Meaghan, and Meaghan put Marc on the

1  phone.

2  Q.  But you had a chance to speak with him about it?

3  A.  I did.

4  Q.  And you learned that his account balance was now in the

5  negative?

6  A.  Yes.

7  Q.  And Marc -- but Marc didn't ask you to write a check?

8  A.  No, not directly, but he was like, "You know, I'm $23,000

9  in the hole because they took the money back from the check

10 that John gave me."

11      And, you know, I'm, like, "Oh, okay.  Sorry, but I don't

12 know anything about this."

13      But, I mean, at the time we had no suspicion of how -- the

14 circumstances under which John's check was written, so -- he's

15 my son-in-law, my daughter and my grand- -- so I said, "Let me

16 help you, and then we'll -- it's odd, but we'll figure it out

17 later once we know John's going to live."

18 Q.  Yeah, of course.

19 A.  And I needed to talk to my husband and I couldn't right

20 then.

21 Q.  Of course.

22 A.  Sorry.

23 Q.  No, no.  Please.

24      And so you did, in fact, then write him the check?

25 A.  Yes.  The check that we looked at earlier.  And I left it,

1   I think, at the house, and they came by and deposited it, he
2   did.
3   Q.  Thank you.
4   A.  Or somewhere.  I don't know what happened.  I just left the
5   check.
6           MS. CAREY:  May I have a moment, Your Honor?
7           THE COURT:  You may.
8           MS. CAREY:  I promised I would be quick and I don't
9   have any further questions.  Thank you, Mrs. Hennelly.
10          THE COURT:  Thank you, Ms. Carey.
11          Would the United States like to redirect?
12          MS. MOGHADAM:  Yes, Your Honor.
13          May I proceed?
14          THE COURT:  You may.
15                      REDIRECT EXAMINATION
16  BY MS. MOGHADAM:
17  Q.  Mrs. Hennelly, on cross-examination defense counsel asked
18  about a blank check that you wrote to Meaghan.
19  A.  Yes.
20  Q.  I want to briefly touch on that.
21  A.  Okay.
22  Q.  You mentioned that Meaghan never used it.  So what happened
23  to the check when it wasn't used?
24  A.  Oh, I don't know.  Either she would have voided it or -- I
25  don't remember her giving it back to me.  You know, I think she

1    had had it because there was -- something was going to happen

2    and she might have to pay somebody that day.  So I don't think

3    she ever used the check, because I don't think she ended up

4    having to pay the person on site, but I think she still had it

5    in her possession.

6    Q.  For the most part, do you trust how Meaghan handles her

7    finances?

8    A.  Oh, yes.

9    Q.  Are you aware of whether the defendant and Meaghan kept

10   their finances separate, for the most part?

11   A.  I believe, for the most part, yes.

12   Q.  And even if you wrote a blank check to Meaghan, have you

13   ever noticed Mr. Hennelly do something like that?

14   A.  Oh, no.  No.  It would have been made out to Meaghan, and

15   it was a onetime thing.

16   Q.  And when you handed the second check, the one that you

17   wrote for $23,000 to the defendant, was it your intention to

18   follow up with what that check was for?

19   A.  The check I wrote?

20   Q.  The check you wrote.

21   A.  So I left it at the house, because I went up to the

22   hospital.  Yes, I was going to, at some point, talk to him

23   about:  Was this a loan?  Was this an investment?  You know, I

24   don't have any documents.  And it was always in the back of my

25   head, but I just had more pressing matters that I was worried

1    about.

2    Q.  So you didn't just hand over this $23,000 check to never go

3    back to address it again?

4    A.    No.   He was to put -- the 23,000 was to make up for the

5    deficit in his account.  He was supposed to put it in the

6    Wells Fargo account so that he -- because I didn't know if he

7    had written checks on it and they were going to be bouncing

8    everywhere.  I just -- because I didn't have any information,

9    and I thought when -- once John's better, we will follow up on

10   this.  It was something I thought was odd, but I wasn't --

11   it -- I had other things that were more urgent in my life at

12   that point.  And I was going to get to it and before I did,

13   John and I had that conversation in rehab where he -- and at

14   that point, the police said, "Don't say anything."

15       We called the police, and they said, "Just let us do our

16   work."

17       So we never brought up the check with Marc or Meaghan

18   either.  We just -- we just let it lay until they finished

19   their investigation.

20           MS. MOGHADAM:  Thank you, Mrs. Hennelly.  No further

21   questions.

22           THE COURT:  May this witness be excused?

23           MS. MOGHADAM:  Yes, Your Honor.

24           THE COURT:  Any objection?

25           MS. CAREY:  No, Your Honor.

```
 1              THE COURT:  Ma'am, you are excused.  You're free to
 2    step down.  Please watch your step when you step down.  Thank
 3    you.
 4              THE WITNESS:  Thank you.
 5              THE COURT:  United States may call their next witness.
 6              MS. MOGHADAM:  The United States calls John Hennelly.
 7              THE COURT:  Good morning, Mr. Hennelly.
 8              THE WITNESS:  Good morning.
 9              THE COURT:  There's a step up, sir.  Please watch
10    that.
11              THE WITNESS:  Okay.
12              THE COURT:  Before I let you sit down, sir, can I get
13    you to raise your right hand?
14         (The witness was duly sworn.)
15              THE COURT:  Thank you, sir.  You may be seated.  Watch
16    that chair.  And, Mr. Hennelly, that microphone in front of you
17    is adjustable, if you need to adjust it.  There are some water
18    bottles that you are free to use, sir.
19              THE WITNESS:  Thank you.
20              THE COURT:  Yes, sir.
21         You may proceed.
22              MS. MOGHADAM:  Thank you, Your Honor.
23
24
25
```

1          <u>JOHN HENNELLY</u>

2       (being duly sworn, testified as follows:)

3          <u>DIRECT EXAMINATION</u>

4   BY MS. MOGHADAM:

5   Q.   Good morning.

6   A.   Good morning.

7   Q.   Please introduce yourself to the jury by your first and

8   last name.

9   A.   I'm John Hennelly.

10  Q.   Mr. Hennelly, before we get started, it sounds like your

11  speech is a little labored.  Can you please explain why?

12  A.   Because of the attack my speech is impaired, so I can't

13  articulate the way I used to.  If somebody has a problem

14  understanding me, let me know.

15  Q.   Thank you, Mr. Hennelly.  And we'll talk about everything

16  that had you mentioned, but I appreciate that clarification for

17  the jury.

18       Mr. Hennelly, how old are you?

19  A.   I'm 80 years old.

20  Q.   Where do you live?

21  A.   Santa Fe.

22  Q.   How long have you been living in Santa Fe, New Mexico?

23  A.   A little over ten years, total time.  We had a home there

24  since the '80s -- or since the early '90s, but we moved there

25  when I retired.

1   Q.  So you had a home out here in the '80s and the '90s and

2   moved full-time to New Mexico?

3   A.  Right.

4   Q.  Who do you live with?

5   A.  My wife.  She was just in here.

6   Q.  What's your wife's name?

7   A.  Vicki.

8   Q.  Same last name?

9   A.  Yes.

10  Q.  And how long have you been married to Vicki?

11  A.  39 years.

12  Q.  Do you have any children with Mrs. Hennelly?

13  A.  We have one son who is 37 and he's autistic.

14  Q.  Do you have any children from a prior marriage?

15  A.  Yeah, three.  Three.

16  Q.  Who are those children?

17  A.  John, Cara and Meaghan.  Two of them are sitting out there.

18  Q.  In September of 2021 was Meaghan Hennelly married?

19  A.  Yes.

20  Q.  Who was she married to?

21  A.  She was married to the defendant.

22  Q.  And what's his name?

23  A.  Marc Candelaria.

24  Q.  Do you see Marc Candelaria?

25  A.  He's right over there, sitting at the defense table.

```
 1   Q.   Okay.
 2            MS. MOGHADAM:   Let the record reflect that the witness
 3   has identified the defendant, Marc Candelaria.
 4            THE COURT:   The record will so reflect.
 5   Q.   (BY MS. MOGHADAM) Do Meaghan and the defendant have any
 6   children?
 7   A.   One.
 8   Q.   Who is that child?
 9   A.   Shay.
10   Q.   Son or daughter?
11   A.   Daughter.
12   Q.   Mr. Hennelly, are you currently employed?
13   A.   I'm retired.
14   Q.   How long have you been retired?
15   A.   I think I retire- -- the last time I retired was in June of
16   2012.
17   Q.   Prior to retirement how were you employed?
18   A.   I was a lawyer.  I used to stand over there and ask the
19   questions.
20   Q.   Does it look the same?  Does it look the same as when you
21   were doing it?
22   A.   Yeah.
23   Q.   Okay.  How long were you an attorney for?
24   A.   Let's see, I got my license in 1970, so 42 years.
25   Q.   What does your wife, Vicki, do?
```

1    A.    She's retired also.

2    Q.    And what was she doing before she was retired?

3    A.    She was an attorney who worked with me.

4    Q.    Since getting married to Vicki, did you keep your finances

5    joint or separate?

6    A.    Joint.

7    Q.    Were there any accounts that Mrs. Hennelly was not on?

8    A.    I didn't hear.  Where there any accounts -- what?

9    Q.    Were there any accounts that did not include Mrs. Hennelly?

10   A.    No.  They were all joint.

11   Q.    Did you guys keep each other in the know about what

12   finances --

13   A.    Absolutely.

14   Q.    Aside from your income as an attorney, did you have any

15   other sources of income?

16   A.    I didn't have any other sources of income, but I took money

17   and invested it in the hopes of having enough for retirement.

18   Q.    Okay.  So you made these investments to plan for

19   retirement?

20   A.    Yeah.

21   Q.    Okay.  What sort of investments did you make?

22   A.    Stocks.

23   Q.    Did investing in stocks work out for your retirement plan?

24   A.    Yes.

25   Q.    Was Mrs. Hennelly informed about the investments that you

1  were making?

2  A.  All the time.

3  Q.  All the time?

4  A.  Yeah.

5  Q.  Was she included on any investment accounts?

6  A.  Oh, yeah.  They were all joint accounts.

7  Q.  What was something that you needed to prepare for, as far

8  as your retirement went, with your son?

9  A.  I don't understand what you're saying.

10 Q.  You mentioned that you had a son with Mrs. Hennelly?

11 A.  Right.

12 Q.  And did you have to make investments to be able to provide

13 for your son?

14 A.  We had to make sure that there would be enough for him

15 after we retired and passed away.  So, yeah, we created a

16 special trust for him.

17 Q.  Did you ever make any investments with your son-in-law,

18 Marc Candelaria?

19 A.  Yeah.  We -- I set up an account so he could trade options.

20 That was the only time.

21 Q.  Okay.  So only one time?

22 A.  Only one time.

23 Q.  And how did that investment go for you?

24 A.  Well, we put $10,000 in the account and he initially made

25 some trades and increased the value, the balance, and then it

1    went back down to around 10-, and I said -- I talked to him,
2    and I said, "We should stop now and see how things go for a
3    while."  And what happened is, he didn't pay attention and he
4    went ahead and invested the money and lost it all.
5    Q.  So when he lost it all, did you have any intention of
6    investing with the defendant again?
7    A.  Never.
8    Q.  Was Mrs. Hennelly on that account where you invested with
9    the defendant?
10   A.  Yes, she was.
11   Q.  At any point did the defendant and your daughter Meaghan
12   move in with you?
13   A.  Yes.  When they moved back from New York, they moved in
14   with us.
15   Q.  Where did they move to?
16   A.  We have a small guesthouse behind our home in Santa Fe, and
17   they moved in there.
18   Q.  Let's talk about the layout a little bit.  How far is the
19   guesthouse from the main house?
20   A.  Oh, 15 feet.  It's very close.
21   Q.  Are there spare keys to the main house?
22   A.  There are -- we provided Meaghan a set of spare keys so
23   they could get in the house whenever they -- in our house
24   whenever they felt the need to.
25   Q.  Did the defendant come to the main house often?

1    A.   Yeah.   Frequently he would come in and he would do chores

2    for us, or they would come in and have dinner.

3    Q.   Did the defendant ever watch your home while you were out

4    of town?

5    A.   I think they both -- they both did.

6    Q.   Were there any areas of the main house that the defendant

7    was not allowed to be in?

8    A.   No.   We didn't restrict them.

9    Q.   Mr. Hennelly, what does your daughter Meaghan do for a

10   living?

11   A.   She's a jewelry designer.

12   Q.   While the defendant was living in your guesthouse, what did

13   he do for a living?

14   A.   He worked at Los Alamos.

15   Q.   What was he doing for Los Alamos?

16   A.   I think he was a carpenter.

17   Q.   Did you do anything to help him with his job at Los Alamos

18   National Labs?

19   A.   Well, we loaned him money, so -- because he had debts and

20   he wanted to get a Q clearance, which I think is a

21   high-security clearance, and we -- he thought it would help if

22   he could pay those debts off, so we loaned him some money.

23   Q.   How did you know how much the defendant was in debt?

24   A.   He gave us a list of all the credit card accounts that he

25   had and what the outstanding balances were.

1  Q.  Did you -- were you aware of whether or not the defendant
2  ever actually paid off any of those debts?
3  A.  We just assumed that he did.  We took him -- he said that's
4  what the purpose of it was, so we assumed he did.
5  Q.  Now, when you gave him the loan for his credit card debts,
6  did you ever give him another loan?
7  A.  Yes.  I think we loaned him another time, I think, for some
8  taxes he owed.
9  Q.  Do you recall how much that was?
10 A.  I think it was $16,000.
11 Q.  What was the payment plan that you expected the defendant
12 to make?
13 A.  I -- it was very lax.  We said he should pay what he could
14 afford, and the loans would accrue at 6 percent interest, and
15 he paid $500 a month, and I would calculate every month the
16 amount of interest and what the capital reduction was.
17 Q.  And whose idea was it for the defendant to pay $500 a
18 month?
19 A.  He -- he said he -- that's what he could afford.
20 Q.  Did you get these $500 payments in a -- in what form did
21 you get these payments?
22 A.  Initially he paid by check and then he switched to cash.
23 Q.  At any point did the repayment of these loans stop?
24 A.  Right.  After I got attacked.
25 Q.  Prior to the date of September 14th, 2021, if the defendant

1   needed another loan, were you inclined to lend him more money?

2   A.   I think we had stretched and got everything -- he had got

3   everything we could -- were willing to loan him.

4   Q.   Mr. Hennelly, were you aware that the defendant had any

5   sort of a gambling problem?

6   A.   I had no idea.

7   Q.   How long did the defendant and Meaghan live in your

8   guesthouse?

9   A.   I think approximately two years.

10  Q.   Did they eventually move out?

11  A.   My daughter purchased a house in La Cienega, and they moved

12  out over a period of time.  They didn't move out all at once,

13  but in the summer of 2021.

14  Q.   Did you help finance that house in any way?

15  A.   Well, we loaned her the down payment, and we -- she -- we

16  took the mortgage.

17  Q.   Did you -- did -- are you aware of -- was this house in

18  Meaghan's name or was it in Meaghan and the defendant's name?

19  A.   It was in Meaghan's name.

20  Q.   Do you know why?

21  A.   She just preferred to have it in her name.  I didn't

22  question her.

23  Q.   From your knowledge, did Meaghan and the defendant keep

24  their finances separate?

25  A.   Yes.  That's what they told us.

1   Q.   How is your relationship with Meaghan?

2   A.   I thought it was very good.  I think it's still very good.

3   Q.   Do you maintain a relationship with your granddaughter?

4   A.   Oh, she's terrific.

5   Q.   How's your relationship with the defendant?

6   A.   Well, I don't have one now.

7   Q.   At the time that you were lending him money what was your

8   relationship with him?

9   A.   I thought it was good.

10  Q.   Mr. Hennelly, I want to turn your attention to the evening

11  of Monday, September 13th, 2021.

12  A.   Okay.

13  Q.   Do you remember that night?

14  A.   I remember, yes.  I was all by myself in the house.

15  Q.   Why were you by yourself?

16  A.   Because my wife and her mother went to Florida where my --

17  where my mother-in-law lived.  She was going to be there for a

18  week.

19  Q.   Were you excited to have the house to yourself?

20  A.   What?

21  Q.   Were you excited to have the house to yourself?

22  A.   No.

23  Q.   No?  All right.  Did you have family conversations about

24  Mrs. Hennelly going out of town?

25  A.   Family conversations about what?

1    Q.  About Mrs. Hennelly leaving town for Florida?

2    A.  Oh, yeah.  It was common knowledge in the family.

3    Q.  When did Mrs. Hennelly leave for Florida?

4    A.  Sunday morning.  I took she and her mother to the airport.

5    Q.  What time was that?

6    A.  It was an early flight.  They left out of Santa Fe around

7    seven o'clock, I think, or 7:30.

8    Q.  Okay.  So back to September 13th, Monday.

9    A.  Right.

10   Q.  Did you have a security system installed in your home on

11   that day?

12   A.  We did.

13   Q.  Did you activate that system that night?

14   A.  I did not.

15   Q.  Why not?

16   A.  I didn't -- I wasn't in a custom of activating it at night

17   when we went to bed.  I do now, but I didn't then.

18   Q.  Okay.  Did you lock your doors that night?

19   A.  As best I recall, I did.

20   Q.  Is it normal practice for you to lock your doors?

21   A.  Absolutely.  That's the last thing we do before we go to

22   bed, go around and check them.

23   Q.  What did you do that -- what is your nightly routine?

24   A.  What?

25   Q.  What's your nightly routine?

1    A.  Well, I ate dinner and I read and then I hit the hay.

2    Q.  And do you know what time you typically hit the hay?

3    A.  I think that night it would have been around 8:45,

4    nine o'clock.  It's earlier now.

5    Q.  When you go to bed, do you close your bedroom door?

6    A.  No.

7    Q.  What happened after you went to sleep?

8    A.  Sometime in the early morning, I was awakened by someone

9    who was in the bedroom, flashing a very strong light in my eyes

10   and pointing a gun at me.

11   Q.  Were you able to see that person's face?

12   A.  I could -- not in the bedroom, I couldn't.  It was all

13   dark.

14   Q.  Did you ever try to turn on a light?

15   A.  I did turn on the light next to my bed so I could see,

16   because he -- he told me to open the safe, and I said, "I don't

17   know the combination.  I have to go get it."  I wanted to be

18   able to see around the room while I was getting the combination

19   that was in the dresser across the room, so I turned the light

20   on so I could see moving -- especially looking in the dresser.

21   Q.  Were you able to turn that light on?

22   A.  I did.

23   Q.  Okay.  Did the intruder ever break the lamp?

24   A.  He did.  While I was over at the chest of drawers getting

25   the combination -- which I did find -- he went behind me and

1    took a -- I think it was a -- his flashlight and knocked the

2    lamp over and said, "No lights."

3    Q.  I want to talk -- I want to go back and talk a little bit

4    about what you noticed about the intruder.  What was the

5    intruder wearing?

6    A.  I can't remember.

7    Q.  Was there anything on his face?

8    A.  A bandanna across his face.  I looked above it and I didn't

9    recognize him.

10   Q.  So you did not recognize this intruder?

11   A.  I did not.

12   Q.  What did you -- what was his voice like?

13   A.  He spoke with a very heavy Hispanic accent, and his

14   articulation of English was very good.

15   Q.  So you're using "he."  Was the intruder a male?

16   A.  Yes.

17   Q.  Was the intruder Marc Candelaria, your son-in-law?

18   A.  No, it was not Marc Candelaria.

19   Q.  Mr. Hennelly, did you hear the intruder come in?

20   A.  No, I did not.

21   Q.  Did you hear any banging noise before you woke up?

22   A.  No.  I didn't wake up until the light was flashed in my

23   face.

24   Q.  So you didn't hear any commotion before that light?

25   A.  No, not at all.

1  Q.  You mentioned that the intruder demanded you open the safe?

2  A.  It was a safe in our closet, yes.

3  Q.  Were you able to open the safe?

4  A.  I was not able to open it.  I got the combination.  I went

5  over -- went into the closet and I was in front of the safe and

6  tried the combination a couple of times and I wasn't

7  successful, and I got up and I said to him, "I've always had

8  difficulty opening this.  I can't do it.  You're going to have

9  to do it."

10  Q.  Do you know if the intruder was able to get into the safe?

11  A.  I don't remember him trying.

12  Q.  After you were unsuccessful in opening the safe, what

13  happened next?

14  A.  He told me to lie down on my face, on my stomach, in the

15  closet where -- it was a closet dressing room, and I did.  And

16  I laid down on my stomach and he left.

17  Q.  When you say "he left," how -- how long was he gone for?

18  A.  Just a few minutes.

19  Q.  And when -- did the intruder ever come back?

20  A.  He did come back.

21  Q.  And then what happened when he came back?

22  A.  Before he left, he said, "Stay in this position for" -- I

23  think it was a couple of hours, "and don't move because if you

24  do, we'll come back and attack you."  I don't know if he said

25  "attack," but he used words to that effect.

1  Q.  I'm sorry.  Did he say -- did he use the words "we"?

2  A.  I don't remember whether he said "we" or not.  I just -- I

3  don't remember.

4  Q.  You don't remember.  Okay.

5      So when he came back, did he make any more demands of you?

6  A.  He came back in the room.  I was laying facedown on the

7  floor of the dressing room closet and he gave me a checkbook,

8  and he -- with a ballpoint pen, and he said, "Make out a check

9  for $23,000."

10 Q.  Did you recognize that checkbook?

11 A.  It was one of my wife's and I's and mine that we kept in

12 our office, which was just adjacent to the home office to my --

13 our bedroom.

14 Q.  And did you write a check for $23,000?

15 A.  I did.  And I -- before -- or when I started to write the

16 check, I said, "Should I make it out to cash?"

17     And he said, "No.  Leave it blank."

18     So I wrote in the number 23,000, and then I went underneath

19 and wrote 23,000 longhand, and then I signed it.  I didn't put

20 in any payee.  I didn't put in any date.

21 Q.  We'll go back and we're going to talk a little bit about

22 that check.  Okay?  But at any point while you were on the

23 floor of your bedroom closet, were you rendered unconscious?

24 A.  Yeah.  After I finished writing the check out, I, of

25 course, handed the checkbook back to him, and he said, "Don't

1  move."  And this time he said for an hour or so and he left.

2  And my reaction was, "Well, that's it.  He's leaving and I'm

3  okay."  And then it wasn't too long afterward, I'm laying there

4  face down, and I got a severe pain in the back of my head and

5  then I passed out.

6  Q.  So do you -- what was the next thing you remembered after

7  passing out?

8  A.  Next thing I remember is going to the rehab center here in

9  Albuquerque.

10  Q.  If you need a minute, let me know, and there's tissues in

11  front of you.

12  A.  I can't hear you.

13  Q.  If you need a minute, let me know, and there's tissues in

14  front of you, sir.

15  A.  Okay.

16  Q.  So you mentioned -- you mentioned going to a rehab center.

17  Do you even remember the time that you were in the hospital?

18  A.  It was over a week.  I don't know the exact dates, but it

19  was over a week, I believe.

20  Q.  Do you remember any conversations you had while you were in

21  the hospital?

22  A.  I'm completely blank for the time from the time I passed

23  out on the floor of the closet until I was at the rehab center.

24  I remember nothing.

25  Q.  So you went to the rehab center after a week of being in

1    the hospital?

2    A.   Yes.

3            MS. MOGHADAM:  Your Honor, may I approach the witness

4    with exhibits, what's already been admitted into evidence as

5    10A through 10F?

6            THE COURT:  You may.

7    Q.   (BY MS. MOGHADAM) Mr. Hennelly, I'm handing you what's

8    already been entered into evidence.  Take your time with them.

9    Okay?  And just let me know if you recognize them.

10   A.   Yeah, I do.

11           MS. MOGHADAM:  May I retrieve them?

12           THE COURT:  You may.

13           MS. MOGHADAM:  I'm publishing Exhibit 10D.

14   Q.   (BY MS. MOGHADAM) Mr. Hennelly, who is that?

15   A.   That's me.

16   Q.   Do you remember laying there --

17   A.   No.

18   Q.   -- in this photograph?

19   A.   No.

20   Q.   Do you remember going back home finally?

21   A.   Yes.

22   Q.   Do you remember if anything was missing from your home?

23   A.   Do I remember what?

24   Q.   Do you remember if anything, aside from the check you

25   mentioned, was missing from your home?

1   A.  All I could tell you is the only thing I know was taken was

2   the check and the checkbook it was in.

3   Q.  Did you ever locate the spare keys of your main house?

4   A.  I never looked for them.

5   Q.  Mr. Hennelly, if I were to show you the check that you

6   testified to writing on the floor of your bedroom closet, would

7   you recognize it?

8   A.  Yes, I would.

9        MS. MOGHADAM:  Permission to approach the witness with

10  what's already been entered into evidence as Government's

11  Exhibit 1?

12       THE COURT:  You may.

13       Can we take down the picture that's on the Elmo?

14       MS. MOGHADAM:  Yes, Your Honor.

15       THE COURT:  Thank you.

16  A.  Yeah.  That's it.

17  Q.  (BY MS. MOGHADAM) Does this look any different?  Does this

18  check look any different than when you wrote it?

19  A.  Yes.

20  Q.  How?

21  A.  Well, the date's entered, which I didn't do.  It's -- the

22  name "Marc Candelaria" is written above, which I didn't do, and

23  the lower left-hand corner behind the word "for," it says

24  "Capital BTC," and I didn't enter that.  And there's a

25  handwritten -- an inscription on the back, an endorsement which

1    looks like Marc's handwriting.

2    Q.  Let me grab that from you and put it up on the screen for

3    you and you'll see it right there.

4        All right.  So, Mr. Hennelly, I'm pointing to that date

5    right there.  You're saying you didn't write this part?

6    A.  No, I did not.

7    Q.  And you're saying that you didn't write --

8    A.  I did not.

9    Q.  And you didn't write the "BTC"?

10   A.  I did not.

11   Q.  Is that your handwriting --

12   A.  Yes.

13   Q.  Really quickly let me finish and then answer.  "23,000"

14   that's in your handwriting?

15   A.  Yes.  Yes.

16   Q.  Is this your signature?

17   A.  Yes, it is.

18   Q.  Did you ever learn what BTC stands for?

19   A.  I learned from someone after -- after I went back home,

20   that it stood for Bitcoin.  I don't remember who told me.

21   Q.  Do you know what Bitcoin is?

22   A.  What?

23   Q.  Do you know what Bitcoin is?

24   A.  I know what it is.

25   Q.  What is it?

1  A.  It's an artificial coin that people have been trading for a
2  number of years.  I've never been interested in it.
3  Q.  When you say you were never interested in it, were you
4  never interested in investing in Bitcoin?
5  A.  Never would.  I don't see any value in it.
6  Q.  Have you ever invested in anything like Bitcoin or
7  cryptocurrency before?
8  A.  No.  Never.
9  Q.  Have you ever previously invested in cryptocurrency with
10  the defendant?
11  A.  No.
12  Q.  At any point did the defendant ever have a conversation
13  with you about investing in Bitcoin?
14  A.  Absolutely not.
15  Q.  If he did have a conversation with you about investing in
16  Bitcoin, what would you have said?
17  A.  No, thank you.
18  Q.  Mr. Hennelly, you just mentioned that you -- you just
19  explained to the jury what portions of the check you wrote and
20  what portions of the check you didn't write.
21  A.  Right.
22  Q.  Is it typical for you to fill out only portions of a check
23  before handing it to somebody?
24  A.  I fill out the full thing.
25  Q.  If you made an investment with the defendant, would you

1    keep a record of it separate from the check?

2    A.   Yes.  Yes.

3    Q.   How do you document investments that you make?

4    A.   Well, when we loaned him the money, we -- we kept a record

5    every month of what he paid, and we -- I gave him a copy of how

6    much interest came down and how much was principle, and I kept

7    a copy.

8    Q.   Have you ever located any documents in your record that

9    shows that you had plans to invest with the defendant into

10   Bitcoin?

11   A.   Never.  I didn't look because I know I didn't do it.

12   Q.   Now, on that check that you indicated you wrote the night

13   that you were attacked, the date September 10th is on that

14   check.

15   A.   Right.

16   Q.   Did you -- do you remember what you were doing on

17   September 10th?

18   A.   I was at home on September 10th.

19   Q.   Do you remember, on September 10th, ever handing the

20   defendant a check for --

21   A.   I never did.  I didn't see him on that day.  I didn't see

22   him for several days before the attack.

23   Q.   How about September 11th?

24   A.   No.

25   Q.   And that's "no," you did not hand the defendant a check?

1   A.  No, I didn't.  I never handed him a check like that.

2   Q.  What about September 12th?

3   A.  No.

4           MS. MOGHADAM:  A moment to confer, Your Honor?

5           THE COURT:  You may.

6   Q.  (BY MS. MOGHADAM) Mr. Hennelly, did your family ever hire a

7   private investigator in this case?

8   A.  Yes.

9   Q.  Why?

10  A.  Because they were concerned that they -- that the Santa Fe

11  Police Department would -- might not do a good, thorough job, I

12  assume.  I wasn't -- not involved.  They made that decision

13  while I was unconscious.

14  Q.  When you learned that the Santa Fe Police Department was

15  investigating your case, did you actively participate in that

16  investigation?

17  A.  I assisted.  Whatever the investigator wanted, I provided.

18          MS. MOGHADAM:  No further questions.

19          THE COURT:  Counsel, would you approach, please?

20          MS. MOGHADAM:  Yes, Your Honor.

21     (The following discussion was held at the bench.)

22          THE COURT:  I'm concerned that he may need a break

23  before we start with cross-examination.  Is that what you're

24  thinking, counsel?

25          MR. GLANZ:  We have no objection to that.

1          MS. MOGHADAM:  That would be lovely.  Thank you.

2      (Bench conference concluded.)

3          THE COURT:  All right.  Ladies and gentlemen, I think

4  it would be a good time to go ahead and break for lunch before

5  we start cross-examination.  It is now 11:30.  If you could be

6  back here by one o'clock, ready to go, the Court would

7  appreciate it.

8          Please remember the rules that I have talked to you

9  about, about not making any decisions regarding this case,

10  because you have not heard all of the evidence.  Please do not

11  talk to each other or anyone else about this case or do any

12  research on your own.  Please be very careful while you are at

13  lunch, and I will see you back here at one o'clock.  Thank you

14  for your time and attention this morning.

15          Please rise for the jury.

16      (Jury exits at 11:35 a.m.)

17          THE COURT:  You may be seated.  If you'd like to come

18  help Mr. Hennelly down, sir.

19          Mr. Hennelly, you are free to step down.

20          THE WITNESS:  Okay.

21          THE COURT:  You're going to come back after lunch and

22  testify some more.  Okay?

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          All right.  Counsel, is there anything we need to take

```
 1   up before we break for lunch?
 2          MR. HURTADO:  Nothing from the government, Your Honor.
 3          MS. CAREY:  No, Your Honor.  Thank you.
 4          THE COURT:  All right.  Thank you.  If you-all can be
 5   back here shortly before one o'clock, hopefully we can start
 6   right at one o'clock.  We'll be in recess.
 7       (Recess taken from 11:36 a.m. to 1:04 p.m.)
 8          THE COURT:  Anything we need to take up before we
 9   begin?
10          MR. HURTADO:  No, ma'am.
11          THE COURT:  Let's bring in the jury, please.
12       (Jury enters at 1:04 p.m.)
13          THE COURT:  Welcome back.  I hope you had a nice
14   lunch.  I think we are ready to get going.
15          Would defense like to cross-examine?
16          MS. CAREY:  Yes, Your Honor.
17          THE COURT:  Thank you.
18                         CROSS-EXAMINATION
19   BY MS. CAREY:
20   Q.  Good afternoon, Mr. Hennelly.
21   A.  Hi.
22   Q.  You and I haven't met.  My name is Emily Carey and I'm one
23   of attorneys for Mr. Candelaria.
24   A.  Okay.  Nice to meet you.
25   Q.  Nice to meet you as well.  Thanks for being back here this
```

1    afternoon.

2         I just want to ask you a few questions, first, about your

3    relationship with Mr. Candelaria.  Marc was your son-in-law?

4    A.   He was.

5    Q.   And he was married to your daughter Meaghan?

6    A.   Yes.

7    Q.   And he's the father to your granddaughter Shay?

8    A.   Yes.

9    Q.   When they were first married, Meaghan and Marc were living

10   in New York City?

11   A.   Yes.

12   Q.   And you and your wife had the opportunity to visit them out

13   there?

14   A.   We visited them on occasion.

15   Q.   But they eventually moved to Santa Fe?

16   A.   Yes.

17   Q.   And you let them stay at a guesthouse that was located on

18   your property?

19   A.   Right.

20   Q.   I think you told us that it was very close, like 15 feet

21   from the main house?

22   A.   Physically the structures were not far apart.

23   Q.   And it sounds like they ended up living there for close to

24   two years?

25   A.   Yes.

1    Q.  And so during that time, you would see them quite
2    frequently?
3    A.  Yes.
4    Q.  And you would have dinners most Sundays?
5    A.  Right.
6    Q.  You would visit outside on the patio?
7    A.  Yes.
8    Q.  You got to spend time playing with Shay?
9    A.  Right.
10   Q.  And on direct you stated that, at the time, you felt like
11   you had a good relationship with Marc?
12   A.  I didn't quite get that.
13   Q.  Sorry.  You had told the jury on direct that at the time
14   you felt like you had a good relationship --
15   A.  I thought so.
16   Q.  And you helped Marc out financially?
17   A.  Right.
18   Q.  You helped him obtain his Q clearance?
19   A.  Helped him what?
20   Q.  Helped him obtain his Q clearance.
21   A.  That's right.  He felt he needed help with it.
22   Q.  And so you lent him money to pay down some of his debts?
23   A.  That's what I understand.  I don't know whether he paid the
24   debt off, but that was the purpose of the loan.
25   Q.  Thank you.

1    And you also, from time to time, loaned money to Meaghan to

2  help her with various things?

3  A.  We helped her with her business.

4  Q.  And you said she's a jewelry designer?

5  A.  Yes.

6  Q.  And she had her own jewelry design business?

7  A.  Right.

8  Q.  And you talked to the jury about your accounting for the

9  loans that you were giving to Mr. Candelaria?

10 A.  I didn't get the question.

11 Q.  You had talked to us about how you kept track of the loans

12 that you had given to Mr. Candelaria.

13 A.  Yeah.  He gave us a legal-sized pad with -- that listed how

14 much he owed on each one of the credit cards, and then he

15 totaled up, and we kept it, and we agreed he would pay $500 a

16 month.  And each month when he paid, I marked it up and I gave

17 him a copy of what he had paid and how much was interest, how

18 much was principle.

19 Q.  And you had a separate sheet that was very similar for

20 Meaghan as well; is that right?

21 A.  What?

22 Q.  You had a separate sheet like that that you kept for money

23 that you loaned to Meaghan as well?

24 A.  We had -- yes.  We kept a record of that too.

25 Q.  And you were able to help Meaghan and Marc with a down

1    payment for the house that Meaghan purchased?

2    A.   Yes.

3    Q.   And, in fact, you were helping with the renovation costs

4    for that house?

5    A.   Yes.

6    Q.   You talked a little bit about an experience investing with

7    Mr. Candelaria.  I want to ask a couple of questions of you

8    about that.

9        You -- my understanding is that you taught yourself how to

10   invest money?

11   A.   I didn't understand.

12   Q.   My understanding is that you taught yourself how to invest

13   money?

14   A.   Over many years I invested money in the stock market.

15   Q.   And you mentored family members on investing?

16   A.   I didn't mentor any family members.

17   Q.   Okay.  My misunderstanding.

18       You did set up an options account with Marc?

19   A.   I didn't -- I didn't -- I gave him permission to use our

20   option account, and I put $10,000 -- paid $10,000 available for

21   him to invest to see how he did.

22   Q.   And it sounds like you gave him a little bit of freedom at

23   first to choose which options?

24   A.   I never -- of course I did.  I wasn't interested in it

25   myself, I just wanted to give him an opportunity to do it.

1    Q.  And it sounds like at first it actually made some money,
2    that it did quite well?
3    A.  For a period, he did do quite well, and then he lost
4    everything he made.
5    Q.  And the original plan, if I understand correctly, is that
6    you were going to split the profits -- any profits that were
7    made -- 50/50?
8    A.  Right.
9    Q.  And that eventually you were considering giving Marc
10   100 percent of the profits?
11   A.  After I talked to him and said, "Let's pause."
12       And then I thought about it -- I thought, let's -- let's
13   just give him the -- all the -- 100 percent of the profits.
14   Q.  Okay.  Thank you.
15       I want to ask you a few questions about -- about the attack
16   that you incurred.
17       So we saw on direct the government showed a photograph to
18   the jury and to you of what you looked like in the hospital.
19   Do you recall seeing that photograph?
20   A.  Yeah.
21   Q.  And I -- I know that that was probably very hard to look
22   at.  You suffered extensive injuries as a result of that
23   attack; is that right?
24   A.  I suffered -- I didn't quite understand you.
25   Q.  And forgive me.  I also sometimes talk too fast, so I will

1    try to be more clear.

2        You suffered extensive injuries --

3    A.   Yes.

4    Q.   -- because of this attack?

5    A.   Yeah.

6    Q.   And you had multiple lacerations; is that right?

7    A.   Yeah.

8    Q.   I understand that you also had fractures in your face?

9    A.   Yeah.

10   Q.   That you had a skull fracture?

11   A.   I had four skull fractures.

12   Q.   And a serious head injury?

13   A.   Yeah.

14   Q.   And, in fact, it sounds like the injuries were serious

15   enough that that's why you were moved from Santa Fe to the

16   University of New Mexico hospital?

17   A.   I don't know what their decision-making was.  I know that I

18   was initially at the Santa Fe hospital.  My brother recommended

19   that I be moved -- he's a doctor and he was there, and I --

20   they eventually did move me.

21   Q.   That's right.  I recall you saying that you have a brother

22   who's a doctor and who lives in Albuquerque?

23   A.   Right.  But when he heard I was injured, he came to me in

24   the emergency room in Santa Fe.

25   Q.   It was great that he was able to be there with you.

1    From what you told the jury, you really don't remember much

2  between when you lost consciousness and when you were at the

3  rehabilitation hospital?

4  A.  Exactly.

5  Q.  Okay.  And so you -- you have no memory of a conversation

6  that you had with police at the hospital in the Santa Fe?

7  A.  I'm told that they came and interviewed me.  I have no

8  independent recollection of that conversation.

9  Q.  Okay.  And then the same would be true of when you were at

10  the hospital in Albuquerque, you don't remember your

11  conversation with police at that hospital?

12  A.  I know they came and I know they interviewed me.  They say

13  that I answered their questions, but I have no independent

14  recollection of it.

15  Q.  Okay.  Your -- you mentioned that your family had hired a

16  private investigation firm; is that correct?

17  A.  Right.

18  Q.  Okay.  And do you recall the investigators with that firm

19  interviewing you at the rehabilitation hospital?

20  A.  Yes.  They came.

21  Q.  Okay.  And that was, maybe, late September?  Does that

22  sound about right?

23  A.  I don't have those dates in my mind, but I wouldn't argue

24  with you on it.

25  Q.  Okay.  Fair enough.

1      And when they met with you, they -- you detailed to them

2  what you remembered about the night you were attacked?

3  A.   Right.

4  Q.   And you didn't say anything to them at that point about

5  your attacker forcing you to write a check?

6  A.   I didn't remember it at that point.  I didn't -- it wasn't

7  on my mind.

8  Q.   And so the first time that you said something about your

9  attacker forcing you to write a check would have been weeks

10  after the actual incident?

11  A.   It was -- my wife said that she had been asked by the

12  Santa Fe Police to come and look at photographs, one of which

13  was a photograph of a drawer we keep our checkbooks, and when

14  she said "checkbooks," it triggered in my mind the whole

15  episode where I was forced to write the check.

16  Q.   Okay.  Thank you.

17      You -- the night that you were -- or early morning that you

18  were attacked, you only saw one person?

19  A.   That's right.

20  Q.   And you never heard the intruder talking to anyone else?

21  A.   No.

22  Q.   And if you saw your assailant, you're pretty confident that

23  you to identify him?

24  A.   I don't know that.  I remember he had a bandanna cross his

25  face.  I might be able to identify him based upon seeing his

1   eyes, his forehead, his hair, I might, but I can't say for
2   sure.
3   Q.   Okay.  Not 100 percent, but you think if you saw him in a
4   lineup, you might be able to?
5   A.   It's possible.
6   Q.   And you're positive that Marc was not your assailant?
7   A.   He was not -- he was not the one.  When you say
8   "assailant," I don't know who assailed me.  The person who came
9   in the room with the gun, I don't know if he's the one who hit
10  me or if Marc hit me or somebody else.  I just didn't see the
11  person who hit me.
12  Q.   Okay.  But, again, you only saw one person?
13  A.   Right.
14  Q.   And you only heard one person?
15  A.   Right.
16  Q.   And that person who you saw and heard was not Marc?
17  A.   No.  No, it wasn't.
18  Q.   Okay.
19          MS. CAREY:  May I have a moment, please, Your Honor?
20          THE COURT:  Yes.
21          MS. CAREY:  Thank you.
22          I have no further questions for you, Mr. Hennelly.
23  Thank you so much for your time today.
24          THE WITNESS:  Okay.
25          THE COURT:  Thank you.

1          Would the United States like to redirect?

2          MS. MOGHADAM:  Yes, Your Honor.

3          May I proceed?

4          THE COURT:  You may.

5                    REDIRECT EXAMINATION

6    BY MS. MOGHADAM:

7    Q.  Mr. Hennelly, do you know the defendant's friends?

8    A.  I never met anyone who said -- who was a friend of his.

9    Q.  Do you know who he hangs out with at all?

10   A.  I have no idea.

11   Q.  Okay.  Mr. Hennelly, there was a lot of conversation on

12   cross-examination about the injuries that you sustained.

13   A.  Uh-huh.

14   Q.  How is your memory today?

15   A.  My memory is pretty good.  Yeah, I'm 80 years old, and I

16   got beat up pretty good, but I think I got a pretty good

17   memory.

18   Q.  Is -- does your labored speech have an effect on your

19   memory?

20   A.  No.

21   Q.  How confident are you that you did not write a check to

22   Marc Candelaria for $23,000 to invest in Bitcoin?

23   A.  I'm positive of that.

24   Q.  When you remembered the check that you wrote for your

25   attacker, did you immediately call the police?

1    A.   No.  What happened, Vicki said, "I'm going to go look at

2    some photographs of one of the drawers we keep our checkbook."

3        I said, "Oh, my God.  I wrote a check while I was in the

4    closet."  And I -- and I looked at her, and I said, "You have

5    to call the police."  I did call --

6    Q.   Sorry to interrupt you.  Continue.  I'm sorry.

7        Were you the one that told Vicki that you needed to call

8    the police?

9    A.   Yeah.  We called them right away.

10   Q.   You testified that you don't remember what conversations

11   you had in the hospital bed, but you do remember the

12   conversation with the private investigator at the rehab center?

13   A.   I remember he came -- like, I remember the details of it.

14   Q.   Okay.  Were you under medication or anything like that?

15   A.   They had me under a lot of painkillers.

16            MS. MOGHADAM:  A moment, Your Honor?

17            No further questions at this time, Your Honor.

18            THE COURT:  May he be excused?

19            MS. MOGHADAM:  Yes, Your Honor.

20            THE COURT:  Any objection?

21            MS. CAREY:  No, Your Honor.  Thank you.

22            THE COURT:  All right.  Thank you.

23            Mr. Hennelly, you are done, sir.

24            THE WITNESS:  Thank you.

25            THE COURT:  Thank you for your testimony, sir.  Please

```
 1    watch your step as you move down.  Okay?
 2              THE WITNESS:  Thank you, Your Honor.
 3              THE COURT:  Would the United States like to call their
 4    next witness?
 5              MR. HURTADO:  Yes, ma'am, Your Honor.  The United
 6    States calls Ms. Meaghan Hennelly.
 7              THE COURT:  Good afternoon, Ms. Hennelly.
 8              THE WITNESS:  Good afternoon.
 9              THE COURT:  Please watch your step as you step up.
10    And if I could get you to raise your right hand before you're
11    seated.
12         (The witness was duly sworn.)
13              THE COURT:  You may be seated.  Ms. Hennelly, that
14    microphone is adjustable.  And I believe there's some water
15    there to your right, if you need some.
16              THE WITNESS:  Thank you.
17              MR. HURTADO:  May it please the Court?
18              THE COURT:  You may proceed.
19                        MEAGHAN HENNELLY
20              (being duly sworn, testified as follows:)
21                      DIRECT EXAMINATION
22    BY MR. HURTADO:
23    Q.  Ms. Hennelly, could you give us your name?
24    A.  Meaghan Hennelly.
25    Q.  Please tell the jury a little bit about yourself.  Where
```

1    are you from?

2    A.   I'm originally from St. Louis, Missouri.

3    Q.   Where did you go to school?

4    A.   The University of Michigan.

5    Q.   Did you earn a degree from the University of Michigan?

6    A.   Yes.  I have a degree in jewelry design and metalsmithing.

7    Q.   Ms. Hennelly, how are you employed?

8    A.   I'm self-employed.

9    Q.   As what?

10   A.   As a jewelry designer.

11   Q.   How long have you been in the jewelry business?

12   A.   24 years.

13   Q.   Now, Ms. Hennelly, do you have any children?

14   A.   Yes.  One.

15   Q.   What's her name?

16   A.   Shay.

17   Q.   How old is Shay?

18   A.   Shay is six.

19   Q.   Ms. Hennelly, are you married?

20   A.   No, I am not.

21   Q.   Have you ever been married?

22   A.   Yes.

23   Q.   To whom have you been married?

24   A.   The defendant.

25   Q.   And who is the defendant?  What is his name?

1    A.   Marc Candelaria.

2    Q.   Is the defendant, Mr. Candelaria, present in the courtroom

3    today?

4    A.   Yes, sir.

5    Q.   Could you please identify him for the record?

6    A.   He is seated right there in the a dark blue suit.

7            MR. HURTADO:   Your Honor, may the record reflect that

8    Ms. Hennelly has identified the defendant, Mr. Candelaria?

9            THE COURT:   The record will so reflect.

10   Q.   (BY MR. HURTADO) Ms. Hennelly, when were you married to the

11   defendant?

12   A.   We were married in June 2017.

13   Q.   And when did your marriage end?

14   A.   In 2022, April of 2022.

15   Q.   Where did you and the defendant get married?

16   A.   Brooklyn, New York.

17   Q.   Did you and he live in Brooklyn, New York?

18   A.   Yes, we did.

19   Q.   How long did you live there?

20   A.   We lived in Brooklyn for a year and then in Long Island,

21   New York, for a year, and then back in Brooklyn for two more

22   years, until 2019.

23   Q.   What happened in 2019?

24   A.   We experience some financial difficulties.

25   Q.   And what did you do as a result of those financial

1    difficulties?

2    A.   We moved to Santa Fe.

3    Q.   Where in Santa Fe?

4    A.   We moved into my parents' guesthouse.

5    Q.   And who are your parents?

6    A.   John and Victoria Hennelly.

7    Q.   And when you say you moved into their guesthouse, was that

8    due to the financial difficulties you just described?

9    A.   Yes.

10   Q.   How long did you live at your parents' guesthouse?

11   A.   We lived there from September of 2019, until August of

12   2021.

13   Q.   Would that be approximately two years?

14   A.   Yes.

15   Q.   Now, let me ask you about the nature of your living

16   arrangement with your parents.  Did you and the defendant have

17   access to your parents' home?

18   A.   Yes.

19   Q.   And how did you have access?  Through what means?

20   A.   We had keys, garage door openers.  We had access to the

21   house whenever we wanted or needed to go in.

22   Q.   When you say "keys," do you mean a set of spare keys --

23   A.   Yes.

24   Q.   -- to the main home?

25   A.   Yes.

1    Q.   Where were those set of spare keys maintained?

2    A.   We had a drawer in, like, a bedside table where we kept all

3    of our spare keys.  That house key was -- the set of house keys

4    to their home were in that drawer, car keys, just various extra

5    things.

6    Q.   Did both you and Mr. Candelaria have access to those keys?

7    A.   Yes.

8    Q.   How many keys were on the set of spare keys?

9    A.   I think there were three keys on that key set.

10   Q.   And you describe which key accessed what?

11   A.   I think one gave access to a back door directly across from

12   the guesthouse where we lived.  One key was to the front door,

13   and I think one key was to the door from the garage into the

14   home.

15   Q.   You indicated that you also had a garage door opener; is

16   that correct?

17   A.   Yes.

18   Q.   Who was equipped with a garage door opener?

19   A.   I think I had one in my vehicle, and I believe my husband

20   at the time had one in his vehicle.

21   Q.   You both maintained separate vehicles?

22   A.   Yes.

23   Q.   Now, when was the last time you ever saw that set of spare

24   keys?

25   A.   When we moved out of the guesthouse in mid-August of 2021,

1  we left that set of keys in the same drawer.

2  Q.  Do you know what ever happen to that set of spare keys?

3  A.  I do not.

4  Q.  Did those set of spare keys ever go missing?

5  A.  Yes, they did.

6  Q.  Were they ever found?

7  A.  No, they were not.

8  Q.  Please describe how often, if ever, you visited the main

9  home to meet with your parents?

10  A.  Probably daily.  If they were in town, we would be in and

11  out for one reason or another, whether it was to do laundry or

12  have happy hour with them or eat a meal.  It was very open.  We

13  had access to the house whenever we wanted to go in.

14  Q.  And just to clarify, when you say, "We had access to the

15  house," are you referring to yourself and the defendant?

16  A.  Yes, I am.

17  Q.  Does that also include your daughter, Shay?

18  A.  Yes.

19  Q.  And when you say you were over on a daily basis, what kinds

20  of things would you do?

21  A.  I mean, we would visit.  They had a larger washer and

22  dryer, so we would do our laundry over there.  We would eat

23  meals together.  We would hang out as a family together.

24  Q.  How about for the holidays?

25  A.  We spent the holidays together.

1    Q.   What did Mr. Candelaria do for a living?

2    A.   He worked at -- as a carpenter at Los Alamos National Labs.

3    Q.   To your knowledge, did he ever employ his skills as a

4    carpenter to help fix things up around the main house?

5    A.   Yes, he did.

6    Q.   How often did he do that?

7    A.   I know -- I don't know, maybe once every few months he

8    would help out with something.

9    Q.   Okay.  To your knowledge, was the defendant familiar with

10   the entire main residence?

11   A.   Yes.

12   Q.   Was there any part of the main residence that was ever off

13   limits to either you or the defendant?

14   A.   No.

15   Q.   Did you ever have occasion to house-sit for the Hennellys?

16   A.   I would always take care of the plants when they would

17   travel.  So if they were out of town, sometimes we went hanging

18   out in there while we were doing laundry or just --

19   Q.   Did you or the defendant ever have occasion to sleep in the

20   main house?

21   A.   Yes.

22   Q.   When was that?

23   A.   When my mother and my stepfather, who live in St. Louis,

24   would come to visit, we would often then sleep in the main

25   house with my dad and Victoria in a spare room so that my

1   mother and stepfather could use the guesthouse.

2   Q.  And, I'm sorry, you and the defendant would also stay in

3   the main house at that time?

4   A.  Yes.  And our daughter.

5   Q.  Did you ever move out of the guesthouse?

6   A.  Yes, in 2021.

7   Q.  And where did you move to?

8   A.  We moved to a home that we renovated in La Cienega.

9   Q.  When was that?

10  A.  When did we move there?

11  Q.  Yes, ma'am.

12  A.  In August of 2021.

13  Q.  Did anybody help you financially with that home?

14  A.  Yes.

15  Q.  Who was that?

16  A.  John and Victoria.

17  Q.  And how did they help you financially?

18  A.  They financed the loan.  They financed the purchase.

19  Q.  Did your parents ever help the defendant financially?

20  A.  Yes, they did.

21  Q.  How so?

22  A.  They loaned him money for credit card debt that he had, and

23  they also loaned him money for back taxes.

24  Q.  Do you know how much the back taxes were for?

25  A.  I think it was $16,000.  I don't remember the exact amount.

1    Q.  How did they help the defendant with his back taxes for

2    $16,000?

3    A.  A check that they wrote to me, and then I provided the

4    money to the defendant.

5    Q.  Okay.  To your knowledge was that money used to pay off the

6    back taxes?

7    A.  At the time I believed that it was, but now I understand

8    that it was not used to pay off the back taxes.

9    Q.  Ms. Hennelly, how would you describe your relationship to

10   your father, John Hennelly?

11   A.  Loving, warm, awesome.

12   Q.  How would you describe your relationship to your mother,

13   Vicki Hennelly?

14   A.  The same.  We're a very close family.

15   Q.  How would you describe your daughter Shay's relationship to

16   John and Victoria Hennelly?

17   A.  The same.  They adore her.  She adores them.

18   Q.  I want to draw your attention to the events of Tuesday,

19   September 14th, 2021.  Do you remember that date?

20   A.  Yes, sir.

21   Q.  I apologize.  Bear with me one second as I grab a drink of

22   water.

23       And I apologize, Ms. Hennelly.  Let me take a step back.

24   Before talking about the events of September 14th, let's talk

25   about the evening of September 13th, 2021.  Do you recall that

1    date?

2    A.   Yes.  Monday.

3    Q.   It was a Monday?

4    A.   Monday.

5    Q.   And what happened on the evening of September 13th, 2021,

6    as it relates to yourself and the defendant?

7    A.   We spent the evening at home.  I believe we watched a movie

8    as a family, like, "Cinderella" or something, live action that

9    our daughter would like, and then I put her to bed around

10   8:00 or 8:30.  The defendant told me he wasn't feeling well and

11   so he laid down on the couch.

12   Q.   Stop.  Stop.

13   A.   Sorry.

14        MR. GLANZ:  Your Honor, may we approach?

15        THE COURT:  You may.

16     (The following discussion was held at the bench.)

17        MR. HURTADO:  Your Honor, she was coached extensively.

18   I apologize.  I think she just blurted that out.  The

19   government is aware of the restrictions provided for in the

20   motion in limine.  I do apologize for that.

21        MR. GLANZ:  That's all I was going to bring up.  Thank

22   you, Your Honor.

23        THE COURT:  Would you like me to instruct the jury to

24   disregard or just let it go?

25        MR. GLANZ:  Just let it go.

1        THE COURT:  All right.  Thank you.

2        (Bench conference concluded.)

3   Q.  (BY MR. HURTADO) So, Ms. Hennelly, before proceeding any

4   further, I just want to caution you to only testify regarding

5   your observations and nothing else.  Do you understand that?

6   A.  Yes.

7   Q.  Very good.

8        So you were saying that you and the family were watching a

9   movie, I believe?

10  A.  Yes.

11  Q.  Okay.  And what else did you observe?

12  A.  I observed the defendant lay down on the couch.  I went

13  into the bedroom with my daughter to put her to sleep, and then

14  I went to sleep with her.

15  Q.  About what time did you go to bed?

16  A.  I think it was 8:30 or nine o'clock.

17  Q.  Now, just to clarify one point, I believe you indicated

18  that you were at home with the defendant and your daughter,

19  Shay; is that correct?

20  A.  Correct.

21  Q.  Which home was it?  Was it the guest residence or the new

22  residence that you had purchased?

23  A.  The new residence in La Cienega.

24  Q.  I apologize.  I'm fighting a cold, so I'm just grabbing

25  some water.

1       With respect to the home that you were now occupying on

2   September 13th, 2021, how far would you say the home is from

3   John and Victoria Hennelly's home?

4   A.   It is about 13 miles or so.   It takes about 20 minutes.

5   Q.   Twenty minutes by car?

6   A.   By car.

7   Q.   You indicated you went to bed around -- I apologize -- what

8   time?

9   A.   Between 8:30 and 9:00.

10  Q.   Did you -- when did you wake up?

11  A.   I woke up very early at -- like, between 4:00 and 4:30 in

12  the morning.

13  Q.   4:00 and 4:30?

14  A.   Yes.

15  Q.   And when you woke up between 4:00 and 4:30, would that have

16  been the next day on September 14th, 2021?

17  A.   Yes.

18  Q.   Is there any reason why you woke up so early on

19  September 14th, 2021?

20  A.   No.   I just woke up on my own.

21  Q.   Do you naturally wake up at that hour, or was that unusual

22  for the time?

23  A.   I wake up pretty early.

24  Q.   So it's customary for you to wake up that early?

25  A.   It's not unusual.

1   Q.  When you wake up -- when you woke up between 4:00 and 4:30

2   on September 14th, 2021, what did you see?  What did you

3   observe?

4   A.  I observed that the defendant was no longer asleep on the

5   couch and was not in the home and his vehicle was not in the

6   driveway.

7   Q.  Whether you got up that morning at 4:00 and 4:30 and saw

8   that the defendant was not there, what did you decide to do?

9   What else did you do that morning?

10  A.  I think I just got up and got ready for the day, and I had

11  to get my daughter up and ready.  We had to be at a friend's

12  house to put their garbage out because they were traveling.  So

13  I just got ready for the day.

14  Q.  Did you ever visit John Hennelly's home that day?

15  A.  Yes, I did.

16  Q.  What time did you visit John Hennelly's home that day?

17  A.  I think I got there between 9:30 and 10:00.

18  Q.  Why did you visit John Hennelly's home that day?

19  A.  I needed to pick up my desktop computer, which I had not

20  packed and moved to the new house yet.

21  Q.  Were you still in the process of moving at that time?

22  A.  Yes.  We still had personal effects in the guesthouse.

23  Q.  When you arrived at John Hennelly's home that morning,

24  September 14th, 2021, what did you see?

25  A.  I pulled in the driveway and I noticed that the newspaper

1  was still in the driveway, which is unusual.  And then I went

2  into the guesthouse to look for my computer, packed up some

3  things.  I think I went into the garage to look for a couple of

4  things, and then put my daughter back in the car and we went on

5  our way.  Before leaving, I picked the newspaper up and put it

6  on the front porch and I texted my father to tell him that I

7  put his newspaper there.

8  Q.  Why was it unusual to you that the newspaper was in the

9  driveway?

10 A.  He is always up very early, and the newspaper is typically

11 the first thing that he collects and starts reading in the

12 morning.

13 Q.  You indicated that you texted your father.  Did he respond

14 to your text?

15 A.  He did not.

16 Q.  What did you do after he did not respond to your text?

17 A.  I went about my day.  I took my daughter to a playground.

18 And then we, I think, went to McDonald's and got a Happy Meal,

19 went to a different playground, and then I went back to our

20 home in La Cienega.

21 Q.  Did you ever again visit John Hennelly's home that day?

22 A.  Yes, I did.

23 Q.  When did you do that?

24 A.  At about 2:30 that afternoon.

25 Q.  Why did you decide to revisit your father's home that day?

1  A.  I had not heard back from him, which was somewhat

2  concerning, so I called him again.  He did not answer the

3  phone.  At that time I called my stepmom, Victoria, and she

4  said that she had spoken to him the night before.  She was

5  going to call him and she'd get back to me.  She called him,

6  and then she called me back right away and said, "He didn't

7  answer.  Can you please go over to the house."

8  Q.  And that's why you revisited the home?

9  A.  Yes.

10 Q.  And did you revisit the home?

11 A.  I did.

12 Q.  What time did you get there?

13 A.  About 2:30, I think.

14 Q.  What did you do when you got to the home at 2:30 p.m.?

15 A.  I pulled to the back of the driveway where the garage is,

16 to access the house through the garage, took my daughter in

17 with me, and we walked through the home, all the way to the

18 master -- or, I'm sorry, primary suite and found my dad.

19 Q.  That was a lot of detail, so I want to go back and flesh

20 out a little bit more information.

21     You indicated that you accessed the home through the

22 garage; is that correct?

23 A.  Correct.

24 Q.  How did you access the garage?

25 A.  The garage door opener in my car.

1  Q.  And where did you park your car?

2  A.  By the guesthouse.

3  Q.  When you opened the garage door, I imagined there would be

4  a home -- excuse me, a door separating between the garage and

5  the main residence; is that correct?

6  A.  Yes.

7  Q.  How did you access the door between the garage and the

8  home?

9  A.  There's a spare key that was kept in a rainbow-striped

10 lunch box on a shelf in the garage.

11 Q.  And is that how you made entry?

12 A.  And I used that key to go into the back- -- the garage door

13 into the home.

14 Q.  When you went inside the home, did anything appear to be

15 out of order to you?

16 A.  No.  Not until I got to my parents' bedroom.

17 Q.  Before we get to your parents' bedroom, let's talk about

18 the house itself.

19     Did there appear to be any signs of forced entry?

20 A.  No.

21 Q.  Were there any other doors that were unlocked before you

22 got there?

23 A.  Not to my knowledge.

24 Q.  You indicated that you found your father?

25 A.  Yes.

1   Q.  Where was he?

2   A.  He was lying on the floor in his closet.

3   Q.  Did you notice anything about the way he was lying on the

4   floor of his closet?

5   A.  He was injured, laying in a pool of his blood, on his side.

6   Q.  Did you call out to your father?

7   A.  I said, "Dad.  Dad," but he was not coherent, so I dialed

8   9-1-1.

9   Q.  Was he responsive in any way?

10  A.  He sort of came to a little bit when he realized that there

11  was another person there, but he didn't know who I was.

12  Q.  What led you to believe that he had been injured?

13  A.  There was blood everywhere.  His face was bruised.

14  Q.  What was going through your mind at the time?

15  A.  Just to get him help.

16  Q.  Did you believe he had injured himself in some way?

17  A.  Initially I had thought he had fallen.  When I first got

18  there, I thought, "Oh, he fell."  Because I've never seen

19  someone violently injured.

20  Q.  When -- well, let me ask you, who did you call?

21  A.  9-1-1.

22  Q.  What did you tell 9-1-1?

23  A.  That my dad had fallen and they needed to send somebody to

24  help him.

25  Q.  Did anybody arrive to help your father?

1    A.    Yes.   The paramedics.

2    Q.    How long did it take the paramedics to arrive?

3    A.    Maybe ten minutes, not very long.

4    Q.    Do you know how many paramedics arrived?

5    A.    I believe there were four.

6    Q.    When those four paramedics arrived, what did they do with

7    your father?

8    A.    They cut his clothes off of him and put him on a -- they

9    carried him, I think, on a board -- I don't actually

10   remember -- out to the ambulance.

11   Q.    Where was your young daughter, Shay, at the time this was

12   happening?

13   A.    When we first got there and I was calling 9-1-1, she was

14   with me, but not in the closet.   And then while we were waiting

15   for the ambulance, I sat her on my parents' bed, and I said, "I

16   need you to say a Hail Mary over and over again.   We're going

17   to help grandpa, and that's what I need you to do right now to

18   help mommy, so that we can get grandpa the help he needs."

19   Q.    If you need a moment, please feel free to.

20   A.    It's okay.

21   Q.    Now, when you were in the -- I believe you described it as

22   "the suite," did there appear to be anything in disarray in the

23   suite?

24   A.    Yes.   The lamp was knocked off his nightstand and broken.

25   Q.    Many pieces?

1    A.   It was in two large pieces and a lot of little pieces.

2    Q.   Did you notice whether anything else was broken?

3    A.   I did not.

4    Q.   Did you notice whether anything of value had been taken?

5    A.   I did not.

6    Q.   Did you notify anybody in your family about Mr. Hennelly's

7    injuries?

8    A.   I think I may have called Victoria or she may have called

9    me while I was at the house waiting for the ambulance, and I

10   told her I would call her back when he was at the hospital.

11   Q.   Now, where was Victoria Hennelly on September 14th?

12   A.   She was in Florida.

13   Q.   Was it known among the family that Mrs. Hennelly would be

14   in Florida?

15   A.   Yes.

16   Q.   Was there anybody who did not know she would be in Florida

17   that day?

18   A.   I don't think so.

19   Q.   Did you advise Mrs. Hennelly, Victoria Hennelly, about your

20   father's injuries?

21   A.   Yes.

22   Q.   What was her reaction?

23   A.   Well, initially I told her that he had fallen.  I did not

24   tell her that he was attacked, because I did not know until I

25   got to the hospital.

1   Q.  When you got to the hospital, what did you observe?

2   A.  I observed him being taken care of, and I was in the room

3   with him, in the emergency room.

4   Q.  Were you able to speak with Mr. Hennelly?

5   A.  We tried.  But at some point, detectives came and we did

6   speak to him -- or tried to speak to him again.

7   Q.  Now, Ms. Hennelly, did you or the defendant,

8   Mr. Candelaria, ever receive a check from John or

9   Victoria Hennelly on September 10th, 2021, in the amount of

10  $23,000?

11  A.  No.

12  Q.  Were you ever made aware of that check?

13  A.  Not prior to that date, no.

14  Q.  When were you made aware of that check?

15  A.  Wednesday the 15th or Thursday the 16th.

16  Q.  And how were you made aware of that check?

17  A.  Victoria called me and said, "Did dad write Marc a check

18  for 23,000" -- whatever the amount is?

19      And I said, "No."  And then I said, "Wait.  I don't know."

20  Q.  Now, when you were made aware of a check for $23,000, for

21  the defendant, did that stand out to you for any reason?

22  A.  I thought it was a little unusual, yes.

23  Q.  In your experience, would your father have -- we would have

24  told you about the check?

25  A.  Yes.

1    Q.  Did you find it surprising that he would not have spoken to

2    you about that check for $23,000?

3    A.  Yes.

4    Q.  How about Victoria Hennelly; did she know about the check?

5    A.  No.

6    Q.  How would you describe your father with respect to

7    finances?  For example, is he responsible?  Is he reckless?

8    A.  He's responsible.

9    Q.  Now, Ms. Hennelly, has your father ever given you a blank

10   check?

11   A.  Yes.

12   Q.  And when did that happen?

13   A.  He gave me a blank check sometime late August or early

14   September of 2021.

15   Q.  Had he previously given you a blank check?

16   A.  Yes.

17   Q.  And why does he do that?  Why does he give you blank

18   checks?

19   A.  He was assisting with the construction costs -- or

20   financing the construction, the renovation costs, for our

21   house.  So he had given me a blank check at that particular

22   time to pay for any labor that had been done.

23   Q.  Now, Ms. Hennelly, I know -- you know, this is difficult to

24   talk about, but I just need to ask you this question.  Would

25   you ever want to hurt your father, John Hennelly?

```
 1   A.   No.
 2           MR. HURTADO:   Your Honor, may I have a brief moment,
 3   please, to confer with my co-counsel?
 4           THE COURT:   You may.
 5   Q.   (BY MS. MOGHADAM) Ms. Hennelly, do you -- or did you keep
 6   your finances separate from the defendant?
 7   A.   Yes.
 8   Q.   Was there a reason for that?
 9   A.   It just was easier.
10           MS. MOGHADAM:   Your Honor, I have no further
11   questions.   Thank you.
12           THE COURT:   Thank you.
13           Cross-examination?
14           MR. GLANZ:   Yes, Your Honor.   Thank you.
15                         CROSS-EXAMINATION
16   BY MR. GLANZ:
17   Q.   Good afternoon, Ms. Hennelly.
18   A.   Good afternoon.
19   Q.   If you don't mind, I'm going to turn this just slightly so
20   I'm actually looking at you.
21       You and I have already met, but as you surely recall, I'm
22   one of Marc's lawyers, Buck Glanz.   It's good to see you again.
23   A.   Thank you.
24   Q.   So you and Marc met in 2014?
25   A.   That sounds right, yes.
```

1    Q.   In New York City?

2    A.   Yes.

3    Q.   And you were involved in a show at Grand Central Station?

4    A.   That is correct.

5    Q.   Called the "Holiday Market"?

6    A.   Yes.

7    Q.   And you were there because you were displaying some of the

8    jewelry you made?

9    A.   Yes.

10   Q.   And it wasn't until 2015 that had you guys started dating;

11   is that right?

12   A.   Sure.

13   Q.   Okay.  It's okay.  You don't have to answer if you don't

14   know the answer.

15       And Marc was working at that same holiday market building

16   exhibits?

17   A.   He was building an exhibit for myself and another artist

18   there.

19   Q.   Okay.  So working as a carpenter?

20   A.   Yes.

21   Q.   Then after you guys started dating, you testified that you

22   lived together for -- I believe you said about four years in

23   New York, not New York City?

24   A.   Yes.

25   Q.   I think you said one in Brooklyn --

1   A.   Correct.

2   Q.   -- and two in Long Island?

3   A.   One in Long Island.

4   Q.   One in Long Island, and then back to Brooklyn?

5   A.   Correct.

6   Q.   And then, ultimately, in 2017, you got married?

7   A.   Correct.

8   Q.   And then I believe you had testified that in 2019 you guys

9   started to experience some financial difficulties?

10  A.   It was prior to that, but that's what -- in 2019, that's

11  what perpetuated our move.

12  Q.   Oh, okay.  And, basically, not to put words in your mouth,

13  but New York City is very expensive?

14  A.   It's not inexpensive.

15  Q.   Fair enough.  But nonetheless it seemed at that point that

16  it was better for your family to move back to Santa Fe?

17  A.   Yes.

18  Q.   And I think I skipped over that step, but not too long

19  after you guys were married and the same time in 2017 is when

20  you had your daughter?

21  A.   Correct.

22  Q.   So you moved back to your daughter -- I'm sorry.  You moved

23  your family back to New Mexico in 2019, and you moved into your

24  father and stepmother's guesthouse?

25  A.   Correct.

1   Q.  And the initial plan was just to live there for a short

2   time?

3   A.  Yes.

4   Q.  While your family figured out what it was going to do next?

5   A.  Yes.

6   Q.  But as we all know at this point, not too long after that,

7   we had the pandemic?

8   A.  That is correct.

9   Q.  Here in New Mexico we had an extensive lockdown?

10  A.  Yes.

11  Q.  So you guys ended up living there for about two years?

12  A.  Yes.

13  Q.  I think you said just one month under two years.

14      And as we've heard from direct, your mom and -- I'm sorry.

15  Your father and your stepmother lived in the main house.

16          MR. HURTADO:  Objection as to form, Your Honor.  Is

17  that a question?

18          THE COURT:  Overruled.  If you'd like to rephrase, you

19  may.

20          MR. GLANZ:  Sure.

21  Q.  (BY MR. GLANZ) Did you want me to repeat it?

22  A.  Yes.

23  Q.  And at that time your father and your stepmother lived in

24  the main house of the property?

25  A.  Correct.

1    Q.   And you described a very -- what sounded like an intimate

2    relationship between your two families?

3    A.   Yes.

4    Q.   You guys spent a whole lot of time together?

5    A.   That is correct.

6    Q.   Had dinners together?

7    A.   Yes.

8    Q.   Barbecues?

9    A.   Yes.

10   Q.   You said Marc helped out around the house with handyman

11   sort of things?

12   A.   Yes.

13   Q.   And I think you had said on direct that that happened about

14   once every few months?

15   A.   I don't remember exactly, but that sounds about right, yes,

16   every couple months.

17   Q.   Okay.  But over the course of those two years, it happened

18   on a number of occasions?

19   A.   Yes.

20   Q.   If you know, did Marc ever -- was he ever compensated by

21   your parents for those handyman things he did?

22   A.   I have no idea.

23   Q.   Okay.  And at some point, once you moved back to

24   New Mexico, Marc got a job working at Los Alamos National Labs?

25   A.   Correct.

1    Q.   And he was doing carpentry work there as well?

2    A.   As far as I know, yes.

3    Q.   Okay.  And you continued to work with your jewelry

4    business?

5    A.   Yes.

6    Q.   Did your financial situation get better when you moved back

7    to New Mexico?

8    A.   Well, the pandemic challenged things for everybody.

9    Q.   It eventually got to the point where you guys were

10   comfortable buying a house?

11   A.   Yes.

12   Q.   And I just want to understand what you said about that on

13   direct examination.  So your parents loaned you the entire

14   amount of money for the house?

15   A.   They gifted me a percentage for the down payment and

16   financed the remainder.

17   Q.   Okay.  And just so we're clear what that means, so the down

18   payment part was a gift, and then they themselves loaned you

19   the money for the remaining portion?

20   A.   Correct.

21   Q.   And did they keep a record of that and how much you owed

22   them?

23   A.   Yes.

24   Q.   And your parents helped you in other ways as well at times

25   if you needed some money for your business?

1    A.   Yes.

2    Q.   I keep saying "your parents," but obviously I mean your

3    father and stepmother?

4    A.   I understand.

5    Q.   And as you said on direct, they also helped Marc with his

6    taxes?

7    A.   Yes.

8    Q.   In order for him to obtain a Q clearance?

9    A.   Yes.

10   Q.   And you also said that they lent him money for his credit

11   card debts?

12   A.   Yes.

13   Q.   And are you -- if you're aware, did Marc ever ask them for

14   money and have them say no?

15   A.   Not to my knowledge.

16   Q.   And I know you had testified that your finances were

17   separate because it made thing easier, but, I mean, the two of

18   you were married.  If Marc had needed money for something and

19   asked you, would you have provided it to him?

20   A.   Yes.

21   Q.   Okay.  So then -- I don't recall the exact date you said

22   you purchased the home, but it was -- was it late 2020; is that

23   right?

24   A.   It was December 2020.  I don't remember the exact date.

25   Q.   And then it took you up until -- it took your family up

1    until August to move into it?

2    A.  Yes, to make it livable.

3    Q.  Okay.  And all that time was -- I know you talked a little

4    bit about some financing coming from your parents, but all that

5    time Marc was also doing a lot of work on the home?

6    A.  He did do some work, yes.

7    Q.  And you yourself were also working on the home as well?

8    A.  Yes.

9    Q.  Okay.  And I think you had said that you had finally moved

10   out in August 2021, so about a month before you had found your

11   father; is that right?

12   A.  Correct.

13   Q.  But you still had some stuff in the guesthouse?

14   A.  Yes.

15   Q.  So the day of incident you mentioned you entered through

16   the garage, and you did that, I assume, with the garage door

17   opener that you said you had in your vehicle?

18   A.  Yes.

19   Q.  And that -- I think you had said earlier that you had a set

20   of keys that was in the guesthouse, but there was an additional

21   key in the garage?

22   A.  That is correct.

23   Q.  Was it only to that door?

24   A.  Yes.

25   Q.  And that was the door -- to be clear -- between the garage

1    and the house?

2    A.   Yes.

3    Q.   And on direct examination I believe the government asked

4    you if you were aware if any other doors were open, and you

5    said you didn't know; is that correct?

6    A.   At the time I entered the house, I did not know of any

7    doors that were open.

8    Q.   Okay.  So then moving forward to after you found your

9    father that day, you said Victoria had asked about this check?

10   A.   Yes.

11   Q.   And you initially said, no, you didn't think John had

12   written one, but then you said, "No, I don't"?

13   A.   That is correct.

14   Q.   And then you contacted Marc about that check; is that

15   correct?

16   A.   Yes.

17   Q.   And at that point, Victoria wrote him a new one?

18   A.   Not immediately, but within a day or so.

19   Q.   Okay.  And you gave that check to Marc, I assume?

20   A.   She gave it directly to him.

21   Q.   She gave it directly to him.  Okay.

22        And then after this happened, Marc did some additional help

23   around the main house such as changing all the locks out?

24   A.   That is correct.

25   Q.   And he also, along -- I believe with your brother, replaced

1    the carpet in the bedroom; is that right?

2    A.   They did not replace it, no.

3    Q.   They never replaced the bloodstained carpet?

4    A.   They removed it, but they did not replace it.

5    Q.   Oh, I see.  And then at some point after this, Marc moved

6    back to New York, right?

7    A.   Yes.

8    Q.   And the two of you started divorce proceedings?

9    A.   It was prior to that, him moving back to New York, that we

10   began divorce proceedings.

11   Q.   Okay.  And that, I believe, was in November of 2021; is

12   that right?

13   A.   That is correct.

14   Q.   And, ultimately, I think you testified that it was

15   finalized in 2022?

16   A.   That is correct.

17   Q.   And since then -- obviously, New York is long-distance from

18   New Mexico -- Marc has continued to visit with your daughter

19   through video?

20   A.   Yes.

21   Q.   And he does things like virtual spa dates with her by

22   video?

23          MR. HURTADO:  Your Honor, objection.  First, beyond

24   the scope; second, relevance.

25          THE COURT:  Relevance?

1          MR. GLANZ:  Your Honor, I do believe the defendant's

2    intent is at the heart of this charge, and his character is

3    relevant to that intent.

4          THE COURT:  I'll sustain the objection.

5          MR. GLANZ:  Thank you, Your Honor.

6          Your Honor, might I have a moment with my co-counsel?

7          THE COURT:  You may.

8          MR. GLANZ:  Thank you.  No further questions,

9    Your Honor.  Thank you.

10          THE COURT:  Thank you.

11          Redirect?

12          MR. HURTADO:  Yes, Your Honor.  Briefly, if I may.

13                        REDIRECT EXAMINATION

14    BY MR. HURTADO:

15    Q.  Ms. Hennelly, on cross-examination the defense asked you

16    whether you would help the defendant, whom you were married to

17    at the time, with money.  Do you recall that line of

18    questioning?

19    A.  Yes.

20    Q.  If you knew that the defendant had a gambling habit, would

21    you have given him money?

22    A.  No.

23    Q.  Without ever telling me the content of any conversations

24    you ever had with him, have you ever given him money in the

25    past?

1    A.   Yes.

2    Q.   Was that before you learned that he had a gambling habit?

3    A.   Yes.

4    Q.   Would you ever give him money today?

5    A.   No.

6    Q.   Was there a time where you ever became tired of giving him

7    money?

8    A.   Yes.

9          MR. HURTADO:  Your Honor, no further questions.  Thank

10   you.

11         THE COURT:  May this witness be excused?

12         MR. HURTADO:  Yes, ma'am, Your Honor.

13         THE COURT:  Any objection?

14         MR. GLANZ:  No, Your Honor.  Thank you.

15         THE COURT:  Ms. Hennelly, please watch your step as

16   you step down.  You are free to go.

17         THE WITNESS:  Thank you.

18         THE COURT:  Thank you.

19         United States may call their next witness.

20         MR. HURTADO:  Yes, Your Honor.  The United States

21   calls Lorraine Cabasuela.

22         THE COURT:  Ms. Cabesuela, you're going to come up the

23   right side of this courtroom.  There's a step.  Please watch

24   your step as you step up.

25         If I can get you to remain standing and raise your

```
 1   right hand.
 2        (The witness was duly sworn.)
 3             THE COURT:  You may be seated, ma'am.  That microphone
 4   is adjustable.  You can pull it down towards you.  And there's
 5   also water to your right if you need something to drink.
 6             THE WITNESS:  Thank you.
 7             THE COURT:  You may proceed.
 8             MS. MOGHADAM:  Your Honor, prior to proceeding at this
 9   time, the United States moves into evidence what's been marked
10   as Government's Exhibit 11, per your pretrial ruling.
11             THE COURT:  All right.  Subject to prior objections,
12   the Court will admit Government's Exhibit 11.
13        (Government's Exhibit 11 admitted into evidence.)
14             MS. MOGHADAM:  May I proceed?
15             THE COURT:  Is there anything else that the defense
16   would like to add at this time?
17             MR. GLANZ:  No, Your Honor.  Thank you.
18             THE COURT:  All right.  Thank you.
19             You may proceed.
20                         LORRAINE CABESUELA
21             (being duly sworn, testified as follows:)
22                         DIRECT EXAMINATION
23   BY MS. MOGHADAM:
24   Q.  Good afternoon.
25   A.  Good afternoon.
```

1    Q.   Please introduce yourself to the jury by your first and

2    last name.

3    A.   My name is Lorraine Cabasuela.

4    Q.   Ms. Cabesuela, where do you currently live?

5    A.   I live here in Albuquerque.

6    Q.   And how long have you been living in Albuquerque?

7    A.   About 16, 17 years.

8    Q.   And what do you do for a living currently?

9    A.   Currently, I'm a Los Alamos planner.

10   Q.   And that's Los Alamos National Labs?

11   A.   Correct.

12   Q.   And what does a planner do?

13   A.   Well, there is a job.  It might be a maintenance job, and

14   it might require multi-craft, and you have to just plan out the

15   resources, instructions, special instructions.  If they need

16   welders' permits, materials for that job, you just plan it out

17   to -- so that the job can actually be executed.

18   Q.   When you say "multi-craft," what do you mean?

19   A.   Different tradesmen; electricians, carpenters, fitters,

20   laborers.

21   Q.   What -- how were you employed in 2021?

22   A.   In 2021 I was the carpenter foreman at the national

23   laboratories.

24   Q.   And what does a foreman do?

25   A.   A lot of administrative work for the crew.  I'd get to work

1    and I'd schedule -- we'd have a schedule, and I'd have a crew

2    of about, maybe, 9 to 13 guys at one given time, and I would

3    schedule where they were going to go to, what jobs that they

4    were going to go to in that day.

5    Q.  You mentioned doing a lot of administrative work.  Did that

6    include handling and filling out time sheets and leave slips?

7    A.  Yes.  Well, I -- I didn't have to do them, but I did them

8    myself because they were a little bit neater, and -- but they

9    can do their own if they chose to or had to or need to.

10   Q.  And we'll talk a little bit about the leave slip and time

11   sheet process a little later, but let me ask you this:  Did you

12   ever supervise, in 2021, a man by the name of Marc Candelaria?

13   A.  Yes.

14   Q.  And what did Marc Candelaria do at Los Alamos National

15   Labs?

16   A.  He was a journeyman carpenter, so he did carpentry work.

17   Q.  Ms. Cabesuela, do you recognize -- do you see

18   Marc Candelaria, the man that you supervised, in the courtroom

19   today?

20   A.  Kind of blurred, but I believe that's him over there.

21   Q.  You can stand up and look around to make sure.

22   A.  I see him here.

23           THE WITNESS:  Hi, Marc.

24   Q.  (BY MS. MOGHADAM) Can you identify him by an article of

25   clothing and where he's seated?

1    A.   Say that again.

2    Q.   Can you tell me what he's wearing and where he's seated?

3    A.   Suit, nice shirt and tie, and he's sitting right over

4    there.

5           MS. MOGHADAM:  Let the record reflect that the witness

6    has identified the defendant.

7           THE COURT:  The record will so reflect.

8    Q.   (BY MS. MOGHADAM) In 2021 how many people were you

9    supervising at any time?

10   A.   I would say between 9 and 13 guys.  They would come and go.

11   Sometimes I'd have a short crew or a large crew.

12   Q.   And what were the working hours for your crew?

13   A.   The standard time was 7:00 to 3:30.

14   Q.   In your experience, as their supervisor, was there any

15   reason on a Tuesday that one of your employees would show up to

16   work at, let's say, 5:00 a.m.?

17   A.   No.

18   Q.   What about 6:00 a.m.?

19   A.   No.

20   Q.   Did Marc Candelaria come in to work regularly?

21   A.   Yes, pretty much.

22          MS. MOGHADAM:  And, Your Honor, permission to publish

23   Government's Exhibit 11?

24          THE COURT:  You may.

25   Q.   (BY MS. MOGHADAM) Ms. Cabesuela, I'm going to show you a

1  total of eight pages and I'd like you to tell me what we're
2  looking at.  Okay?
3  A.  Okay.
4  Q.  So, Ms. Cabesuela, do you see the first page on the screen?
5  A.  Yes, I do.
6  Q.  Now, let's start with the top portion where it says, "Triad
7  Craft Weekly Time Sheet."  Can you explain to the jury what a
8  weekly time sheet is?
9  A.  That's just one single time sheet for the entire week.
10  Q.  Why does it say "Estimated" at the top of that time sheet?
11  A.  Because a couple of times of the year, the lab goes on
12  estimated time, and we have to -- in advance -- do estimated
13  time for about a two- or three-week period of time.  So what I
14  would do is I would do the estimated time for the whole crew
15  and then have them sign it.
16  Q.  So is the estimated time a reflection of the time that was
17  actually worked?
18  A.  No.
19  Q.  I'm pointing to bottom middle of the page where it says,
20  "Employee's signature."
21  A.  Uh-huh.
22  Q.  Whose signature is that?
23  A.  Marc Candelaria's.
24  Q.  And what about below the supervisor's signature; do you
25  recognize that signature?

1  A.  Yes.

2  Q.  Whose signature is that?

3  A.  Esli Dominguez.

4  Q.  Okay.  And who is that?

5  A.  He was my field foreman.

6  Q.  Is there a reason why you didn't sign this time sheet?

7  A.  Most likely because I was not there that day.

8  Q.  And is the date of 8/30/2021, is that the time in which

9  this time sheet was generated?

10  A.  No.  The -- see the actual -- see the top pay period

11  "beginning"?  That was the date that that estimated time sheet

12  was for that week, which would have probably been, maybe, a

13  Monday.  And then the date at the bottom is the day they

14  actually signed it.

15  Q.  And we're looking at -- you know, I'm noticing that there's

16  eight hours across the board Monday through Friday and ten

17  hours on Saturday.

18  A.  Correct.

19  Q.  What is that ten hours on Saturday?

20  A.  It was -- it's overtime.

21  Q.  And this is just an estimate, correct?

22  A.  Yes.

23  Q.  All right.  I'm moving to Page 2 of Government's Exhibit --

24  actually, I'm moving to Page 3 of the Government's Exhibit 11.

25  Okay?

1    Ms. Cabesuela, do you see the third page that I have up on

2    your screen?

3    A.   Yes.

4    Q.   Okay.  What does it mean when the top sheet says, "Triad

5    Craft Daily Time Sheet"?  What is that?

6    A.   Daily, each day, for each day worked.

7    Q.   So how does -- how do you fill out or sign this time sheet?

8    A.   I myself?

9    Q.   Let me ask you this:  In the employee signature, whose

10   signature is that?

11   A.   Mine -- oh, employee signature is Marc.

12   Q.   And when did he sign this employee signature?

13   A.   On 9/10/2021.

14   Q.   And whose signature is the supervisor's signature?

15   A.   Mine.

16   Q.   And what is a Z number?

17   A.   It's my -- I have a Q clearance, and that is my Z Number,

18   296784.

19   Q.   If the date on that Craft time sheet is September 13th,

20   2021, why is it signed by you on September 14th, 2021?

21   A.   Because normally the time sheets are filled out towards the

22   end of the day, of that day worked, and I either sign them by

23   the end of that day or the next morning, because they need to

24   be turned in by 9:00 a.m. the following morning.

25   Q.   So are you essentially doing time sheets every single day?

1    A.  I was, yes.

2    Q.  Why does this time sheet say "Revised" at the top?

3    A.  Because for that week of 9/13, I had already turned in an

4    estimated time, and the revised time sheet is the actual time

5    worked.

6    Q.  And there is a number 8 under two zeros.  Can you explain

7    to the jury what that means?

8    A.  That is personal time off.

9    Q.  And this is -- the personal time off is just for

10   September 13th, 2021, for this sheet?

11   A.  Yes.

12   Q.  When you see that the request is for September 13th, 2021,

13   but the defendant signs it on September 10th, 2021, what does

14   that mean to you?

15   A.  That it was signed in advance, prior to that date.

16   Q.  Okay.  I am now showing you Page 5 of Exhibit 11.  What are

17   we looking at here?

18   A.  You're looking at a time sheet.

19   Q.  For what date?

20   A.  9/14/2021.

21   Q.  Okay.  Now, let's start with -- first, can you explain to

22   the jury why on this particular time sheet there isn't the

23   words "revised" at the top like the other time for

24   September 13th?

25   A.  I may have not put "revised" on it.

1    Q.   Were you supposed to?

2    A.   Yeah.  As a rule, yes, but it was a time sheet that was

3    turned in for the daily -- actual daily worked time sheet.

4    Q.   Whose signature is on the supervisor's signature line?

5    A.   It's mine.

6    Q.   Can you explain to the jury why on this time sheet

7    Marc Candelaria's signature is not there?

8    A.   I would say either he didn't come in that day or he called

9    in that day, and I did the time sheet.

10   Q.   Is there a reason why you would put in OO time, leave time,

11   if the defendant did, in fact, show up to work on

12   September 14th?

13   A.   No.

14   Q.   It shows here on the -- the date line for your signature,

15   September 15th, 2021.  Is there a reason why you didn't give

16   this time sheet to Marc Candelaria to sign on September 15th,

17   2021?

18   A.   I may have turned it in early.  I usually get there at

19   5:30, six o'clock, and I do the time sheets.

20   Q.   Looking at this time sheet for September 14th, 2021, was

21   the defendant at work on September 14th, 2021?

22   A.   In looking at this time sheet, no.

23           MS. MOGHADAM:  One moment, Your Honor.

24           No further questions for this witness at this time.

25           THE COURT:  Thank you.

1          Cross-examination?

2              MR. GLANZ:  Thank you, Your Honor.

3                     CROSS-EXAMINATION

4    BY MR. GLANZ:

5    Q.  Good afternoon, Ms. Cabesuela.

6    A.  Good afternoon.

7    Q.  I'm Buck Glanz.  I'm one of Mr. Candelaria's attorneys here

8    today.  It's nice to meet you.

9    A.  Nice to meet you too.

10   Q.  So in 2021 I believe you said that you were Marc's,

11   basically, direct supervisor; is that right?

12   A.  Correct.

13   Q.  And he worked at LANL as a carpenter?

14   A.  Yes.

15   Q.  And that was a union position?

16   A.  Yes.

17   Q.  Now, I can bring it back up if you wanted to take a look at

18   it, but the government had just showed you part the exhibit --

19   I believe it was for the 14th.  If you need to look at it

20   again, I'll bring it back up.  And you had said it was -- you

21   had noted that it was not signed, and you had said that that

22   was because he had either called in that day, would be likely

23   the reason?

24   A.  He either called in or didn't come in.

25   Q.  Okay.  And if he did call, would he contact you directly as

1    his supervisor?

2    A.   He should have, yes.

3    Q.   But do you recall if he contacted you that day to let you

4    know he was not coming in?

5    A.   I don't.

6    Q.   Were you aware that his father-in-law was hospitalized that

7    day?

8    A.   Not that day, no.

9    Q.   I mean, you didn't become aware of it on that day, but you

10   did become aware of it eventually?

11   A.   Yes.

12   Q.   Okay.  And working in that job -- I think earlier you --

13   the government asked you something about his employment record,

14   and you said generally he was a good worker and came in

15   regularly, something like that.  Is that true?

16   A.   Yes.

17   Q.   Okay.  And he made about $70,000 a year in that job?

18   A.   I don't know what he made.

19   Q.   Okay.  Did -- were there different pay grades for different

20   employees in your unit, or --

21   A.   No, but you're telling me 70,000, and I don't know what his

22   gross pay was at the end of year.

23   Q.   Was that also because of the different overtime amounts

24   that someone might work?

25   A.   We -- no.  I just don't know how much he made that year.

```
1   Q.  I see what you're saying.  Do you know, by chance, what the
2   entry-level pay would be for that position?
3   A.  I think back then it was probably 25 to $29 an hour --
4   Q.  Okay.
5   A.  -- for a union carpenter.
6   Q.  Thank you very much, Ms. Cabesuela.  I appreciate your
7   time.
8           MR. GLANZ:  No further questions, Your Honor.
9           THE COURT:  Thank you.
10          Redirect?
11          MS. MOGHADAM:  A really quick one.
12                       REDIRECT EXAMINATION
13  BY MS. MOGHADAM:
14  Q.  Were -- your employees that you supervised, did they work
15  hourly or salary?
16  A.  Hourly.
17  Q.  So their pay varies depending on how much leave they take
18  or if they show up to work?
19  A.  Yes.
20          MS. MOGHADAM:  No further questions.
21          THE COURT:  May this witness be excused?
22          MS. MOGHADAM:  Yes, Your Honor.
23          THE COURT:  Any objection?
24          MR. GLANZ:  No, Your Honor.  Thank you.
25          THE COURT:  Ms. Cabesuela, you are excused.  You're
```

```
 1   free to go, ma'am.  Please watch your step as you step down.
 2           I think now is a good time, counsel, to go ahead and
 3   take a break.  Let's take about a 15-minute break.  Please rise
 4   for the jury.
 5       (Jury exits at 2:16 p.m.)
 6           THE COURT:  We'll be in recess.
 7       (Recess taken from 2:17 p.m. to 2:34 p.m.)
 8           THE COURT:  Counsel, I understand there is something
 9   that you wanted to discuss before we brought them in?
10           MS. MOGHADAM:  Yes, Your Honor.  And before I get
11   started, I just want to put everybody on notice that everything
12   I'm talking about and all documents I'm talking about have
13   already been turned over to defense, but it seems as if what
14   happened was we presented to the jury Exhibit 11, which
15   consists of six pages total.  I referenced it as eight pages
16   because what -- the exhibit that we attached to the notice that
17   we filed with the certification of business records actually
18   had eight pages, two of which were leave slips.
19           Now, in order to remedy this, maybe not make an issue
20   of the page numbers and to keep the record clean, the United
21   States is willing to proceed without those two pages, if
22   there's no objection, of course, from defense.  But if there is
23   no problem with proceeding without those two pages, then we
24   won't have to make any amendments to the jurors' and the
25   evidence that will go back to the jury, and we don't have a
```

1    problem with the way in which we presented it today.

2            But I just wanted to clarify that there were eight

3    pages in the notice.  There were two leave slips.  Defense had

4    an opportunity to review those, and if they have an issue with

5    it, we can address how we want to proceed with the witness.

6            THE COURT:  All right.

7            Counsel?

8            MR. GLANZ:  Your Honor, we have no objection to just

9    proceeding with the six-page document.

10           THE COURT:  All right.  Thank you.

11           Now, did you reference eight pages in front of the

12   jury?  I don't remember.

13           MS. MOGHADAM:  I think I might have, but I referenced

14   each page in order of 1, 2, 3, 4, 5.  So eight pages total, but

15   Page 3 was being referenced as Page 3.

16           MR. GLANZ:  She did say eight pages, but I have no

17   issue with the Court instructing the jury that, in fact, that

18   exhibit is only six pages long.

19           THE COURT:  All right.  Thank you.  I'll be happy to

20   do that.

21           MS. MOGHADAM:  Thank you, Your Honor.  I apologize.

22           THE COURT:  Are we ready to bring them in?

23           MS. MOGHADAM:  Yes, Your Honor.

24           THE COURT:  All right.  Please rise for jury.

25       (Jury enters at 2:36 p.m.)

1          THE COURT:  Please be seated.

2          Members of the jury, before I let the United States

3    call their next witness, United States' Exhibit Number 11 was

4    admitted and it had multiple pages.  I believe the United

5    States referred to it as having eight pages.  In fact, it only

6    has six pages.  So I just wanted to make that clear to you.

7    There's only six pages to Exhibit Number 11.

8          All right.  The United States may call their next

9    witness.

10         MR. HURTADO:  Yes, ma'am, Your Honor.  The United

11   States calls Detective Hilderbrandt.

12         THE COURT:  Good afternoon.  Come up this right side.

13   There is a step up.  Please watch your step.  If I can get you

14   to raise your right hand.

15      (The witness was duly sworn.)

16         THE COURT:  You may be seated.  That microphone is

17   adjustable and there's water to your right if you need it.

18         You may proceed.

19         MR. HURTADO:  Yes, ma'am.

20                    REBECCA HILDERBRANDT

21          (being duly sworn, testified as follows:)

22                    DIRECT EXAMINATION

23   BY MR. HURTADO:

24   Q.  Please tell us your name.

25   A.  Rebecca Hilderbrandt.

1    Q.    Where do you work?

2    A.    With the Santa Fe Police Department.

3    Q.    What do you do for the Santa Fe Police Department?

4    A.    I'm a detective with the Violent Crimes Unit.

5    Q.    How long have you been a detective?

6    A.    For about five years now.

7    Q.    What role did you have previous to becoming a detective?

8    A.    I was patrol officer with the Santa Fe Police Department.

9    Q.    How long total have you been in law enforcement?

10   A.    12 years.

11   Q.    And as a detective, does that mean you're a full-time

12   sworn, salaried and commissioned peace officer in the state of

13   New Mexico?

14   A.    Yes.

15   Q.    Now, are you familiar with an investigation involving a

16   subject named Marc Candelaria?

17   A.    I am.

18   Q.    Is Mr. Candelaria present in the courtroom?

19   A.    Yes, he is.

20   Q.    Could you please identify him for the record?

21   A.    He is at the defense counsel table in blue suit, a gray

22   shirt and a gray tie.  He's on the second from the left.

23          MR. HURTADO:  Your Honor, may the record reflect that

24   the detective has identified the defendant, Mr. Candelaria?

25          THE COURT:  The record will so reflect.

1  Q.  (BY MR. HURTADO) Detective, did your investigation

2  involving Mr. Candelaria occur in the city of Santa Fe, County

3  of Santa Fe, and District of New Mexico?

4  A.  Yes, it did.

5  Q.  What kind of investigation were you conducting into

6  Mr. Candelaria?

7  A.  The investigation began on September 14th of 2021, in a

8  home invasion of John Hennelly's residence.

9  Q.  What facts or circumstances did you learn regarding that

10  home invasion on September 14th?

11  A.  So Mr. John Hennelly was woken in the early morning hours

12  of September 14th, 2021.  It was still dark, and he was woken

13  by an intruder in his residence at gunpoint, and the intruder

14  was pointing a flashlight at him, instructing him to open the

15  safe in his master bedroom closet.

16  Q.  Now, what caused your investigation to focus on the

17  defendant, Mr. Candelaria?

18  A.  John Hennelly's wife, Victoria Hennelly, had found a check

19  that had been cashed against her Hennelly trust account, and

20  the check was to Marc Candelaria for the amount of $23,000, and

21  Mrs. Victoria Hennelly had been notified by Wells Fargo that

22  there was possible fraud with the check.

23  Q.  You indicated the bank was Wells Fargo?

24  A.  Yes.

25        MR. HURTADO:  Your Honor, at this time the United

1    States would seek to publish what has already been admitted as

2    Government Exhibit 3, which is a trial stipulation regarding

3    the FDIC status of Wells Fargo.

4            THE COURT:  You may publish.

5    Q.  (BY MR. HURTADO) Detective, I've just published what's been

6    admitted and marked for identification as Government's

7    Exhibit 3.  Do you see that document published on your screen?

8    A.  I do.

9    Q.  I would like you to read before the members of the jury,

10   the paragraph underneath the section titled "FDIC Status."

11   Could you please read that paragraph?

12   A.  "The parties agree that before and during the time period

13   charged in the indictment, Wells Fargo was a federally insured

14   bank, meaning that it was a bank insured by the Federal Deposit

15   Insurance Corporation, FDIC."

16   Q.  Thank you.

17           MR. HURTADO:  I'll now remove Government Exhibit 3.

18   Q.  (BY MR. HURTADO) Now, I believe you -- Detective, I believe

19   you indicated that Victoria Hennelly had indicated that a check

20   had been drawn against the family Hennelly trust account; is

21   that correct?

22   A.  Yes.

23   Q.  What did you do based on that information?

24   A.  I began writing search warrants for the Hennelly trust bank

25   accounts belonging to Mr. Marc Candelaria, search warrants for

1  his residence, his vehicle, his place of employment.  Many

2  search warrants were drafted and executed.

3  Q.  Was a search warrant also drafted in connection with

4  Mr. Candelaria's Wells Fargo bank account?

5  A.  Yes.

6        MR. HURTADO:  Your Honor, may the United States

7  approach Detective Hilderbrandt with what have been marked as

8  Government Exhibit 5 and Government Exhibit 6?

9        THE COURT:  You may.

10 Q.  (BY MR. HURTADO) Detective, let me have you review

11 Government Exhibit 5 and Government Exhibit 6.  Take your time.

12 Do not give any details or about those exhibits until you're

13 done reviewing them.  When you are done reviewing them, just

14 look up at me.

15    Detective, have you completed your review of Government

16 Exhibit 5 and Government Exhibit 6?

17 A.  I have.

18 Q.  Do you recognize Government Exhibit 5 and Government

19 Exhibit 6?

20 A.  I do.

21 Q.  What are those documents?

22 A.  This is production from Wells Fargo in response to the

23 search warrants that I drafted for Marc Candelaria's account

24 and to the family -- Hennelly family estate trust.

25 Q.  Do Government Exhibits 5 and 6 appear to be fair and

```
1   accurate records of what you had obtained pursuant to your
2   search warrant?
3   A.  They are.
4        MR. HURTADO:  Your Honor, with that foundation, the
5   United States seeks to admit at this time Government Exhibits 5
6   and 6.
7        THE COURT:  Any objection?
8        MR. GLANZ:  No, Your Honor.
9        THE COURT:  Government's 5 and 6 will be admitted
10  without objection.
11     (Government's Exhibits 5-6 admitted into evidence.)
12  Q.  (BY MR. HURTADO) I'm going to retrieve Government's
13  Exhibits 5 and 6 from you.
14     Detective, regarding Government Exhibit 5, which is
15  Marc Candelaria's account information from Wells Fargo --
16        MR. HURTADO:  Let me go ahead and publish that to the
17  jury if I may, Your Honor?
18        THE COURT:  You may.
19  Q.  (BY MR. HURTADO) Now, Detective, I've just published what
20  has been marked and admitted as Government Exhibit 5.  Once
21  again, do you recognize that?
22  A.  I do.
23  Q.  Can you please tell the jury what Government Exhibit 5 is?
24  A.  It is the production for Marc Candelaria's Wells Fargo bank
25  account, in which Wells Fargo responded to my search warrant.
```

1  Q.  Is Marc Candelaria the only subscriber to that Wells Fargo

2  account?

3  A.  Yes, he is.

4  Q.  Could you please tell the members of the jury what you

5  learned from reviewing the record concerning Mr. Candelaria's

6  bank records?

7  A.  So when I obtained the production, I found that on

8  September 14th of 2021, Marc Candelaria deposited a check for

9  $23,000 that was signed by John Hennelly.

10 Q.  Now, let me publish for you what has been marked and

11 admitted as Government Exhibit 6.

12     Once again can you tell the members of the jury what

13 Government Exhibit 6 is?

14 A.  This is the production from Wells Fargo in response to my

15 search warrant that was written for the Hennelly Family Trust

16 account.

17 Q.  And who are the subscribers to that account, specifically

18 within the Hennelly family?

19 A.  It is John and Victoria Hennelly.

20 Q.  And what did you learn in reviewing their bank records from

21 Wells Fargo?

22 A.  That a check signed by John Hennelly had been cashed

23 against this checking account, which it's drawn off of, and

24 then a second check for $23,000, which Victoria Hennelly wrote,

25 was cashed against the account.

1  Q.  Yes, ma'am.  I'll move on with other things, but I do want
2  to go back to these records later.
3      You indicated you conducted a search warrant of
4  Mr. Hennelly's home; is that correct?
5  A.  I did.
6  Q.  Where was that home located?
7  A.  So the Hennelly house was at 1457 Encina Road.  And I
8  apologize, I was not present at the time for that search
9  warrant, but another detective did do the search warrant.
10 Q.  I understand.
11     Based on the information that you gleaned from other
12 officers, were you able to determine whether there had been at
13 signs of forced entry into Mr. Hennelly's home?
14 A.  There was no forced entry into the Hennelly residence at
15 the time of the attack.
16 Q.  Were there any items of evidentiary value -- excuse me.
17 Were there any items of value that were seized from the home?
18 A.  Seized by the police?  We did not take items of value.
19 There were many items of evidentiary value that were taken,
20 yes.
21 Q.  Now, you made reference to a check for $23,000 that was
22 deposited into Mr. Candelaria's bank account; is that correct?
23 A.  Yes.
24 Q.  Do you know whether the checkbook that contained the check
25 for $23,000 was ever located by authorities?

1   A.  The checkbook in which John Hennelly wrote the check -- the
2   checkbook that contained the check that John Hennelly wrote was
3   never located.
4   Q.  Now, were there other items of value inside the home?
5   A.  Yes.  The Hennellys had an extensive amount of art,
6   pottery.  Victoria Hennelly's jewelry box was also in the
7   master bedroom closet.
8   Q.  Were any of those items missing?
9   A.  No.
10  Q.  Do you know whether there was a safe inside the home?
11  A.  Yes.  There was a safe in the master bedroom closet.  It
12  was hidden in a cabinet.
13  Q.  And is that something -- is that a fact that the jury
14  should appreciate for any reason?
15  A.  Yes.  Because I don't believe a random person would have
16  known that the safe was in that closet.
17  Q.  Now, did you ever find anything of evidentiary value in the
18  defendant's car?
19  A.  I did.  A search warrant was executed for the car that
20  Marc Candelaria was entrusted.
21  Q.  Okay.
22          MR. HURTADO:  And at this time, Your Honor, I would
23  request permission to approach Detective Hilderbrandt with what
24  has been marked as Government Exhibit 4?
25          THE COURT:  You may.

1    Q.  (BY MR. HURTADO) Detective, please take a look at

2    Government Exhibit 4.  Review it at your leisure.  Once you are

3    done reviewing Government Exhibit 4, please take a look at me.

4        Detective, have you completed your review of Government

5    Exhibit 4?

6    A.  I have.

7    Q.  Could you please tell the members of the jury -- or, well,

8    first, let me ask you, do you recognize Government Exhibit 4?

9    A.  I do.

10   Q.  How do you go recognize Government Exhibit 4?

11   A.  It was located in the center console of the vehicle that

12   Marc Candelaria drove, during the execution of my search

13   warrant for that vehicle.

14   Q.  Is there anything about Government Exhibit 4 that's been

15   altered for deleted in any way?

16   A.  No.

17   Q.  Does it appear to be a fair and accurate representation of

18   Government Exhibit 4 as you found it on the day that you

19   searched Mr. Candelaria's car?

20   A.  Yes.

21        MR. HURTADO:  Your Honor, with that foundation, the

22   United States seeks to admit Government Exhibit 4 at this time?

23        THE COURT:  Any objection?

24        MR. GLANZ:  No, Your Honor.  Thank you.

25        THE COURT:  Government's 4 will be admitted without

1    objection.

2        (Government's Exhibit 4 admitted into evidence.)

3    Q.  (BY MR. HURTADO) Detective, I will grab Government

4    Exhibit 4 from you.

5        Detective, I've just published --

6            MR. HURTADO:  I apologize, Your Honor.  May I publish

7    Government Exhibit 4?

8            THE COURT:  You may.

9    Q.  (BY MR. HURTADO) Detective, I've published Government

10   Exhibit 4 on your screen.  Do you see Government Exhibit 4?

11   A.  I do.

12   Q.  I'm going to flip over Government Exhibit 4.  Can you

13   please describe the information contained on Government

14   Exhibit 4?

15   A.  It is an ATM deposit receipt for Wells Fargo, and it was

16   made on September 14th, 2021, the same day that John Hennelly

17   was attacked in his home, and it was made just before 9:00 a.m.

18   in Española, New Mexico.

19   Q.  Specifically what time is listed on the Wells Fargo deposit

20   slip?

21   A.  8:58 a.m.

22   Q.  And what was the location of that ATM?

23   A.  In Española, New Mexico.

24   Q.  Do you happen to know how far Española is from

25   Mr. John Hennelly's residence?

1    A.   It's approximately 45 minutes.

2    Q.   And how do you know that this deposit slip was made in

3    connection to Mr. Candelaria's Wells Fargo banking account?

4    A.   Because the -- I believe it has the account number -- or

5    the customer card number, the last four digits.  It also has --

6    everything corresponds.  The check corresponds to the deposits

7    made in Mr. Candelaria's account.  It does have his name on it

8    as well.

9    Q.   Can you identify where on the Wells Fargo deposit slip it

10   reads John Hennelly's check number?

11   A.   Do you want me to mark it?

12   Q.   Yes, please.  You can using the screen, touch screen.

13   A.   So it was Check Number 5162.

14   Q.   Okay.  And what is the amount, again, for that check?

15   A.   It is for $23,000.

16   Q.   Now, the copy of the check that appears on that deposit

17   slip, is that the check that was taken from Mr. Hennelly's

18   residence?

19   A.   Yes.

20   Q.   Do you know whether Ms. Victoria Hennelly ever gave to the

21   defendant a check for $23,000?

22   A.   Yes.  She wrote him a check on September 16th of 2021.

23   Q.   And is that also reflected in the bank records for the

24   Hennelly Family Trust?

25   A.   Yes, it is.

1    Q.   Detective, did you ever interview the defendant?

2    A.   I did.

3    Q.   When did you interview the defendant?

4    A.   I interviewed him November 23rd of 2021, the same day that

5    search warrants were executed on his residence.

6    Q.   Why did you want to interview the defendant?

7    A.   Because he was a suspect in the bank fraud and the home

8    invasion.

9    Q.   Speaking of suspects, do you know who Meaghan Hennelly is?

10   A.   I do.

11   Q.   Who is Meaghan Hennelly?

12   A.   She is Marc Candelaria's former wife, and she is the

13   daughter of John Hennelly and stepdaughter of

14   Victoria Hennelly.

15   Q.   Was Ms. Hennelly, Ms. Meaghan Hennelly, ever a suspect in

16   this case?

17   A.   Yes, she was.

18   Q.   Was she ever cleared as a suspect?

19   A.   Yes, she was.

20   Q.   And what did you base that on?

21   A.   Bank records with Marc Candelaria, interviews, her

22   cooperation, and then finding the evidence of the home invasion

23   within Marc Candelaria's vehicle.

24   Q.   Do you still believe that Ms. Hennelly is not a suspect in

25   this case?

1  A.  Correct.

2  Q.  How about Victoria Hennelly, John Hennelly's wife; was she

3  ever suspect in this case?

4  A.  No.

5  Q.  And why is that?

6  A.  She was out of town at the time the attack occurred.

7  Q.  Now, going back to Mr. Candelaria, you indicated that you

8  interviewed him on or about November 23rd, 2021; is that

9  correct?

10 A.  That is correct.

11 Q.  Please describe the details of your interview.

12 A.  Mr. Candelaria was detained at his residence for a search

13 warrant for his DNA and his fingerprints.  He was transported

14 to the Santa Fe Police Department by a patrol officer.  His DNA

15 and fingerprints were then obtained, and he was placed in an

16 interview room.  He was unhandcuffed.  I entered the room, and

17 I told Mr. Marc Candelaria that I wanted to speak with him and

18 he was no longer detained and he was free to leave at any time.

19 Q.  Did he agree to speak with you?

20 A.  Yes.

21 Q.  You indicated he was free to leave?

22 A.  Yes, he was.

23 Q.  Did that mean he was not under arrest at the time?

24 A.  That is correct.

25 Q.  What did you ask him?

1  A.  Mr. Candelaria began by asking why he was at the Santa Fe

2  Police Department, and I told him it was pertaining to the

3  attack on his father-in-law, and Mr. Candelaria kind of

4  chuckled and asked why we didn't tell him this sooner.

5  Q.  What was his demeanor like initially when you began to

6  speak with him?

7  A.  He was very friendly, very cordial.  He was laughing with

8  me.  At some point in time he was giving me financial advice,

9  motivational advice.  So it was very cordial.

10  Q.  Did his demeanor towards you ever change during the

11  interview?

12  A.  Yes, it did.

13  Q.  How so?

14  A.  When I began asking about Bitcoin and the investments that

15  he and John Hennelly allegedly were going to make into Bitcoin.

16  Q.  When you began speaking about Bitcoin, how did is demeanor

17  change towards you?

18  A.  So he became annoyed because I mispronounced the types of

19  cryptocurrency, and then when I started asking details about

20  when he obtained the check.  He became very short.  He gave me

21  one-word responses to my questions and then immediately asked

22  to leave, if he was -- he asked if he was under arrest.  I said

23  no.  And he asked, again, if he was free to leave, and I said

24  yes, and he did ask for a ride back to his residence.

25  Q.  Did you provide him with a ride back to his residence?

1   A.   Yes.

2   Q.   Did you ever ask the defendant about the check for $23,000?

3   A.   I did.

4   Q.   What did he say?

5   A.   He stated that he and John Hennelly had been discussing in

6   investing in Bitcoin together, a cryptocurrency.

7   Q.   Did he say how he intended or why he wanted $23,000

8   specifically?

9   A.   He said the intention was to split it between three

10  different types of cryptocurrency.  One for 10,000, another

11  10,000, and then a third for 3,000.

12  Q.   You had reviewed Mr. Candelaria's bank records at

13  Wells Fargo; is that correct?

14  A.   I did.

15  Q.   Did there appear to be a split in these amounts as you just

16  described with one amount for 10,000, another amount for

17  10,000, and a final amount for 3,000?

18  A.   No, there were not.

19  Q.   Did he say how he came into possession of the check for

20  $23,000?

21  A.   Marc Candelaria stated he picked the check up for

22  John Hennelly on Friday after work, on Friday September 10th,

23  just a few days prior to the home invasion.

24  Q.   And I believe -- I apologize.

25       Did he make reference regarding he and John Hennelly using

1    that money for Bitcoin?

2    A.  Yes, he did.

3    Q.  Do you know whether the defendant was aware that

4    John Hennelly's wife, Victoria Hennelly, was out of state on a

5    trip?

6    A.  Yes.  He discussed it during my interview with him.

7    Q.  Now, Detective, I want to go back to the bank records.  I

8    want to publish Government Exhibit 5.  Detective, are you able

9    to see Government Exhibit 5 on your screen?

10   A.  Yes.

11   Q.  Now, Detective, I am at Page 3 of 8 on Government

12   Exhibit 5.  Do you see that page?

13   A.  I do.

14   Q.  I'll zoom in.  Detective, can you point to the entry listed

15   for September 14th?

16   A.  Yes.

17   Q.  Can you circle it.

18   A.  Right here.

19   Q.  Okay.  And I note that you drew a red arrow next to the

20   entry that reads "9/14"; is that correct?

21   A.  Yes.

22   Q.  What does that entry read?

23   A.  It says, "ATM check deposit on September 14th, 645 North

24   Riverside Drive, Española, New Mexico."

25       I believe this is the banker ATM ID as 0007312ATMID, and

1  then 1976L, as in "Lincoln."  Card 5091, and it is for the

2  amount of $23,000.

3  Q.  Now, right above the entry for September 14th, there reads

4  an amount that reads $8.47.  Are you able to see that in the

5  entry above?

6  A.  Yes, I am.

7  Q.  Okay.  Can you circle that for the jury's benefit?  What

8  does that $8.47 mean?

9  A.  That was the balance -- the ending daily balance on

10 Marc Candelaria's bank account on September 13th.

11 Q.  So prior to the check for $23,000 that was deposited,

12 Mr. Candelaria had $8.47 in his account; is that accurate?

13 A.  Correct.

14 Q.  Okay.  Now, I want to move on.  Can you clear your screen,

15 Detective?

16 A.  Yes.

17 Q.  Detective, there are a multitude of entries for

18 September 15th.  Do you see those entries?

19 A.  I do.

20 Q.  Okay.  I want to direct your attention specifically to the

21 entries for September 15th that read as follows:  $3,400;

22 $1,000; $8,000; and $8,000.  Do you see those amounts?

23 A.  I do.

24 Q.  Could you please circle them for the jury's benefit.  Okay.

25     Now, earlier you had testified that during your interview

1    with Marc Candelaria, he had wanted to divide up the amounts
2    into three total increments.  One for 10,000, another for
3    10,000, and, yet, another for 3,000.  Do you recollect that?
4    A.   That is correct.
5    Q.   Do any of the amounts that you just circled on Government
6    Exhibit 5 reflect those amounts?
7    A.   No, they do not.
8    Q.   What do they reflect, based on what's contained in those
9    records?
10   A.   So the first one for $3,400 is a Zelle transfer, a -- the
11   second one -- let's see, this is one, this is two.  The second
12   one is an ATM withdrawal made in Santa Fe for $1,000.  And then
13   the third one here is a withdrawal, a cash withdrawal, for
14   $8,000.  And then the fourth one is a transfer to a JPMorgan
15   Chase account for $8,000.
16   Q.   Based on what you see in these records, are they consistent
17   with what Marc told you during his interview?
18   A.   No.
19   Q.   Now, Detective, I want to go back to Government Exhibit 6,
20   which are the bank records for the Hennelly Family Trust.
21   Specifically, I'm going to Page 4 of Government Exhibit 6, and
22   I'll zoom in.
23       I want to draw your attention to the entries for
24   September 14th.  Do you see those entries?
25   A.   I do.

1   Q.  Could you please mark them for the jury's benefit?

2   A.  So this is the check that John Hennelly wrote on

3   September 14th, 2021, while under duress in his master bedroom

4   closet.  It is Check Number 5162 for $23,000.

5   Q.  Was there another check deposited by the defendant or drawn

6   from the Hennelly Family Trust?

7   A.  Yes.  There was a check that was written by

8   Victoria Hennelly on September 16th of 2021.

9   Q.  Could you please highlight where that information is

10  contained the same way you did for the entry on September 14th?

11      Just bear with me one moment, Detective.

12      Now, Detective, what information were you provided with

13  respect to the intruder who perpetrated the home invasion on

14  John Hennelly's home?

15  A.  John Hennelly described him as a tall Hispanic man with

16  bushy eyebrows and a thick Spanish accent.

17  Q.  Was that man ever located?

18  A.  Not to this day.

19  Q.  Is the Santa Fe Police still looking for that individual?

20  A.  Yes, we are.

21      MR. HURTADO:  Your Honor, may I have a brief moment to

22  confer with my co-counsel?

23      THE COURT:  You may.

24  Q.  (BY MR. HURTADO) Detective, you made reference earlier to a

25  search warrant for DNA.  Do you recall that portion of your

1  testimony?

2  A.  Yes.

3  Q.  Were there any conclusive results found with respect to

4  DNA?

5  A.  No, there were not.

6  Q.  With respect to the records that we just inspected for the

7  defendant, Marc Candelaria, there was an entry for an

8  individual named Elaine or Allen.  Do you know who that person

9  is?

10  A.  He was identified by Meaghan Hennelly as a cousin to

11  Marc Candelaria.

12  Q.  Did the defendant ever tell you that part of his plan was

13  to give Allen or Elaine money for Bitcoin?

14  A.  No.  He stated the money was to be broken up to invest in

15  three different types of cryptocurrency and that totaled the

16  $23,000.

17        MR. HURTADO:  Those are all the questions I have for

18  Detective Hilderbrandt.  I pass the witness, Your Honor.

19        THE COURT:  Thank you.

20        Cross-examination?

21        MR. GLANZ:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23  BY MR. GLANZ:

24  Q.  Good afternoon, Detective Hilderbrandt.

25  A.  Good afternoon.

1  Q.  As you may know, my name is Buck Glanz.  I'm one of

2  Mr. Candelaria's attorneys.

3      So I believe you were assigned to this case on

4  September 20th of 2021; is that correct?

5  A.  I was assigned on the 14th, but I didn't return to town

6  until about that time.  That's correct.

7  Q.  You were out of town on some sort of leave?

8  A.  I was.

9  Q.  Okay.  So you returned and began actively working on it on

10 September 20th, then?

11 A.  I did.

12 Q.  And I don't know that I heard you say this during your

13 direct examination, but you were the case agent, right?

14 A.  I am.

15 Q.  And what that means is that you're in charge of the entire

16 investigation?

17 A.  Yes, sir.

18 Q.  And you supervise the other officers that are working on

19 the case?

20 A.  To a certain extent.  They all report to their individual

21 supervisors.

22 Q.  But generally you would delegate various tasks to the other

23 officers working on the case?

24 A.  I'd say, yes, up until -- or when I got back from my leave.

25 Q.  Okay.  So if you needed help with something because you

1  were busy, you delegate to another officer?

2  A.  Yes, sir.

3  Q.  And I think this was abundantly clear from your direct, but

4  as part of being the case agent, you have to be aware of the

5  entire case and all the details?

6  A.  Yes, sir.

7  Q.  And I think you also testified to this on direct, but at

8  first you didn't have any suspects when you started

9  investigating this?

10  A.  Well, we didn't have a definitive suspect, sir.

11  Q.  Okay.  I think -- I think you actually had said perhaps

12  Ms. Hennelly and Mr. Candelaria were both potential suspects

13  initially?

14  A.  Correct.  There were multiple people that we were

15  investigating as suspects.

16  Q.  So in your role as case agent in this matter, you were

17  aware that Santa Fe Police interviewed Mr. Hennelly on

18  September 14th at the hospital?

19  A.  I don't remember him being interviewed at the hospital.

20  Q.  But you were back in town at that point, right?

21  A.  I was not.

22  Q.  But in reviewing the hospital, you're not aware of any

23  police officers talking to him about the events?

24  A.  I remember them talking to Ms. Meaghan Hennelly.

25  Q.  On September 14th?

1   A.  Correct.

2   Q.  And then Mr. Hennelly was, though, interviewed on

3   September 18th at the hospital?

4   A.  Yes.  I apologize.  Mr. John Hennelly was.

5   Q.  Okay.  And there's no mention in any Santa Fe Police report

6   that he mentioned a check at that time; is that correct?

7   A.  Yes.  That is correct.

8   Q.  Okay.  And then I believe you and your supervisor,

9   Sergeant Champlin -- am I saying her name correctly?

10  A.  It's Sergeant Champlin, sir.

11  Q.  Champlin.  Thank you for that correction.

12      You both interviewed Victoria Hennelly at the Santa Fe

13  Police station on October 5th?

14  A.  It wasn't really an interview.  Mrs. Hennelly stopped by to

15  bring the Wells Fargo checks, copies of the checks that she had

16  obtained from her bank.

17  Q.  Was that the first time you learned about the Wells Fargo

18  check to Marc Candelaria?

19  A.  Yes.

20  Q.  And then you, again -- or you, I guess, for the first time,

21  interviewed John Hennelly at his home on October 12th?

22  A.  Yes.  That's correct.

23  Q.  And was that the first time that you learned about the

24  check allegedly being written during the home invasion?

25  A.  No.  Mrs. Victoria Hennelly had stated that it was possibly

1    written during the home invasion when she met with us on

2    October 5th.

3    Q.   So on October 5th you learned about that from

4    Mrs. Hennelly --

5    A.   Correct.

6    Q.   -- when she brought you those checks?

7    A.   Correct.

8    Q.   Okay.  And at that point, is it fair to say that your

9    investigation became focused on Mr. Candelaria?

10   A.   I wouldn't say "focused" completely because we did believe

11   Ms. Hennelly was possibly a suspect as well.

12   Q.   Or perhaps an accomplice?

13   A.   Correct.  And then we also still were ruling out other

14   people that were in and out of Hennelly residence at the time.

15   Q.   Now, I'm just going to -- I mean, I think you testified to

16   some of these, but there's quite a few search warrants you

17   executed, so I'm going to try to go through those.

18        So, I think, first, was a search warrant of the Hennelly

19   home; is that right?

20   A.   Yes.  And I was not present for that one.

21   Q.   And then a search warrant for cell phone records from AT&T?

22   A.   Correct.

23   Q.   Then a search warrant for Mr. Candelaria's Wells Fargo

24   account?

25   A.   I believe so.  I don't know the exact order.

1    Q.   That's okay.   You do agree that these search warrants
2    occurred?
3    A.   Yes, sir.
4    Q.   Okay.   And then a search warrant for the Volkswagen vehicle
5    driven by Mr. Candelaria?
6    A.   Correct.
7    Q.   And then a search warrant for Ms. Hennelly's Volvo?
8    A.   Correct.
9    Q.   And a search warrant for Mr. Candelaria's DNA?
10   A.   Correct.
11   Q.   And a search warrant for his fingerprints?
12   A.   Correct.
13   Q.   Then, I believe you even went and searched his locker at
14   Los Alamos National Laboratory; is that right?
15   A.   I did.
16   Q.   And that was also pursuant to a warrant?
17   A.   Correct.
18   Q.   Then, I believe you also submitted a search warrant for
19   Bank of America records, potentially, for Mr. Candelaria?
20   A.   I did.
21   Q.   Then, another search warrant for JPMorgan Chase bank?
22   A.   Correct.
23   Q.   Was that in response to the transfer that the government
24   asked you in direct examination?
25   A.   Yes, it was.

1  Q.   Okay.  And then also a search warrant for Capital One bank?

2  A.   Yes.

3  Q.   And then a search warrant for two Apple accounts, one for

4  an iCloud and one for an e-mail address?

5  A.   Yes, sir.

6  Q.   And those were also targeted at Mr. Candelaria?

7  A.   Yes, sir.

8  Q.   And then a search warrant for Mr. Candelaria's actual

9  iPhone?

10 A.   Yes, sir.

11 Q.   And that's -- to be clear, that's the physical device?

12 A.   Yes, the physical phone.

13 Q.   That you recovered when you seized his vehicle, right?

14 A.   Yes, sir.

15 Q.   And then you also did a search warrant for something called

16 "Early Warning Services"?

17 A.   Yes, sir.

18 Q.   I always -- never spoken this word right, so if I

19 mispronounce it, I apologize, but that was to obtain the Zelle

20 records?

21 A.   Yes, sir.

22 Q.   And those are some kind of bank-to-bank transfers?

23 A.   Yes.  It's kind of like PayPal.

24 Q.   Okay.  And did I pronounce it correctly?

25 A.   I don't know.  I apologize.  I don't know either.

1    Q.   No apology necessary.

2         And then I believe you executed a second search warrant on

3    Mr. Candelaria's house because Ms. Hennelly had told you that

4    there were crawl spaces under the house?

5    A.   That is correct.

6    Q.   And then finally -- I don't know if this was pursuant to a

7    search warrant, so please don't let me put words in your mouth,

8    but you eventually obtained his casino records as well?

9    A.   That is correct.

10   Q.   And those were from Buffalo Thunder?

11   A.   That is correct.

12   Q.   Were there any search warrants there that I missed?

13   A.   I wrote a lot of search warrants, so I don't know offhand

14   if there's any that you missed.

15   Q.   Okay.  And I know that you didn't respond to the Hennellys'

16   home on September 14th --

17   A.   That is correct.

18   Q.   -- but a number of Santa Fe police officers did, right?

19   A.   Correct.

20   Q.   And, to your knowledge, were they all wearing standard

21   issued lapel cameras?

22   A.   I believe so, yes, sir.

23   Q.   And did you review those lapel cameras as well?

24   A.   Yes, sir, I did.

25   Q.   And a number of them probably authored police reports?

1    A.  Yes, sir.

2    Q.  And did you review those as well?

3    A.  Yes, sir.

4    Q.  In order to be aware of all the details of the

5    investigation?

6    A.  Yes, sir.

7    Q.  And so you're aware that they -- I believe you had

8    testified on direct that you're not aware of any other valuable

9    property being missing from the home; is that right?

10   A.  Correct.

11   Q.  But you are aware from your review of all the other

12   evidence that there were a number of drawers that were opened

13   in various rooms; is that right?

14   A.  That is correct.

15          MR. GLANZ:  Your Honor, may I have one moment?

16          THE COURT:  You may.

17          MR. GLANZ:  Thank you.

18          No further questions, Your Honor.  Thank you.

19          THE COURT:  Thank you.

20          Redirect?

21          MR. HURTADO:  Briefly, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MR. HURTADO:

24   Q.  I want to direct your attention to the portion of defense

25   counsel's cross-examination with respect to the Hennelly family

1    search warrant that was executed.  Were there drawers open in

2    the home?

3    A.  Yes, there were.

4    Q.  Were you under the impression at one point in time that

5    perhaps the Hennelly daughter [*sic*], the youngest daughter,

6    Shay, may have opened those drawers?

7    A.  Yes.  Victoria Hennelly stated that Shay liked to play in

8    the bedrooms and open the drawers, so it was a possibility that

9    it was the youngest granddaughter that had done that.

10             MR. HURTADO:  Your Honor, those are the only questions

11   I have.  Thank you.

12             THE COURT:  All right.  Thank you.

13             May this witness be excused?

14             MR. HURTADO:  Yes, ma'am, she may.

15             THE COURT:  Any objection?

16             MR. GLANZ:  No objection, Your Honor.  Thank you.

17             THE COURT:  Thank you.

18             You are excused.  Thank you for your testimony.

19   Please watch your step as you step down.

20             THE WITNESS:  Thank you, Your Honor.

21             THE COURT:  You're free to go.

22             You may call your next witness.

23             MR. HURTADO:  Yes, ma'am.  Your Honor, the United

24   States calls Ms. Vanessa Vasquez Garcia.

25             THE COURT:  Good afternoon.  There's a step up to the

1    witness stand here.  Please watch your step.

2            THE WITNESS:  Thank you.

3            THE COURT:  And before you're seated -- if you'd like

4    to put your purse down.  Before you're seated, can I get you to

5    raise your right hand?

6        (The witness was duly sworn.)

7            THE COURT:  Thank you.  You may be seated.  That

8    microphone is adjustable, and there's water to your right.

9            You may proceed.

10           MR. HURTADO:  Yes, ma'am.

11                    VANESSA VASQUEZ GARCIA

12           (being duly sworn, testified as follows:)

13                    DIRECT EXAMINATION

14   BY MR. HURTADO:

15   Q.   Please tell us your name.

16   A.   My name is Vanessa Vasquez Garcia.

17   Q.   Where do you work?

18   A.   I work for the DOE under --

19        (Reporter clarification.)

20           THE WITNESS:  Department of Energy, National Nuclear

21   Security Administration.

22   Q.   (BY MR. HURTADO) And what do you do for the DOE?

23   A.   I am a personal security specialist.

24   Q.   And what are your duties?

25   A.   My duties are to receive and adjudicate background

1    investigations for determination regarding an individual's

2    eligibility or continued eligibility for a duty access,

3    authorization or security clearance.

4    Q.   How long have you been a personnel security specialist?

5    A.   I've been a personal security specialist for about five

6    years on the federal side.  Prior to that, I supported DOE on

7    the contractor's side for about 13 years.

8    Q.   So about 18 years total?

9    A.   About, yeah.

10   Q.   Have you ever testified in court in your official capacity

11   as a personnel security specialist?

12   A.   I have not.

13   Q.   Have you ever testified in other capacity?

14   A.   No.

15   Q.   Now, I want to present to you what has been marked for

16   identification purposes as Government Exhibit 7.

17            MR. HURTADO:  May the United States approach,

18   Your Honor?

19            THE COURT:  You may.

20   Q.   (BY MR. HURTADO) Ms. Vasquez Garcia, please take a look at

21   Government Exhibit 7.  Take your time reviewing it.  Once

22   you're done reviewing it, please look up at me so that I know

23   you've completed your review.

24   A.   Okay.

25   Q.   I've noticed you're now looking at me.  Does that mean you

1  completed your review?

2  A.  Yes, it does.

3  Q.  Do you recognize Exhibit 7?

4  A.  I do recognize it.

5  Q.  How do you recognize Government Exhibit 7?

6  A.  This is a Letter of Interrogatory Questionnaire that I had

7  sent to a Mr. Marc Candelaria.

8  Q.  What is a Letter of Interrogatory?

9  A.  So a Letter of Interrogatory is a questionnaire that we

10 send in order to gain some more information regarding

11 information that was contained in the background investigation

12 that was received.

13 Q.  Does Government Exhibit 7 appear to be in the same

14 condition as when you first saw it?

15 A.  It appears to be, yes.

16 Q.  Who prepared Government Exhibit 7?

17 A.  I prepared the LOI questionnaire and sent it to

18 Mr. Candelaria.

19 Q.  And does it appear that Mr. Candelaria completed Government

20 Exhibit 7, the questionnaire?

21 A.  It does appear as though he completed it.

22 Q.  Does Government Exhibit 7 appear to be a fair and accurate

23 depiction of what's contained therein?

24 A.  Yes, it does.

25        MR. HURTADO:  Your Honor, at this time the United

1    States moves to admit Government Exhibit 7.

2            THE COURT:  Any objection?

3            MR. GLANZ:  No, Your Honor.  Thank you.

4            THE COURT:  Thank you.

5            Government's 7 will be admitted without objection.

6        (Government's Exhibit 7 admitted into evidence.)

7    Q.  (BY MR. HURTADO) Ma'am, I'm going to retrieve Government

8    Exhibit 7 from you.

9    A.  Sure.

10   Q.  I believe you indicated that the questionnaire was designed

11   to obtain additional information regarding an applicant's

12   eligibility for a security clearance; is that correct?

13   A.  Yes.  That is correct.

14   Q.  In this case, for purposes of Government Exhibit 7, what

15   specific information were you looking for?

16   A.  So in his initial background investigation there was issues

17   pertaining that finances, delinquencies, delinquent accounts.

18   So that questionnaire was in relation to those delinquencies

19   that were contained in his background investigation to

20   determine the status, intentions toward resolution, that sort

21   of thing.

22   Q.  Now, you indicated that the defendant had completed

23   Government Exhibit 7, the questionnaire.  What leads you to

24   believe that Mr. Candelaria, the defendant, completed the

25   questionnaire as opposed to somebody else?

1  A.  The fact that it was sent to his personal e-mail address,

2  the entire document was submitted, and it assigned at the end.

3        MR. HURTADO:  Now, let me publish, if I may,

4  Your Honor, Government Exhibit 7?

5        THE COURT:  You may.

6  Q.  (BY MR. HURTADO) Ma'am, are you able to see Government

7  Exhibit 7 on your screen?

8  A.  I can see it.

9  Q.  What is the heading at the top of Government Exhibit 7?

10 A.  The Letter of Interrogatory questionnaire and the subject's

11 name.

12 Q.  What's written beneath that, where it says, "To whom it may

13 concern"?

14 A.  This looks to be an explanation regarding his reasoning

15 behind his financial delinquencies.

16 Q.  Is it common to receive a narrative such as the kind that's

17 depicted in Government Exhibit 7?

18 A.  It does happen.  It's not typical to receive, maybe, a

19 three-page response, but it can happen.

20 Q.  You said three pages?

21 A.  One, two -- and then a little bit of a third page.

22 Q.  All right.  Now, you indicated that Mr. Candelaria had

23 signed this document; is that correct?

24 A.  Yes.  That is correct.

25 Q.  I've just turned to what is marked at the bottom as

1    Page 12.  Do you see that?

2    A.  Yes, I do.

3    Q.  Okay.  Can you tell the members of the jury what's depicted

4    on Page 12?

5    A.  So this is the certification page where the individual can

6    sign his name.  It looks like he signed his name,

7    Marc Candelaria; the date, 6/22/2021.

8    Q.  Now, you indicated that you had administered or delivered

9    this Letter of Interrogatory to Mr. Candelaria; is that

10   correct?

11   A.  Correct.

12   Q.  And how did you do that?  How did you ensure that he

13   received a copy of this?

14   A.  So I sent it to his personal e-mail address that was listed

15   on his questionnaire for national security positions.  That

16   form is part of his background investigation that was submitted

17   to us.

18   Q.  All right.  Now, I want to take a look at some of the

19   information that is compiled on Government Exhibit 7, beginning

20   with what is located on Page 1.  Do you see Page 1 published on

21   your screen?

22   A.  I do.

23   Q.  Now, there appears to be a statement that is made right

24   before the questions or the inquiry regarding the debts.  Can

25   you tell us what that information provides?

1    A.  So it's just like an opening statement.  So, "U.S.
2    Department of Energy has information that you have financial
3    issues and the questionnaire is to clarify this issue."
4    Q.  The information that's contained in this questionnaire,
5    from where is it compiled?
6    A.  So as part of his background investigation, part of what's
7    included is a credit report, and so these accounts that are
8    listed are accounts that were reflected on his credit reports.
9    Q.  Now, I don't want to go through all of them.  There's a lot
10   of pages here, but I want to start with the first one.  The
11   first one reads, "Bank of America."  It says, "Balance of
12   11,000."
13        Can you explain what each entry means?
14   A.  So, as I said, we received his credit report and on his
15   credit report there were a number of delinquencies, collections
16   charge-offs, things of that nature.  I believe after I received
17   his background investigation, I obtained another credit report,
18   and so those accounts -- the delinquencies that were listed on
19   the credit reports, I included them in this questionnaire to
20   determine their status and to reason nonpayment, steps being
21   taken to be resolved.
22   Q.  Now, let's take a look at the next outstanding balance.
23   What is the amount listed on that second outstanding balance?
24   A.  6,204.
25   Q.  Again, I won't go through the whole thing, but I want to

1   move on.  I want to draw your attention to Page 10, Question 6.

2   What does Question 6 say?

3   A.  It reads:  "Were there financial difficulties due to

4   gambling; if so, please provide details to include date started

5   gambling and frequency."

6   Q.  What is the defendant's answer to Question 6?

7   A.  His answer was no.

8   Q.  Do you know whether that is accurate?

9   A.  I do not know.  I assume that that was a true and accurate

10  response at the time he signed it.

11  Q.  So how do you verify the information?  Are you just taking

12  it on the applicant's word?

13  A.  Yes.  It's a trusted workforce, so trusting that he's being

14  honest, and the fact that he signed it certifying that his

15  answers were true and correct.

16  Q.  Okay.  Were you responsible for issuing him a Q clearance

17  in this case?

18  A.  Yes.

19  Q.  Okay.  In your experience, do applicants often lie on their

20  questionnaire?

21  A.  It can happen, yes.

22  Q.  Okay.  Has it happened?

23  A.  Sure.  Yes.

24  Q.  In your experience, about how many times has that happened?

25  A.  I couldn't give a number, but it's certainly does happen.

1  This question is also a question that is on his questionnaire

2  for national security positions that I indicated earlier.  So

3  it can happen.  I can't give a frequency or a number.

4  Q.  Now, I want to direct your attention to Question Number 8.

5  What does Question Number 8 say?

6  A.  So that reads:  "Are you current on filing and/or paying

7  federal and state taxes?  If you have not filed, please

8  explain.  If you owed money, please provide proof of payment or

9  a payment plan."

10  Q.  And what is the defendant's response to that question?

11  A.  He responded, "I am up to date of filing all taxes.  I owe

12  about $20,000 in taxes and will resolve after credit cards are

13  paid."

14          MR. HURTADO:  Your Honor, may I have a brief moment to

15  confer with my co-counsel?

16          THE COURT:  You may.

17  Q.  (BY MR. HURTADO) Ms. Vasquez Garcia, with respect to your

18  questionnaire, specifically with respect to financial debt,

19  does the applicant need to show an intent to resolve their

20  outstanding debt, or do they actually have to resolve the debt?

21  A.  They have to express on intent to resolve their debt.

22  Q.  Okay.  But would you have reason to know whether they had

23  resolved that debt?

24  A.  At the time of granting?  No.  The expectation -- that's

25  why we include -- the question's on there, "What is your

1  intentions towards resolution?" and their stated intent to do

2  so.

3  Q.  Thank you.

4        MR. HURTADO:  Your Honor, those are all the questions

5  I have.  Thank you.

6        THE COURT:  Thank you.

7        Cross-examination?

8        MS. CAREY:  Yes, please, Your Honor.  Thank you.

9        THE COURT:  You may proceed.

10       MS. CAREY:  Thank you.

11                      CROSS-EXAMINATION

12  BY MS. CAREY:

13  Q.  Good afternoon, Ms. Vasquez.  I just have a couple of

14  questions for you.  We were just looking at Exhibit 7, which

15  was the interrogatory questionnaire that you had sent to

16  Marc Candelaria.  And the information regarding certain credit

17  cards and money that was owed, that reflects liabilities at the

18  time that you ran the credit report, correct?

19  A.  Correct.

20  Q.  Okay.  And I want to -- the government was asking you about

21  a question -- it's on Page 10.  I'm publishing Government's

22  Exhibit 7.  This is Page 10 of the questionnaire.  And Question

23  Number 6 that the government asked you about says, "Were your

24  financial difficulties due to gambling?"

25       And so if a person was not having financial difficulties

1    due to gambling, then there's no reason to put down gambling

2    information; is that correct?

3    A.   I would assume, yes.

4    Q.   And then just -- we've been talking a lot about Q clearance

5    today, and from a layperson's perspective, I definitely had to

6    Google that because I had no idea what that meant, but it's

7    basically the equivalent of a top secret clearance for other

8    agencies?

9    A.   Correct.

10           MS. CAREY:  One moment, please, Your Honor.

11   Q.   (BY MS. CAREY) One more question for you.  Is a Q clearance

12   the highest level of clearance that the DOE grants?

13   A.   Yes, it is.

14           MS. CAREY:  Thank you.  No further questions.  I

15   appreciate your time.

16           THE WITNESS:  Thank you.

17           THE COURT:  Thank you.

18           Redirect?

19           MR. HURTADO:  Yes, Your Honor, briefly.

20                      REDIRECT EXAMINATION

21   BY MR. HURTADO:

22   Q.   And I apologize if I asked this before.  Do you recall what

23   date the defendant filled out his questionnaire?

24   A.   This LOI response?  June of 2021.

25   Q.   Because you had issued to the defendant this interrogatory

1    around that date, does that mean that he had financial debts at
2    around that time?
3    A.   Yes.
4    Q.   Okay.  Would you have issued the questionnaire if he did
5    not have any financial debts or issues?
6    A.   No.
7              MR. HURTADO:  Thank you.  No further questions,
8    Your Honor.
9              THE COURT:  May this witness be excused?
10             MR. HURTADO:  Yes, ma'am.
11             THE COURT:  Any objection?
12             MS. CAREY:  No, Your Honor.  Thank you.
13             THE COURT:  Ma'am, you are excused.  Thank you for
14   your time.  Please watch your step as you step down.
15             THE WITNESS:  Thank you.
16             THE COURT:  You may call their next witness.
17             MS. MOGHADAM:  The United States calls Mitch Bailey.
18             THE COURT:  Good afternoon, sir.  If you would watch
19   the step up.  And before you're seated, can I get you to raise
20   your right hand?
21      (The witness was duly sworn.)
22             THE COURT:  You may be seated.  Just to let you know,
23   that microphone is adjustable in front of you.  There should be
24   water to your right, sir.
25             You may proceed.

1    MS. MOGHADAM:  Thank you, Your Honor.

2    TERRENCE BAILEY

3    (being duly sworn, testified as follows:)

4    DIRECT EXAMINATION

5    BY MS. MOGHADAM:

6    Q.  Good afternoon.  May you please introduce yourself to the

7    jury by your first and last name?

8    A.  My name is Terrence Bailey.

9    Q.  Do you go by anything else, Mr. Bailey?

10   A.  I go by my middle name, Mitch.

11   Q.  Mr. Bailey, where do you currently live?

12   A.  In Santa Fe.

13   Q.  How long have you been living in Santa Fe?

14   A.  I started living there in 2008.  I moved away for about

15   eight months, and I'm currently living there now.

16   Q.  How far did you get in your education?

17   A.  I've a Bachelor of Science degree.

18   Q.  Majoring in what?

19   A.  Law enforcement administration with an emphasis in

20   security.

21   Q.  Did you have a minor?

22   A.  My minor was in psychology.

23   Q.  And what year did you graduate?

24   A.  I graduated in 1989.

25   Q.  Mr. Bailey, what do you currently do for a living?

1  A.  I work at Buffalo Thunder as the director of gaming
2  operations.
3  Q.  Do you work at any other casino?
4  A.  We own two casinos.  We own Buffalo Thunder and Cities of
5  Gold.
6  Q.  Where is Buffalo Thunder Casino located?
7  A.  About 20 minutes north of Santa Fe in Pojoaque.
8  Q.  How about City of Gold [*sic*]?  Is it --
9  A.  Cities of Gold Casino is another, maybe, five miles down
10  the road from Buffalo Thunder.
11  Q.  So it's Cities of Gold Casino?
12  A.  Correct.
13  Q.  Okay.  Making sure I say it right.
14     How did you -- how do you currently -- you just mentioned
15  that you're the director of gaming operations, correct?
16  A.  Correct.
17  Q.  How do you split your time amongst these two locations?
18  A.  I spend the majority of it at Buffalo Thunder.  That's
19  where the -- more of the business is.  We have more outlets.
20  We have table games, a sports book, slots.  Cities of Gold is
21  strictly slot machines.
22  Q.  What are your job responsibilities as the director of
23  gaming operations?
24  A.  I oversee slots, table games, the sports book at both
25  locations.  It's to make sure that we're in compliance with the

1  gaming machines, that we're being fair on both sides, making

2  sure we're following policy and procedures, making sure we have

3  the right games, right denoms.

4      (Reporter clarification.)

5          THE WITNESS:  Denoms, denominations.

6  Q.  (BY MS. MOGHADAM) Talk to me a little bit about what that

7  means when you say, the right games, right denominations.

8  A.  Every casino's a little different.  Our -- when I'm looking

9  at the right games, what games are popular, you know, to the

10 people who come to Buffalo Thunder or Cities of Gold.  So I

11 need to get those type of games.  And, likewise, I have to set

12 the denomination to the correct amount too.  If I live, you

13 know, in Vegas, you might get away with a place that has all

14 dollar machines.  You know, casinos these days are more -- the

15 vast majority of machines, 80 percent, are pennies.

16 Q.  How do decide on -- how do you decide on the games and the

17 denominations for your casino?

18 A.  Casino analysis.  I look at what we call "coin-in" and

19 "win" on games and what does better, what's more popular.

20 Q.  Okay.  Do you ever go to any -- I don't know --

21 conventions, trainings or anything like that to be up to speed

22 on the different games and denominations used by other casinos?

23 A.  Yes.

24 Q.  Where do you go?

25 A.  Yearly there is a G2E conference in Las Vegas.  That's

1    probably the biggest show, and then we also have IGA, which is

2    essentially the same, but it's more geared for tribal casinos.

3    Q.  How often do you go to these places?

4    A.  Each one once a year.  Also, there's a lot of just business

5    magazines.  I'm an avid reader.

6    Q.  Do you ever visit other casinos that you don't help -- that

7    you don't work in, in order to get information on casinos?

8    A.  Yes.

9    Q.  What are you usually looking out for?

10   A.  I'm looking to see what kind of games they have, what --

11   you know, what their clientele is, how much people are betting.

12   Q.  Okay.  Do you talk to the people that work at these other

13   casinos, or do you just go in and observe?

14   A.  Both.

15   Q.  How long have you been in the casino business?

16   A.  I've been in the casino business since 1989.

17   Q.  I'm not even going to try to do the math, but --

18   A.  Thirty-plus years.

19   Q.  Okay.  So how long have you been the director of gaming

20   operations?

21   A.  I started at Buffalo Thunder in 2018.  I was assistant

22   director of slots.  It was approximately 2012, 2013, when I was

23   promoted to the director of operations.

24   Q.  So what were you doing before you were the director of

25   operations?

1  A.  I was initially the assistant director of slots and the

2  director of slots.

3  Q.  And what did that entail?

4  A.  Overseeing just the slot department at both properties.

5  Q.  Do you -- did you do anything else in the casino industry

6  prior to managing slots?

7  A.  Yes.  I've been a security manager, security director,

8  surveillance director, slot shift manager table game

9  supervisor.

10  Q.  Can you think of a position in the casino industry that you

11  haven't done?

12  A.  Cook.

13  Q.  Are you familiar with the rules of all of the games that

14  you offer at the Buffalo Thunder Casino?

15  A.  Yes.

16  Q.  How about Cities of Gold?

17  A.  Yes.

18  Q.  Are you familiar with casino games that maybe you don't

19  have at Buffalo Thunder?

20  A.  Yes.

21  Q.  Okay.  Let's talk about some of the games that you offer at

22  the Buffalo Thunder Casino.  Please tell the jury what you

23  offer.

24  A.  We have -- between both properties, we have almost 1500

25  slot machines, different manufacturers, different

1    denominations.  We also have ten table games at Buffalo

2    Thunder, which includes two roulette, what we call a "carnival

3    game," which is high card flush, and the rest are blackjack

4    games.

5    Q.  Do you -- does Buffalo Thunder Casino keep records of the

6    people that play at your casino?

7    A.  Yes.

8    Q.  What sort of records do you keep?

9    A.  For slots it keeps a lot of information.  People are rated.

10   We keep information -- the only time we're going to have

11   information is if a person's rated.  And what that means is

12   they get a player's club card, and then they use that either in

13   a slot machine or when they're playing table games, and we'll

14   collect information as far as, you know, in slots, coin-in --

15   and what that means is every time you hit the button and it's a

16   dollar, it will be a dollar of coin-in.  And specifically in

17   slots, coin-in, number of games played, win, loss, jackpots,

18   ticket-in, ticket-out.

19   Q.  So go back and explain to me really quick -- first, let me

20   ask you this:  In order for you to obtain records on a player,

21   do they need to use a player's card?

22   A.  Yes.

23   Q.  If an individual comes into your casino and they play with

24   just cash and they don't have a player's card, does that come

25   up on your records?

1    A.    No.

2    Q.    Is -- what is the benefit of an individual playing with a

3    player's card?

4    A.    The benefit of playing with a player's card is you reap the

5    rewards of what the casino offers.  That could be slot free

6    play, hotel rooms, food offers.  So if you don't play with a

7    player's card, you'll never be invited to a special event or

8    get any freebies.

9    Q.    Is it common for a person that, let's say, frequents a

10   casino, is it common for them to not have a player's card?

11   A.    People who play frequently at a casino normally get a

12   player's card, just for the fact if you're able to get the free

13   offerings that the casino can offer.

14   Q.    Now, really quickly, how are -- these records on individual

15   players, how are they -- are they computer generated?

16   A.    Yes.

17   Q.    How are they kept?

18   A.    They're kept within the casino management system.  I call

19   it the "slot system."

20   Q.    Do you have access to the slot system?

21   A.    Yes.

22   Q.    How often would you say you check these records?

23   A.    I check them on a daily basis.

24   Q.    Why do you do that?

25   A.    I check a lot of things on a daily basis to see how --

1   maybe how machines -- a specific machine does or a specific

2   bank does or how a person does.

3   Q.   And we'll talk a little bit more about that a little later.

4        Do you know -- are you familiar with the system that you

5   use to keep track of these records?

6   A.   Yes.

7   Q.   And are they -- is there any portion of these records that

8   are manually inputted by an individual or just records that are

9   kept through computers?

10  A.   No.  They're all done by the computer.

11            MS. MOGHADAM:  Your Honor, at this time the United

12  States moves to qualify Mr. Terrence Mitchell Bailey as an

13  expert in casino gaming.

14            THE COURT:  Any objection?

15            MR. GLANZ:  No, Your Honor.  35 years sounds like a

16  lot of experience.

17            THE COURT:  All right.  Thank you.

18            He will be so recognized.  Thank you.

19            MS. MOGHADAM:  Thank you, Your Honor.

20  Q.   (BY MS. MOGHADAM) Mr. Bailey, I want to bring your

21  attention to an individual by the name of Marc Candelaria.  Do

22  you recognize that name?

23  A.   Yes.

24  Q.   Did you pull Mr. Candelaria's gambling records?

25  A.   Yes.

1    Q.   Specifically, did you pull gambling records from the date
2    of September 3rd, 2020, through May 10th of 2022?
3    A.   Yes.
4    Q.   Now, is there a reason for those dates?
5    A.   Probably in late 2019, early 2020, Marc Candelaria was a
6    player in table games.
7    Q.   Did anything -- let me ask you this:  Who requested that
8    you pull those records?
9    A.   It's something I do on a regular basis.
10   Q.   When was the first time that Marc Candelaria became someone
11   you recognized?
12   A.   It was late 2019, early 2020.
13   Q.   What brought your attention to him?
14   A.   Just like any player, large buy-in, large loss, large win.
15   Q.   Is there a specific amount of money that a player -- is
16   there an amount of money played by a player that would make --
17   draw -- that you would draw your attention to, that would ring
18   alarm bells or make you focus on them?
19   A.   Yeah.  Anybody who's going to be buying in for $1,000 or
20   more or has a win of $1,000 or more or a loss of $1,000 or
21   more.
22   Q.   Do you -- as part of your job duties, do you frequent the
23   casino often?
24   A.   Yes.
25   Q.   As in -- essentially, I'm asking if you're outside of your

1  office on the floor?

2  A.  Yes.

3  Q.  Do you remember seeing Marc Candelaria come into your

4  casino often?

5  A.  I have seen Marc at table games, yes.

6  Q.  Do you see Marc Candelaria in the courtroom today?  And you

7  can take a look, stand up and look around.

8  A.  Yes.

9  Q.  May you please identify him by an article of clothing and

10 what he's wearing.

11 A.  Blue suit.

12 Q.  And where is he seated?

13 A.  It would be, I guess, second from left to right.

14       MS. MOGHADAM:  Let the record reflect the witness has

15 identified the defendant.

16       THE COURT:  The record will so reflect.

17 Q.  (BY MS. MOGHADAM) Mr. Bailey, how many players come into

18 your casino at any one point -- how many players do you serve?

19 A.  On any given day, 200 plus, depending on the day.

20 Q.  And how many records do you pull?

21 A.  I'm pulling records of people -- again, big losses, big

22 wins.

23 Q.  Is it common for you to recognize every individual that

24 walks into your casino?

25 A.  Most people I'll recognize at least by name, but a lot of

1   people I know face-to-face.

2   Q.  Why is it important to you and your casino to know how much

3   money people are playing with or what they're -- what their

4   frequency is like at the casino?

5   A.  A lot of it is the -- to know our guests.  I mean, these

6   people come in and spend money with us, so it's important that

7   I know they're being taken care of.  Likewise, I want to know

8   who these people are.  If someone comes in and loses a large

9   amount or buys in for a large amount, you know, I want to know

10  who they are.

11  Q.  Would you describe Mr. Candelaria as a good gambler or a

12  bad gambler?

13  A.  Marc was a good gambler for us.

14  Q.  When you say "for us," what do you mean?

15  A.  Marc spent a lot money at Buffalo Thunder.

16  Q.  What would be a bad gambler for you?

17  A.  I think for any casino a bad gambler would be someone who

18  consecutively beat you all the time.

19          MS. MOGHADAM:  May I approach the witness, Your Honor?

20          THE COURT:  You may.

21  Q.  (BY MS. MOGHADAM) Now, Mr. Bailey, I'm handing you what has

22  been marked as Government's Exhibit 9, 9A and 9B.  It is quite

23  a large stack, so what I would like you to do is -- keep them

24  in order -- just look through them and take your time and look

25  up at me when you're done reviewing.

1    Mr. Bailey, do you recognize what I handed you?

2  A.  Yes.

3  Q.  How do you recognize what I handed you?

4  A.  These are reports that I produced out of the computer.

5  Q.  So these are computer-generated reports?

6  A.  Yes.

7  Q.  Are they a fair and accurate copy of the reports that were

8  generated on your computer that you pulled?

9  A.  Yes.

10  Q.  Have they been altered in any way?

11  A.  No.

12       MS. MOGHADAM:  Your Honor, at this time the United

13  States moves into evidence United States' 9, 9A and 9B.

14       THE COURT:  Any objection?

15       MR. GLANZ:  No, Your Honor.  Thank you.

16       THE COURT:  United States' Exhibits 9, 9A and 9B will

17  be admitted without objection.

18    (Government's Exhibits 9, 9A and 9B admitted into

19  evidence.)

20       MS. MOGHADAM:  May I retrieve?

21       THE COURT:  You may.

22  Q.  (BY MS. MOGHADAM) Now, Mr. Bailey, I'm -- I'm obviously not

23  going to go through every single entry on these documents --

24  okay? -- but I want to discuss a little bit about them.  And if

25  you feel uncomfortable giving me a number, don't, but in the

1   course of the, I guess, 21 months of records that you pulled,

2   how frequently would the defendant come to your casino?

3   A.   He would be in multiple times a month.

4   Q.   Now, I'm showing you only the first page -- and it should

5   pop up on your screen.  Only the first page of Government's

6   Exhibit 9.  Can you tell us and the jury, everyone, what does a

7   cash buy-in mean?

8   A.   Cash buy-in means just that, you're buying in with cash.

9   So on this specific situation, for September 3rd, when it says

10  "Cash buy-in for $240," he's at a blackjack table, and he's

11  bought in from when he was being rated for $240.

12  Q.   I think that you can, maybe, make some markings on the

13  screen.

14          THE COURT:  You can use your finger, sir.

15  Q.   (BY MS. MOGHADAM) So can you point to how you know what

16  table he's playing at?

17  A.   Yes.

18  Q.   Okay.  Now, earlier in your testimony you mentioned

19  something called a "rate in."  What -- were is the "rate in"

20  reflected?

21  A.   The rating?

22  Q.   The rating period.  Sorry.

23  A.   Okay.  Well, the rating period is going to be -- the time

24  is going to be over to the right, and then it's going to

25  indicate in this area that he was -- a rating was open and a

1    rating was closed.

2    Q.  Okay.  That circle that you made in the far upper right,

3    under "time" where it says "1:03."  What does that mean?

4    A.  One hour and three minutes.

5    Q.  Was Marc Candelaria at this table for one hour and three

6    minutes?

7    A.  Yes.

8    Q.  Okay.  If the defendant got up and played at a different

9    table, would there be another rating period?

10   A.  Yes.

11   Q.  Okay.  Now, does the cash buy-in mean that the defendant

12   walked in with that much cash?

13   A.  Not necessarily.

14   Q.  What does that mean?

15   A.  The cash buy-in means they physically put that amount of

16   money either into a machine or on the able to purchase chips.

17   Q.  So there's a possibility -- is there a possibility that

18   when an individual wins house money and replays with house

19   money, it would be calculated in the buy-in?

20   A.  Yes.

21   Q.  What is the difference between a cash buy-in and a buy-in?

22   A.  Cash buy-in is always going to be cash.  If they're doing

23   a -- if we're looking at a total buy-in, it could be a buy-in

24   with cash, chips, tickets.

25   Q.  So if an individual plays with -- let's say he won some

1   chips and then he plays a hand with chips, does that reflect on

2   the cash buy-in?

3   A.   No.

4   Q.   Okay.  When you are looking at these records, what are the

5   main portions that you're focusing on?

6   A.   The two things I look at on this is -- again, this is the

7   total for the day, this is the cash buy-in, and then the casino

8   win.  That tells me how much a person bought in for in cash and

9   whether the casino won or lost.

10  Q.   And in this circle that you made under "Casino Win" where

11  it's reflecting $190, who won there?

12  A.   The casino did.

13  Q.   Now, when the casino wins does that mean necessarily that

14  you now have -- or the casino now has $190 from

15  Marc Candelaria's pocket for the casino?

16  A.   Yes.

17  Q.   Okay.  Let me ask you this:  Can you explain to the jury

18  what it would tell you if -- if the cash buy-in and the casino

19  win is similar in number, as in close to each other, 400, 430,

20  something like that, what does that indicate to you?

21  A.   A person bought in for 400 and lost 400.

22  Q.   Does that give you a better -- does that give you a better

23  representation of how much an individual walked into the casino

24  with?

25  A.   For that -- for those -- yeah, when it's kind of straight

1    up like that, it kind of indicates to me that a person walked

2    in with 400, bought in for 400, lost 400.

3    Q.  Let me ask you this:  You're familiar with these records,

4    right?

5    A.  Yes.

6    Q.  You pulled these records?

7    A.  Yes.

8    Q.  When you look at these records and you analyze these

9    records, are you able to tell this jury what an estimate day of

10   gambling is for the defendant, Marc Candelaria?

11   A.  I can't say with a 100 percent accuracy what he -- how much

12   money he walked in with his pocket, but based off his past

13   play, and some of his buy-ins and some of his losses and wins,

14   he comes in probably with -- I'm going to -- you know,

15   75 percent of what the buy-in is, if not more, his cash buy-in.

16           MS. MOGHADAM:  I am going to publish 9A, Your Honor,

17   if that's okay?

18           THE COURT:  You may.

19   Q.  (BY MS. MOGHADAM) 9A is a little wonky.

20           MS. MOGHADAM:  How do I clear this?  Oh.  Sorry, guys.

21   I look like I should be tech savvy.  I am not.  All right.

22   Okay.  I might have to zoom in.  I think I've got it this time.

23   Look at that, just learning on the job.

24   Q.  (BY MS. MOGHADAM) Now, there are a couple of pages and

25   we're going to go through these pages -- okay? -- but what I

1  want you to tell the jury is what is in these -- in this
2  document?
3  A.  What you're looking at here is a record for Marc Candelaria
4  for the months of September, October, November, December fiscal
5  year 2020.
6  Q.  What does "fiscal year 2020" mean?
7  A.  Our fiscal year starts October 1st.  So for fiscal year
8  2020, our fiscal year actually starts October 2019.
9  Q.  Okay.
10 A.  So when you see September on here, it's actually
11 September 2019, October 2019, November, December 2019.
12 Q.  Now, I didn't go through all 113 pages of that record, but
13 what I am going to do is I'm going to go through each month on
14 these three pages.  Okay?
15     So fiscal year September 2020, what was the defendant's
16 total cash buy-in?
17 A.  Total cash buy-in was $7,350.
18 Q.  What was the actual win?
19 A.  The casino won 575.
20 Q.  Now, when you see this number of 7,350, in your experience
21 is this a big number for the month or a little number?
22 A.  For us that's a good number.  That's a big number.
23 Q.  If somebody is spending $7,350 at your casino, do you want
24 them to come back?
25 A.  I absolutely do.

1    Q.   Okay.  What about October 2020; what was the defendant's

2    total cash buy-in on that month?

3    A.   Total cash buy-in was $20,030.

4    Q.   Did he win, or did he lose?

5    A.   The casino won $533.75 [*sic*].

6    Q.   $5,333.75.  Okay.  Let's move on to November of 2020.  What

7    is that?

8    A.   Cash buy-in of 3,000.

9    Q.   Now, let's talk to the jury about what it means when this

10   2,200 of actual win is in parentheses.  What does that mean?

11   A.   That means the casino lost $2,200, that Marc won $2,200.

12   Q.   Now, if this is happening in your casino where somebody

13   walks -- wins 2200, are you concerned?

14   A.   People do win, and people do win on a regular basis, so

15   it's something I'm just aware of.

16   Q.   If somebody wins this much money, is that why you would,

17   maybe, keep track or pay attention to the records of that

18   individual?

19   A.   Correct.  When I have buy-in amounts of, you know, these

20   amounts, you know, a person's win and losses is important to

21   me.

22   Q.   So it looks like December of 2020 was a slow month of

23   business for you when it comes to Mr. Candelaria, correct?

24   A.   Correct.

25   Q.   All right.  Same thing, January 2021?

1   A.   Correct.

2   Q.   February 2021?

3   A.   Correct.

4   Q.   Now, do you have any -- do you know if -- I mean, do you

5   know if the defendant's gambling in other casinos?

6   A.   I do not.

7   Q.   But there are other casinos in New Mexico to play at?

8   A.   Correct.

9   Q.   All right.  What about March of 2021; what number am I

10  looking at here?

11  A.   Cash buy-in of $40,750.

12  Q.   So he's playing with $40,750 in cash?

13  A.   Through the course of the month he has bought in for

14  $40,750.

15  Q.   All right.  Is it seems like it's parentheses.  What does

16  that mean?

17  A.   It means Marc won $3,055.

18  Q.   Okay.  April?

19  A.   Cash buy-in of 13,950.

20  Q.   I'm sorry if it's -- what about actual win?

21  A.   The casino won 12,550.

22  Q.   Okay.  And just really quick, to briefly stop here, are

23  these each -- each row a day at the casino?

24  A.   Correct.

25  Q.   So let me go back really quickly to the first page.  So

1    what we're seeing here is -- this is September 1st, 2nd, 3rd,

2    and it keeps going down, correct?

3    A.   Correct.

4    Q.   All right.  May of 2021?

5    A.   Cash buy-in of 6200, and a casino win of $4,168.25.

6    Q.   What about June of 2021?

7    A.   It's a cash buy-in of $21,650.  Casino win of $10,437.60.

8    Q.   So earlier you mentioned that 7,000 was a lot.  What about

9    40,000; 21,000; what about those numbers?

10   A.   Those are big numbers for us.

11   Q.   What about July of 2021?

12   A.   Cash buy-in of $8,350.  Casino won $3,704.85.

13   Q.   August 2021?

14   A.   Cash buy-in of 8700.  Casino win of thirty-eight fifteen.

15   Q.   September?

16   A.   That is a cash buy-in of 33,105.  The casino win of

17   12,941.80.

18   Q.   I'm not going to go through the rest, but this one is a

19   total cash buy-in of twenty-seven nine forty, correct?

20   A.   Correct.

21   Q.   And, again, the casino wins?

22   A.   Correct.

23   Q.   November, casino wins?

24   A.   Correct.

25   Q.   December, casino wins?

1  A.  Correct.

2  Q.  January 2022, casino wins?

3  A.  Correct.

4  Q.  February, casino wins?

5  A.  Correct.

6  Q.  Now, let's talk about March 2020.  Why are there, I guess,

7  little dashes there or dots there for the cash buy-in?

8  A.  Those would -- looking at this -- probably indicate it was

9  a slot machine that the money was put in -- or a ticket was put

10 in prior to the card being inserted, so there would be no

11 rating.

12 Q.  And then it seems like April 2022 was a win for

13 Mr. Candelaria?

14 A.  Yes.

15 Q.  Now, let's focus in on this number really quick.  What was

16 the total amount of cash that the defendant played with in this

17 21-month period where he didn't even play for two of the

18 months?

19 A.  The cash buy-in was $241,231.

20 Q.  Who won?

21 A.  The casino won $85,596.26.

22 Q.  So out of these 21 months, Marc won three of the months?

23 A.  It looked like it, yes.

24 Q.  Would you like Marc to gamble again at your casino?

25 A.  I would like Marc to gamble again at my casino.

1          MS. MOGHADAM:  I am showing and publishing,

2    Your Honor, Government's Exhibit 9B.  It is tiny, but I am

3    going to zoom in.

4    Q.  (BY MS. MOGHADAM) Now, of course, does the days that

5    Mr. Candelaria gambled, does it reflect it in that first stack,

6    Government's Exhibit 9?

7    A.  Yes.

8    Q.  On Monday, September 13th, did the defendant visit your

9    casino?

10   A.  Yes.

11   Q.  I'm going to point a little bit closer to Monday.  Okay.

12   What time did he -- did that rating period start?

13   A.  On September 13th.  It was 9:59 a.m.

14   Q.  All right.  What time did it end?

15   A.  At 10:47 a.m.

16   Q.  Okay.  On Tuesday, September 14th, there's two entries

17   here.  What does that mean?

18   A.  It -- over to the right there probably should be either --

19   the other way.

20   Q.  Okay.

21   A.  Yes, it has -- this area right here, it will have BJ103 two

22   times.  It means he was rated two different times on the same

23   table.

24   Q.  What does it mean?  Does that mean somebody got up from the

25   table?  How does that work?

1    A.   Yes.   If there's two different ratings, it means at some

2    point he got up and left and then came back again.

3    Q.   Okay.   I'm going to clear that.   I'm going to go back here.

4         So on September 14th, what time does the defendant start

5    gambling at your casino?

6    A.   10:21 a.m.

7    Q.   Okay.   And, I guess, since there's a second entry, I'm

8    going to move on to that third line.   What time does he stop

9    playing, to your knowledge?

10   A.   12:37 p.m.

11   Q.   Okay.   What about Wednesday, September 15th?

12   A.   The rating starts at 9:29 a.m.

13   Q.   And there's multiple entries, so I'll go to the rating end

14   period on September 15th.   When does he, I guess, stop playing,

15   to your knowledge?

16   A.   11:51 a.m.

17              MS. MOGHADAM:   A moment, Your Honor?

18              THE COURT:   You may.

19              MS. MOGHADAM:   No further questions at this time.

20              THE COURT:   All right.   Thank you.

21         Let's take a brief recess before we begin

22   cross-examination.   Please rise for the jury.

23      (Jury exits at 4:06 p.m.)

24              THE COURT:   Mr. Bailey, you may step down during the

25   break, sir.

1    We'll be in recess.

2    (Recess taken from 4:07 p.m. to 4:19 p.m.)

3        THE COURT:  Anything we need to take up before we

4    bring them back in?

5        MR. GLANZ:  Not from our end, Your Honor.

6        THE COURT:  Bring them in, please.

7    (Jury enters at 4:20 p.m.)

8        THE COURT:  You may be seated.

9        Cross-examination?

10       MR. GLANZ:  Yes, Your Honor.  Thank you.

11                    <u>CROSS-EXAMINATION</u>

12   BY MR. GLANZ:

13   Q.  Mr. Bailey, good afternoon.  My name is Buck Glanz, and I'm

14   one of the attorneys for Marc Candelaria.

15       So a couple of things I just wanted to hone in on.  First

16   off, in reviewing these records, I had a real difficulty trying

17   to figure out how to understand them, and I think you've been

18   very helpful today, but I just want to make sure that my

19   understanding is correct.  So I'm going to show you what is

20   Page 111 of Government's Exhibit 9, which was disclosed to me

21   by the government.

22       This was a little blurry when we were looking at it, but

23   are you able to see this okay, sir?

24   A.  Yes.

25   Q.  Okay.  So I'm going to move it over just slightly.  If you

1    look down there in the bottom left where it says "BTR

2    totals" --

3           MS. CAREY:  Forgive the interruption.  One of the

4    jurors has their hand raised.

5           THE COURT:  Thank you.  Thank you for letting us know.

6           THE JUROR:  We can't see it.

7           THE COURT:  Is the monitor back on?

8           COURTROOM DEPUTY:  Yes.

9           THE COURT:  Great.  Thank you for letting us know.

10   Q.  (BY MR. GLANZ) Are you able to see that okay?

11   A.  Yes.

12   Q.  Now, again, as I said, I had a lot of trouble figuring

13   these out, so you please educate me if I'm wrong, but right

14   here where it says "BTR totals," so these columns reflect the

15   total numbers for the entire record you pulled for

16   Mr. Candelaria's player's card; is that right?

17   A.  For BTR.

18   Q.  Okay.  Which is the name of this recordkeeping system; is

19   that right?

20   A.  No.  BTR stands for Buffalo Thunder Resort.

21   Q.  Ah, gotcha.  So it's the total for all of his gambling

22   activity at Buffalo Thunder?

23   A.  Correct.

24   Q.  Gotcha.  Thank you for that.

25       And so if you look at that number right there under "Cash

1    buy-in," am I correct, then, that that says during that -- I
2    believe you said 21-month period, his cash buy-in was $241,231?
3    A.   Correct.
4    Q.   And then right next to that is "Bet," and that number, if
5    I'm reading that correctly, is $3,351,281.87.
6    A.   Correct.
7    Q.   Now, let me -- just so I understand why this number would
8    be so large, let me walk you through a hypothetical.  A person
9    sits down at a blackjack table, say.  They put it all on 21,
10   let's say 1,000 bucks.  They get 21.  They win.  They put the
11   money again on 21.  They win again.  This continues.
12   Eventually they lose all that money.  That's why that bet
13   number would be so much higher than the cash in; is that right?
14   A.   Correct.
15   Q.   Okay.  So -- and that's why that could be so astronomically
16   out of proportion to the cash in?
17   A.   Correct.
18   Q.   And moving over here -- and the government had already
19   discussed the number that, I believe, you described as casino
20   win, and that says $85,564.55, correct?
21   A.   Correct.
22   Q.   And that -- as you testified earlier, I believe, about
23   Exhibit 9A, that would have been the casino's total win --
24   Buffalo Thunder -- for the entire period of records you pulled
25   from Marc Candelaria's player card?

1  A.  Say that one more time.

2  Q.  My apologizes.  Convoluted question.

3      So for the period that you pulled Marc Candelaria's

4  player's card, which is reflected in Government's Exhibit 9,

5  the casino's total win for that period would have $85,564.55?

6  A.  Correct.

7  Q.  And then right next to that, that "Walked" number, if I'm

8  understanding that correctly, that the amount, based your

9  computer system, that Mr. Candelaria left the casino with?

10  A.  No.  "Walked" is something we don't -- I don't really use

11  on this, but it -- it's basically saying walked is -- at the

12  end of his -- closing out his rating, it's saying that he

13  walked with so many chips.

14  Q.  Oh, I see.  Okay.  And then this theoretical win, is that

15  your calculation of the amount that he won?

16  A.  That is, again, something we put into the system.  It's a

17  theoretical win for -- this would be 7.65 percent, and that's

18  based on -- that rating there is for a slot machine.

19  Q.  I see, but what is the number down below that that says

20  "$52,929.27"?

21  A.  Theoretical win.

22  Q.  What does that number reflect?

23  A.  That's going to be everything combined.  The theoretical --

24  a slot machine has a different theoretical.  Each table game

25  has a theoretical.

1    Q.   A theoretical amount that Mr. Candelaria won?

2    A.   No.

3    Q.   So who's the theoretical winner in that?

4    A.   Theoretical, that is the casino.

5    Q.   Okay.  So then just so we're clear on all these different

6    numbers, this is a hard number right there that he put $241,231

7    in cash into Buffalo Thunder during that period?

8    A.   Correct.

9    Q.   And then this is a hard number here that Buffalo Thunder

10   gained, $85,564.55?

11   A.   Correct.

12   Q.   My apologies.  My computer locked.  Just a moment.

13        Okay.  Now, as I recall, you said that you'd been working

14   in the casino industry for about 35 years?

15   A.   Correct.

16   Q.   And you testified that you also visit other casinos as part

17   of research, I guess, would be the word I would use; is that

18   correct?

19   A.   Right.  We call that shopping to see what other casinos

20   have, what they're doing.

21   Q.   Shopping.  And so as you said, that would be just visiting

22   them for -- kind of see what's going on there, what you might

23   be missing out on in terms of new games or marketing or

24   something?

25   A.   Yes.

1    Q.   Okay.  And I would imagine because of that, you're very
2    familiar with all the different casinos in at least Northern
3    New Mexico?
4    A.   I'm pretty familiar with most of the casinos in the state.
5    Q.   And how about Central New Mexico?
6    A.   I'll shop probably Santa Ana the most.
7    Q.   Okay.  Have you been to the majority of casinos in the
8    state of New Mexico?
9    A.   Yes.
10   Q.   And earlier, I believe, on direct you had testified that
11   you had no way of knowing -- aside from, I think, Cities of
12   Gold -- how much Mr. Candelaria frequented any other casino?
13   A.   I have no idea.
14   Q.   So up there in your neck of the woods, that would be
15   casinos like Tesuque?
16   A.   Correct.
17   Q.   Which is just north of Santa Fe?
18   A.   Correct.
19   Q.   And I believe if one was driving from Santa Fe, you'd pass
20   Tesuque before you got to Buffalo Thunder; is that right?
21   A.   Correct.
22   Q.   And then, again, please correct me if I'm wrong, but isn't
23   Cities of Gold, then, the next one down the Taos highway after
24   Buffalo Thunder?
25   A.   No.  It would be Buffalo Thunder, then Cities of Gold.

1    Q.   Heading north or heading south?

2    A.   Heading north.

3    Q.   Heading north.  Okay.  And after that you hit Pojoaque

4    casino?

5    A.   Pojoaque is Buffalo Thunder and Cities of Gold.

6    Q.   Gotcha.  So then the next one north would probably be

7    Santa Clara?

8    A.   Correct.

9    Q.   And then Ohkay Owingeh?

10   A.   Correct.

11   Q.   And then after that, Taos?

12   A.   Correct.

13   Q.   And back down here in this neck of the woods, Sandia

14   Casino?

15   A.   Correct.

16   Q.   Isleta Casino?

17   A.   Correct.

18   Q.   Route 66 Casino?

19   A.   Correct.

20   Q.   San Felipe Casino?

21   A.   Correct.

22   Q.   Santa Ana Star Casino?

23   A.   Correct.

24   Q.   That's all the ones I'm aware of.  And so just to sum all

25   that up, you have no idea how often Mr. Candelaria may have

1    frequented any of those other nine or so casinos?

2    A.  I have no idea.

3    Q.  And how much money he may or may not have won at them?

4    A.  I have no idea.

5         MR. GLANZ:  Your Honor, might I have a moment?

6         THE COURT:  You may.

7         MR. GLANZ:  Thank you, Mr. Bailey.

8         No further questions, Your Honor.

9         THE COURT:  Thank you.

10        Redirect?

11        MS. MOGHADAM:  Yes, Your Honor.

12                    REDIRECT EXAMINATION

13   BY MS. MOGHADAM:

14   Q.  Mr. Bailey, of course, you don't follow the defendant

15   around to know exactly which casinos he's playing at or winning

16   or losing, so I just want to talk to you about how he's doing

17   in your casino alone.

18        When the defendant is gambling in your casino, is he the

19   type of gambler to leave your casino when he wins?

20   A.  Based off his track record, no.

21   Q.  What do you mean by that?

22   A.  We won a lot of money off of Marc.

23   Q.  So when you -- how would you describe a good gambler?

24   A.  For me, specifically on table games, again, it's someone

25   who, you know, comes on a regular basis.  Some days they might

1   have smaller buy-ins.  Some days they might have larger

2   buy-ins, but someone that comes on a regular basis, does, you

3   know, maybe $500 a day; $500 a day, $1,000 a day or more or has

4   a win or loss of, you know, someone who obviously loses more.

5   It's a profit for the casino.  Someone who loses, again, that's

6   gaming.  Sometimes we win and sometimes we lose.

7   Q.  Does a good gambler typically stop playing when they win?

8   A.  It all depends on the gambler.  Some gamblers have a very

9   strict regimen that they only want to win to a certain point.

10  That's their -- that's their stop point.  If I only want to win

11  $500, then they'll stop at $500.

12  Q.  You testified that you can't quite tell us any exact number

13  that the defendant came in with to your casino, but from the

14  records that you pulled, is the defendant somebody that's able

15  to, let's say, take $10 and turn it into thousands and

16  thousands of dollars to play with?

17  A.  That doesn't happen.

18          MS. MOGHADAM:  No further questions.

19          THE COURT:  May this witness be excused?

20          MS. MOGHADAM:  Yes, Your Honor.

21          THE COURT:  Any objection?

22          MR. GLANZ:  No, Your Honor.

23          THE COURT:  Mr. Bailey, thank you for your testimony,

24  sir.  You are excused.  Please watch your step when you step

25  down.

1          United States may call their next witness.

2          MR. HURTADO:  Your Honor, the United States has no

3    further witnesses at this time.  The United States rests its

4    case in chief.

5          THE COURT:  All right.  Thank you, ladies and

6    gentlemen.  That signals the time when I have work to do with

7    the attorneys that may take a while, and so in -- it's 4:32.

8    I'm going to let you go a little bit early again today.  If you

9    could be back here tomorrow -- I'm not going to go bring you in

10   at 8:30.  If I could have you back here at nine o'clock, the

11   Court would appreciate that very much.  It's been a long

12   afternoon.  I'm sorry if it got stuffy this afternoon in here a

13   little bit.  I don't have a whole lot of control over that, but

14   I'll try to do something.

15         But please remember the rules that we have talked

16   about, about not making any decisions, because you have not

17   heard all of the evidence in this case.  Do not talk to anyone

18   about the case and/or do any research on your own.  Please have

19   a good evening with the thanks of the Court and the attorneys.

20   Please relax.

21         Please rise for the jury.

22     (Jury exits at 4:32 p.m.)

23         THE COURT:  You may be seated.

24         I'd like to talk to counsel a little bit about

25   tomorrow.  Have -- and certainly I'm not trying to put you on

1    the spot.  Have you made a decision whether or not you're going

2    to be calling any witnesses tomorrow?

3            MR. GLANZ:  Your Honor, I believe that we would not be

4    calling any individuals identified in our witness list;

5    however, Mr. Candelaria has not made a final decision on

6    whether or not he will testify tomorrow.

7            THE COURT:  All right.  So that will give you some

8    time to talk to him to make that decision.

9            Let's talk about jury instructions.  I don't believe

10   that we received any objections to the Court's final proposed

11   jury instructions.  It's been a long day.  If counsel would go

12   through those and be back here at 8:30 in the morning to see if

13   there's anything -- preliminarily.  I know they may be subject

14   to change based on what happens further with the defense's case

15   and any rebuttal, but if you'd be back here at 8:30 prepared to

16   discusses any changes in what you have right now, I would

17   appreciate that.

18           Anything further from the United States for this

19   evening?

20           MR. HURTADO:  No, ma'am.  Thank you, Your Honor.

21           THE COURT:  Anything further from the defense?

22           MR. GLANZ:  No, Your Honor.  Thank you.

23           THE COURT:  All right.  Thank you.

24           We'll be in recess.

25       (Proceedings adjourned at 4:34 p.m.)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____
                            )
UNITED STATES OF AMERICA,    )       No. 1:22-cr-00767-KWR
                            )
          Plaintiff,         )
                            )
     vs.                     )
                            )
MARC CANDELARIA              )
                            )
          Defendant.         )
_____)


CERTIFICATE OF OFFICIAL COURT REPORTER

     I, Andrea M. Lynch, RPR, New Mexico CCR #127, Federal

Official Court Reporter, in and for the United States District

Court for the District of New Mexico, do hereby certify that

pursuant to Section 753, Title 28, United States Code, that the

foregoing is a true and correct transcript of the

stenographically reported proceedings held in the

above-entitled matter on March 26, 2024, and that the

transcript page format is in conformance with the regulations

of the Judicial Conference of the United States.

Dated this 29th day of April, 2024.


_____
ANDREA M. LYNCH, RPR, NM CCR #127
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard Northwest
Albuquerque, New Mexico  87102
Phone:  (505) 348-2093
Email:  Andrea_Lynch@nmd.uscourts.gov